UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON, KENTUCKY

UNITED STATES OF AMERICA,        ) Lexington Criminal
                                 ) Action No. 18-20
        Plaintiff,               )
                                 ) At Lexington, Kentucky
-vs-                             )
                                 )
SCOTT W. SULIK,                  ) January 25, 2019
                                 ) 10:15 a.m.
        Defendant.               )


TRANSCRIPT OF MOTION HEARING PROCEEDINGS
BEFORE THE HONORABLE DANNY C. REEVES
UNITED STATES DISTRICT JUDGE


Appearances of Counsel:

On behalf of Plaintiff:        ANDREW T. BOONE, ESQ.
                               Assistant U.S. Attorney
                               260 West Vine Street
                               Suite 300
                               Lexington, Kentucky  40507

On behalf of Defendant:        PAM LEDGEWOOD, ESQ.
                               271 West Short Street
                               Suite 403
                               Lexington, Kentucky  40507

Court Reporter:                PEGGY W. WEBER, RPR
                               Official Court Reporter
                               U.S. District Court
                               P.O. Box 362
                               Lexington, Kentucky  40588
                               (859) 421-0814


Proceedings recorded by mechanical stenography,
transcript produced by computer.

```
 1        (Whereupon, the Hearing proceedings commenced on
 2   Friday, January 25, 2019, at 10:15 a.m., on the record in
 3   open court, as follows.)
 4             THE COURT:  All right.  Thank you.
 5             Madam Clerk, if you would call the matter
 6   scheduled for 10:15, please.
 7             THE CLERK:  Yes, Your Honor.
 8             Lexington Criminal Action Number 18-20,
 9   United States of America versus Scott W. Sulik, called for
10   a motion hearing.
11             THE COURT:  All right.  Thank you.
12             If counsel would state their appearances,
13   please.
14             MR. BOONE:  Good morning, Your Honor.
15             Andy Boone for the United States.
16             THE COURT:  Thank you.  Good morning.
17             Ms. Ledgewood.
18             MS. LEDGEWOOD:  Good morning, Your Honor.
19             Pam Ledgewood, attorney for Scott W. Sulik, and
20   this is Mr. Sulik.
21             THE COURT:  All right.  Thank you.
22             This matter is scheduled for a hearing on
23   counsel's motion seeking to clarify two issues.
24             I wasn't clear from looking at the motion,
25   Ms. Ledgewood, whether you'd like to take some or all of
```

1   this up ex parte.

2          MS. LEDGEWOOD:  I feel comfortable however

3   Your Honor wants to proceed on that.  I mean, I have made

4   the United States aware of the difficulties I've been

5   having here.

6          THE COURT:  All right.

7          MS. LEDGEWOOD:  So I will defer to Your Honor's

8   judgment on that.

9          THE COURT:  Well, I'll just ask the parties not

10  to disclose any communications that would otherwise be

11  protected by the attorney-client privilege.

12          MS. LEDGEWOOD:  That's fine, sir.  Thank you.

13          THE COURT:  All right.  Ms. Ledgewood, I'll

14  begin with you.

15          MS. LEDGEWOOD:  Well, let me begin by

16  apologizing to the Court that I've had to bring this to

17  your attention.  I hope everybody here knows that when I

18  was privileged and honored enough to become -- to become a

19  member of the CJA panel, I knew that it was -- that it was

20  not going to be easy.

21          And I also believe very firmly that -- that if

22  you spend enough time with just about everyone, even if

23  there are difficulties and issues, that is the obligation

24  for defense counsel to do that.

25          And I'm aware of a couple of attorneys, who will

1   remain nameless, that are former members of our panel.

2   And although I don't know exactly why they were removed, I

3   suspect part of it was -- at least in one case, an

4   individual had a tendency to let's just say when the going

5   got tough, he tried to get going, and eventually he was

6   gone.  So I -- I'm not singling out any one person, but I

7   think --

8           THE COURT:  Yes, ma'am.  That's -- no, that's

9   fine.

10           MS. LEDGEWOOD:  -- that that has happened.  So I

11   take it very seriously.

12           And it is also not my business to be

13   inconveniencing the Court.  It's my job to try to work

14   these out, and I will assure you I tried very sincerely.

15           I'm just very concerned about Mr. Sulik and

16   about his open -- his open -- I -- his open criticism of

17   the structure of how we operate, the CJA system operates,

18   and the government in general.

19           Let me make clear he has said nothing

20   threatening to me about any of the participants.  He's

21   always, as I said it, he's always polite to me.  We've

22   never had an open disagreement.

23           But I simply can't go forward in this very

24   serious case where I'm being told repeatedly that there

25   are other individuals on the -- on the outside who are

1   working on his case, that some of them would -- he would

2   say are experts, and that they could be coming into this

3   case soon.  We are set currently for February the 12th,

4   and the last thing I want to be doing is coming in here

5   the morning of February the 12th and say, oh, by the way,

6   Judge, I have this expert who may not be an expert, and

7   I've not exchanged reciprocal discovery, but, gee, Judge,

8   let's -- can we just go forward with this.  I think I

9   would be putting myself at great risk to be joining my

10  people who were formally on the CJA panel.

11              THE COURT:  All right.

12              MS. LEDGEWOOD:  And so that's where I'm coming

13  from.

14              THE COURT:  If we can, maybe we can just take it

15  one step at a time.

16              MS. LEDGEWOOD:  Yes, sir.

17              THE COURT:  Because as you know, I generally

18  don't know about discovery issues until they come to a

19  head --

20              MS. LEDGEWOOD:  Correct, sir, yes.

21              THE COURT:  -- unless there's a problem.

22              MS. LEDGEWOOD:  Yes.

23              THE COURT:  And so, for example, in this case

24  and with the issue that you just raised, I assume the

25  government will be calling an expert witness and has

 1  disclosed the expert to defense counsel.  Is that correct?

 2           MR. BOONE:  That's correct, Your Honor.

 3           THE COURT:  And that would implicate the

 4  corresponding duty of the defendant, if you've asked for

 5  it, to identify any expert witness that the defendant may

 6  wish to call.  And failure to provide that information in

 7  a timely manner would prevent the defendant from then

 8  calling that person as a witness at trial.

 9           So I think that's maybe where we are, but let me

10  make sure that there's been that disclosure made by the

11  government under Rule 16.

12           MR. BOONE:  Yes, Your Honor.  We would -- at

13  trial we intend to call expert testimony from at least one

14  law enforcement agent who's authored a report.  We've

15  disclosed that report and made the restrictive version

16  available --

17           THE COURT:  All right.

18           MR. BOONE:  -- to Ms. Ledgewood.  So we've --

19  and in the government's view we've made sufficient

20  disclosures, and triggered that reciprocal discovery on

21  occasion.

22           THE COURT:  All right.  Now, in this particular

23  case this is a one-count indictment.  It does have a

24  forfeiture claim.  But as I understand the charge in the

25  matter, it involves the charge of possession, not receipt,

1   but possession of child pornography of a child under the

2   age of 12, or more than one perhaps, but at least images.

3            It's charged under 2252(a)(4), yes.  And so this

4   would appear to be a rather straightforward case when

5   you've got your expert that's been identified that will be

6   testifying to the issues in the case.

7            And then, Ms. Ledgewood, of course, if you're

8   not able to timely respond, if you -- if your client knows

9   of a person that he wishes to call and doesn't disclose

10   that to you, if you can't disclose it to the government,

11   you won't be able to call that person at the last minute.

12            MS. LEDGEWOOD:  Correct.

13            THE COURT:  And so it would not be any fault of

14   you or the government.  It would be by virtue of the rules

15   that do require reciprocal discovery with regard to expert

16   issues.

17            So I suppose that's one question that we have in

18   the case.  And you've explained that to Mr. Sulik?

19            MS. LEDGEWOOD:  I have attempted to, yes, sir.

20   Yes, sir, I have.

21            THE COURT:  All right.

22            DEFENDANT SULIK:  (Nods head)

23            THE COURT:  The rule itself doesn't set a

24   timeline, but this case has been continued -- or time

25   deadline for disclosure, but this case has been continued

1   on several occasions previously.  We do have a

2   February 12th trial date, and I will set a deadline for

3   the defendant to provide that reciprocal discovery.  That

4   would be two weeks prior to trial.  That would be this

5   coming Tuesday, I believe.

6           And so, Mr. Sulik, if you've got an expert you

7   think you want to use, you're going to have to provide

8   that name to counsel so she can talk to the person and

9   make a decision as to whether it would be expert testimony

10  that would be admissible in the trial.

11          And if you feel like you don't want to do it, or

12  if you just choose not to do it for whatever reason by the

13  deadline that I've set, you're not going to be able to

14  call an expert witness in the case.

15          DEFENDANT SULIK:  I understand.

16          THE COURT:  All right.  All right.  So that

17  takes care of the issue of the expert witness.

18          There was also an issue that was raised about

19  seeking to clarify the role of defense counsel, and

20  sometimes this will come up from time to time in cases

21  involving defendants or parties that want to be more

22  actively involved perhaps in a case.  It's sometimes the

23  phrase that's used is hybrid representation.

24          MS. LEDGEWOOD:  Yes, sir.

25          THE COURT:  Is that what we're discussing here?

1                MS. LEDGEWOOD:  Your Honor, I am -- I am not

2     sure about my -- I'm not being coy with the Court when I

3     say that.  The -- as I have put in the motion, discussed

4     with counsel, my -- the fundamental problem that I feel

5     like I'm running into with Mr. Sulik, the expert issue

6     aside --

7                THE COURT:  Yes, ma'am.

8                MS. LEDGEWOOD:  -- is that he genuinely believes

9     that this is a corrupt legal system, and that both

10    Your Honor, Mr. Boone, and myself, all Court personnel

11    that we're -- that we're part of this giant corruption.

12    And he's told me frankly he just -- he refuses to

13    cooperate in a corrupt system.

14               THE COURT:  All right.

15               MS. LEDGEWOOD:  So I -- what I have discussed

16    with him is that I -- that I believe that he needs to at

17    least consider self-representation and have that explained

18    to the Court.  Again, I don't want to do that.

19               THE COURT:  All right.

20               MS. LEDGEWOOD:  I did everything I could to

21    avoid filing this motion.

22               THE COURT:  All right.

23               DEFENDANT SULIK:  Your Honor, if I would have a

24    chance --

25               THE COURT:  Yes, sir.

```
 1            DEFENDANT SULIK:  -- to lay out the chain of
 2   events that has led not only to confirm what I've already
 3   known before I was ever interested in my life working with
 4   people in the military and contractors is --
 5            MS. LEDGEWOOD:  Excuse me, just ask a question.
 6            THE COURT:  All right.
 7            MS. LEDGEWOOD:  Your Honor, may I have
 8   permission to sit if --
 9            THE COURT:  Yes, certainly.
10            MS. LEDGEWOOD:  -- your Honor has no more
11   questions for me at this time.
12            THE COURT:  Yes, sir.  I just want to make sure,
13   Mr. Sulik, you can tell -- you can give me this
14   information, but I want to make sure that you do
15   understand with the government present, that you're not
16   protected by any type of attorney-client privilege if you
17   decide to disclose --
18            DEFENDANT SULIK:  It doesn't matter.
19            THE COURT:  All right.  That's fine.
20            DEFENDANT SULIK:  I've already had that, and it
21   was --
22            THE COURT:  All right.  I just want to make sure
23   that you understand that if you disclose information to
24   me, you're also disclosing it to the government.
25            All right.  Yes, sir.
```

```
 1              MS. LEDGEWOOD:  I think you need to stand up.

 2              THE COURT:  No, he can sit down.  That's fine.

 3   You can remain seated.  He's not counsel.  He can remain

 4   seated.

 5              MS. LEDGEWOOD:  All right.

 6              THE COURT:  Yes, sir.

 7              DEFENDANT SULIK:  Well, when I was charged

 8   with the Gutierrez's case when I was given the six-point

 9   enhancement for being political, when Congressman

10   Guiterrez used his political platform to disgrace a

11   four-star general in the Marine Corp who lost their son

12   serving our country, in all honesty, if General Kelly

13   hadn't lost his son, I would have never sent him an email

14   in regards to "Marines are loyal to their generals, not to

15   parasite politicians like you."

16              And the thing -- and which, by the way, I feel

17   bad about it, but any gold-star family should be afforded

18   respect, and no politician, especially Congress who's

19   involved with sending our men and women in harm's way to

20   defend the Constitution, which they fight and die for.

21              When I had Rachel Yavelak as my attorney, I

22   respectfully at the same tone of voice I'm talking to you

23   at countered -- wanted to counter Prosecutor Boone here

24   respectfully, and she said, oh, that's not going to

25   happen.  And I was taken, put in a hole for eight days
```

1   with no electronic communication, no nothing.  And Rachel

2   I received her -- she quit by the next morning, and there

3   were two agents there reading me my rights in an

4   intimidating fashion the next day, and asking me if I -- I

5   think they were insinuating that I threatened the Judge.

6   I only had seen you and spoke with you, and I certainly

7   had not.  In fact, if they go back on any of my messages,

8   one of the first things I wrote my wife, who was the only

9   person I correspond with in prison, in the messages I

10  thought you were very articulate and would have made a

11  good marine officer.  And they were insinuating, I don't

12  know -- I don't know any other Judges I would have

13  threatened, and I have been in jail for over a year.

14          I knew one of the people who died in Benghazi.

15  I know what Hillary was up to.  I know why she had her own

16  server.  People talk about it in the private security

17  business, and most of them are ex-vets.

18          The accountability that is held to politicians

19  versus the men and women who have served this country and

20  the thousands have died for the Constitution, you know,

21  just what it says on the back window of my truck.  It's

22  been on there since Benghazi, and I wrote it; "Corruption,

23  power, and greed equal a government out of control, a

24  regime of self-serving parasites hiding behind the law who

25  have abused the privilege of leadership to those they

1  serve.  We, the people, who pay their salary, medical,

2  dental," I put dental on their because vets don't get

3  dental, "paid vacations, full retirement."  And you have

4  full retirement even after four years in Congress with a

5  felony.  "Need to hold them accountable.  Inaction is a

6  disgrace for our children and vets who died for our

7  freedom."

8              That's about the only thing that's political

9  except for some bumper stickers on my -- or First and

10 Second Amendment right, or American infidel, or anything

11 political.  I've never been on the Internet.  I'm not on

12 the Internet.  I've never been on Facebook.  I'm a ghost

13 on the Internet, and I got a six-point enhancement, which

14 increased, you know, by charge, which I respected that

15 when you sentenced me.

16             But I just don't understand when a politician

17 makes it political on TV and insults a general.  I served

18 with him when he was a major colonel.  He's a guy of full

19 integrity.

20             And I'm from Chicago.  In the discovery it says,

21 oh, I don't -- I hadn't lived there.  I grew up there

22 right near O'Hare airport.  I moved my mom out of there

23 three years ago because I was worried about the random

24 crime going to the suburbs.  It's the most corrupt city in

25 the country now that Louisiana has been flooded out from

1  Katrina.

2          And -- and I know what goes on there with the

3  drugs.  I have friends in the DEA in San Diego that I used

4  to know.

5          And now it seems that -- my phone, I had one

6  image.  I told Rachel when my wife --

7          MS. LEDGEWOOD:  Please don't talk about that.

8          I'm sorry, Your Honor, but I don't want him to

9  go there.

10          THE COURT:  All right.

11          DEFENDANT SULIK:  Well, the thing is -- these

12  things that -- the -- when the IRS and Lois Lerner and

13  John Constante were -- the IRS was targeting Christian

14  conservative groups.  Lois Lerner pleaded the Fifth.

15  Nobody was held accountable.

16          I had friends that are vets were getting 10,

17  $20,000 moneys to buy guns in the Phoenix area that were

18  given into the fast and furious program that Eric Holder

19  was held in contempt in front of Congress over when

20  Agent Terry was killed with one of those weapons.  Now, he

21  was held in contempt.

22          Okay.  Then we have Benghazi, the gentleman,

23  which they had timed it on 9/11, which it had nothing to

24  do with 9/11.  It was a way to cover up Hillary's weapons

25  in Syria, Libya, and illicit dealings.  There was over 600

1   requests for more beefed up security.  They never got it.

2   They didn't want more people to know what was going on

3   over there.

4           All the -- America needs to know what goes on

5   behind the scenes.  I'm not saying everyone is corrupt in

6   the government.  I have two friends that are FBI agents

7   out in California.  And six years ago or seven years ago

8   they were like, dude, if you knew what they were doing to

9   the FBI, says, if I didn't need my retirement, I'd be the

10  F out of here.

11          And when they came to my house, Homeland

12  Security, FBI, and ATF and came in, storming into my

13  house, and they came in.  They had to come in on my

14  six-year-old felony warrant, Class D, when we took horses

15  back.  They were getting starved on, and then we donated

16  too, and I took our horses back.  They were still in our

17  name on the Saddlebred registry.  I told the Versailles

18  cops right in my kitchen, I said, you see these guys here,

19  if they had warrants for you, they'd be pounding down your

20  door this morning.  I said, they should be at Hillary's in

21  Chappaqua getting the facts right and holding people

22  accountable equal justice under the law, which men and

23  women died for.

24          And then when they took me to the car, one of

25  the FBI guys right on there took me aside, and he said,

1  sir, if I didn't have this on, we could have a good talk.

2  I agree with you.

3          And so it's not -- I'm not painting a broad

4  picture across the integrity of all men and women in the

5  judicial system, sir, or the FBI or the CIA.  My

6  father-in-law was a marine and in the CIA.  My

7  brother-in-law is in.  My dad was a marine.

8          And I -- my -- whatever tactic is being used in

9  this -- when I refer to the Eastern District, I wondered

10 why I wasn't taken in out in Arizona.  I've got other

11 things that I had no idea until recently on video because

12 I was living in an RV park that I have a friend working

13 on.  But because I'm in jail and they record everything, I

14 have to be very careful about how I communicate.

15         Rachel told me on two different accounts when I

16 was -- when they were trying to get me on the gun charges

17 for the guns -- and every single gun I've ever bought or

18 sold I would go to a gun shop, have them sign the actual

19 form.  I never did a handwritten bill of sale on anything.

20 I was flawless.  I knew they couldn't get me on anything,

21 but because no guns are manufactured here they're trying

22 to use that as a tactic to put 10 more years on my case

23 and dangle it to take the plea deal.

24         And I asked her two different times, I said,

25 well, what about Rand Paul's case and Dr. Renee Boucher, I

1    said -- she goes, no, it's state.  And I asked her two
2    different occasions, I said -- and I was -- because I was
3    making my decision on -- I told her I want to go to trial
4    on the charge with Gutierrez.  And I admitted the email
5    and the gun charges, and I've never -- my PSI should --
6    barely should have been -- it shouldn't even have been a
7    one.  I haven't had a DUI in my life.  I had that fugitive
8    felony warrant for six-and-a-half years.  I never even got
9    pulled over, and we were all over the country showing
10   horses.

11           But what happened is I told her I want to wear
12   my dress blues at trial, and I have a right to face my
13   accusers.  And she goes, well, you can't wear your -- I
14   don't think you can wear your dress blues, and I don't
15   think he's going to come down to trial.

16           And then she called my -- at a future date,
17   which I don't know off the top of my head, she had tried
18   to get in touch with me at the jail.  They were having
19   problems with the phones.  And so my wife was given the
20   information that they were going to drop the gun charge if
21   I took the plea deal on the Gutierrez thing.  I would have
22   much rather had my chance to explain to a box of 12 people
23   that I had the security clearances in the Marine Corp, and
24   that being a patriot is not a mental illness.  Wanting
25   equal justice under the Constitution, which thousands of

1   men and women died for, and real men, men out -- like when
2   you see Normandy in the beginning of Saving Private Ryan.
3   I know that's a fictional re-enactment of non-fiction.
4           But my dad is in a book called Highpocket's War
5   Stories where he's a fire team leader, and they're being
6   overrun at night.  And the lieutenant at the time, he's a
7   colonel, retired now, wrote, Corporal Sulik, although, he
8   was shot several times in the legs, crawled over on his
9   belly and said to me, sir, if I die out here tonight, will
10  you make sure my dad gets my check for my car payment?
11  That's how I was raised.  That's what I believe in.  I
12  don't believe in the FBI being weaponized like the IRS has
13  been to come after Americans with not proper FISA warrants
14  where they're spying on thousands of Americans.  And if I
15  weren't in here, I could be out -- I could have -- if I
16  were fighting my case from the outside, I'd have all of
17  this on paper and all documented.
18          And I'm quite -- and John, the marine that I got
19  in a fight with, he's a good guy.  He's under a lot of
20  pressure.  I know this prosecutor is here.  Him and I made
21  amends, and I have no intention of pressing charges
22  against him.  I know it's out of my hands.  I know he's
23  dealing with a lot of pressure, as everybody is in the
24  system, but I don't want to press charges against him.
25          And I just want to know what -- if there is a

1   Constitution and I'm afforded my freedom of speech under

2   the First Amendment, why was I put in the hole for eight

3   days with no communication, then left there another

4   22 days?

5            And I have nothing against the facility.  I have

6   nothing but good things to say about the way I've been

7   taken care of there.  I know they're under orders from

8   somebody higher.  And given a TV after that on a cart for

9   22 days, to be in there, I don't understand if -- if I'm

10  not allowed to speak to my lawyer and counter the

11  prosecutor in a respect way, then where -- what rights do

12  I have?

13           THE COURT:  Okay.  Let me --

14           MS. LEDGEWOOD:  Let me stop you.  Let me

15  interrupt to put something on.

16           THE COURT:  Yes, ma'am.

17           MS. LEDGEWOOD:  May I just interrupt him for a

18  moment --

19           THE COURT:  Yes, ma'am, certainly.

20           MS. LEDGEWOOD:  -- by way of explanation to the

21  Court.  Your Honor will recall, because you were the Court

22  for the charge, that he's alluding to.

23           THE COURT:  Yes, sir -- yes, ma'am.

24           MS. LEDGEWOOD:  Ms. Yavelak represented him on

25  that, and she also represented him on this charge, which

 1   as Your Honor knows, was charged in a separate

 2   independent indictment.  That case was in front of

 3   His Honor Judge Hood who for scheduling purposes, I don't

 4   know why, but he moved the case to His Honor Judge Bunning

 5   who was coming down here dealing -- dealing with that.

 6          The reason I was contacted by the clerk's office

 7   back at the end of October and asked if I would be willing

 8   to accept appointment here, and all I can tell Your Honor

 9   is I don't know what happened.  I don't think Mr. Boone

10   does either, but something occurred that led Ms. Yavelak

11   to seek the advice of the ethics hot line.  This is the

12   only thing that she's told me, the only thing she should

13   tell me, and that because of that she then felt that she

14   had to file a motion to withdraw from his case.

15          And so that's why I was asked to come down to

16   stand by, and then appointed by Judge Bunning.

17          Apparently, during that few days right after

18   Ms. Yavelak announced, filed a motion to withdraw,

19   agents -- I'm not sure if they were FBI, I'm not sure who

20   they were, came to the Woodford County Detention Center

21   and questioned him.  And as a result he was placed in the

22   hole, as they call it.

23          THE COURT:  Is that segregation?

24          MS. LEDGEWOOD:  Yes, sir.

25          THE COURT:  Okay.

```
 1                    MS. LEDGEWOOD:  So that's the -- that is what he
 2   is alluding to, Your Honor.
 3                    THE COURT:  Okay.
 4                    MS. LEDGEWOOD:  So I just want to clarify that
 5   for the Court, because I know it --
 6                    THE COURT:  All right.
 7                    MS. LEDGEWOOD:  -- maybe -- maybe you didn't
 8   understand what he was referring to.
 9                    THE COURT:  No.
10                    MS. LEDGEWOOD:  It was that brief period then
11   before I was appointed or -- and right after I was
12   appointed.
13                    THE COURT:  Okay.
14                    DEFENDANT SULIK:  And, sir, if I may, during
15   that time when I was brought in front of -- Judge Bunning,
16   is it?
17                    THE COURT:  Yes, sir.
18                    DEFENDANT SULIK:  In the discussion, a brief
19   discussion we had before I was brought to the front, his
20   bench, I picked up on -- I was in -- from what I heard,
21   she had already divulged some of our privileged
22   information between her and I to him.  And when I brought
23   that up, and not in an accusatorial fashion, but I said, I
24   thought I had confidentiality between me and my lawyer.
25   And I was thinking how would he know this?  And the time
```

1   that this happened, all happened within a 24-hour period.

2   The -- the request for a counter-offer to Prosecutor

3   Boone.  And Prosecutor Boone is just doing his job.  He's

4   getting information from a corrupt agency.  The FBI is

5   corrupt, Your Honor.  And I don't mean everybody in it.

6   The head of it is corrupt.  They tried to circumvent the

7   American voter.  I didn't vote for Trump.  But whoever our

8   president is, he was voted in by the laws that made this

9   country great.

10          Now -- now, whether or not you like him does

11  that mean Peter Strzok and Lisa Page can have thousands of

12  messages that go back and forth, which only a handful have

13  been divulged to Congress?  There's millions of documents

14  Congress has been trying to get from the FBI and -- or the

15  Department -- DOJ, and they've only gotten about 3,500 of

16  them.  There's a -- there's a bias going on here that you

17  can hide behind the law like the Clintons and the

18  foundation and think you can -- whatever is going on with

19  the Russian thing and all that with Trump, you know, it is

20  what it is.

21          But what I'm -- what I want to know is when --

22  when does accountability happen for the American people,

23  but it's not happening for the people in Washington?  It's

24  not fair, and it's certainly not fair when -- I love my

25  country, and I love everything about it except for what's

1    happening to it.  And my life is going to be ruined now
2    for standing up or to what I thought was a right thing to
3    do.  I didn't do it in a right way, and I agree I was
4    wrong in doing it.  But Congressman Gutierrez had no right
5    to use his political platform to disgrace an honorable
6    general who spent decades as an honorable marine and paid
7    the ultimate price by losing their son.
8              And I never even got the chance to have my day
9    in court because I was mis-informed on two different
10   occasions.  And I'm not saying Rachel intentionally did
11   it.  I had -- I know she's a very intelligent woman and
12   handling other cases, and maybe she mistakenly said it
13   twice.  But I'll take a polygraph.  I'm not lying.  She
14   told me that.  Because I'm -- when I'm -- I'm not -- when
15   I say I'm a fighter, I'm not a fighter in the way like
16   with what happened with John and I, because I have been in
17   there over a year and haven't had a fight.  But it was a
18   principle thing.  He said I was a snitch because they
19   worked out with these water bottles.  They save them, they
20   fill them up, and they work out with them.  I said, I'm
21   not a snitch.  Don't tell everybody I'm a snitch.  I never
22   snitch on anybody in there.  I've never snitched.  Because
23   everybody in the cell was giving me the cold shoulder.
24   I'm like, you know, you're in a cell that's overcrowded,
25   you know, it's not a fun environment.

1          And I said, well, you know, I don't need to be
2   in here with all these guys I've done nothing to, and I'm
3   not a snitch.
4          And so he got up out of the bed, and things
5   escalated.  And so I told him I fell out of the shower.  I
6   lied.
7          And the next morning I woke up, and I had --
8   because probably a previous injury I had, a head injury,
9   where I was in a coma.  I wasn't -- I was dead to the next
10  day, Your Honor, and I was throwing up.  And so they took
11  me to the hospital.  And I've got a lot of metal in my
12  body so I get a bunch of x-rays done.
13         And I know the pressure he's under.  He was
14  waiting to get sentenced a month or so ago, maybe a little
15  longer, and he's -- I don't think his lawyer even showed
16  up.  He didn't know until the day he came to court.  And
17  he's under a lot of pressure too, and it's a different
18  type of case than the thing I'm fighting.  And I really
19  don't want to press charges against him, because things
20  happen in there.  It's a whole different world in there.
21  And I -- he's a marine, and he's --
22              THE COURT:  All right.
23              DEFENDANT SULIK:  He's served our country, so I
24  don't want his circumstances any worse.
25              THE COURT:  Okay.

1        DEFENDANT SULIK:  I admitted to it because I

2   want to go to the hospital only because my -- I know I

3   have issues in my right leg.

4        THE COURT:  Okay.

5        DEFENDANT SULIK:  But I don't -- I honestly

6   don't mean to just paint the whole government that way.  I

7   have a -- my mom went to high school with Hillary Clinton

8   at Maine East.  My grandmother's brother and my uncle was

9   a Supreme Court Judge in Minnesota.  My mom used to get

10  asked to baby-sit JFK, Jr.  We've got a lot of old-school

11  democrats in my family, and republicans.

12       What's happening to our country is turning into

13  a socialist.  It's a move toward socialism.  And this

14  country isn't about socialism.  Socialism has killed more

15  people in the world than anything else, communism.

16       And in the Marine Corp when you're at boot camp

17  at Parris Island they teach you about the fifth-year

18  takeover, and that's what this is.

19       It's -- and if I'm going to be thought of as

20  mentally incapable because of these statements, then it's

21  only because of the way I was raised under the guidelines

22  of religion, Judeous Christian religion that made the

23  Constitution, made this country what it is.

24       If people are going to be able to doctor up

25  whatever charges or protect people from charges that

1    they're covering up because of whatever deals and weapons
2    or things that went wrong in a delivery of weapons and
3    Hillary didn't want to expose.  Over 600 requests for more
4    security in Benghazi.  You don't just not send anybody,
5    sir; you send somebody.  There's a cover-up.
6              America -- you tell the families in Benghazi
7    that it was the guy with the video.  The first -- one of
8    the first guys that got killed I knew was from a direct
9    mortar hit.  They're not that good with giving mortar.
10   The people they said that did the charge against the
11   Embassy.  This was a carefully planned thing to cover up
12   and conceal her connection with these things.
13             And there's other things too.  I'm not going to
14   sit here and go into a long list of things because some of
15   it I know only from hearsay, but of people who have
16   clearances who worked in that industry, sir.
17             THE COURT:  Okay.  Let me stop you, if I could,
18   for just a second.
19             DEFENDANT SULIK:  Yes, sir.
20             THE COURT:  Because what I'd like to do is I
21   want to go back, and I want to kind of separate out the
22   two cases, and I want to make sure you understand what
23   relates to one and what relates to the other.
24             I've looked at your file, this particular file,
25   the chronology of the file.  And the first case, just so

1  we're in some type of a general agreement, I think was

2  18-19.  Then this case is 18-20.  So they were indicted at

3  the same time, but indicted separately.

4          And the first case related to -- let me just

5  characterize it as Internet threats or threats against

6  Gutierrez, I believe, is the congressman from Chicago,

7  separate from the indictment in this case, which is

8  possession of child pornography.

9          In the first case there was a guilty plea that

10  was entered.  The presentence report was prepared.  And I

11  think the guideline range in the case - I'm going by

12  memory - but I think the guideline range was 46 to

13  57 months.  That was because of that enhancement that you

14  talked about earlier.

15          DEFENDANT SULIK:  Yes, sir.

16          THE COURT:  And I think your sentence was toward

17  the low end of the guideline range.  I think it was

18  48 months --

19          DEFENDANT SULIK:  Correct.

20          THE COURT:  -- if I'm not mistaken.  And that's

21  on appeal now.  And, of course, you can raise those -- a

22  lot of the issues that you've talked about here, you can

23  certainly raise in that proceeding on appeal.  And then if

24  you're correct -- now, the case may be remanded, it may be

25  reversed.  But the reason I say that is a lot of that

28

1    information that you talk about is not relevant to this

2    case.

3            And I know you're frustrated.  I can hear the

4    frustration in your voice in a -- not only in what you

5    say, but the way that you say it, and I know you feel very

6    strongly about it.

7            And, of course, sometimes it's hard for a

8    layperson to understand the concepts of malice that's

9    required when certain statements are made about public

10   officials and what has to be shown in terms of slander and

11   liable laws and the issues with General Kelly and some of

12   the other issues that I know that concerned you in that

13   earlier case.  And you were speaking out about it, but you

14   entered a guilty plea in the case, and I accepted your

15   guilty plea, and then we had the sentencing proceeding.

16   So that's let's say chapter one.

17           DEFENDANT SULIK:  Yes, sir, in all due respect.

18           THE COURT:  I'll give you time, but I do want to

19   go through both of these matters so we're -- so we're

20   hopefully in some agreement.

21           So we have the second case that was originally

22   filed, and Judge Hood, I believe, drew the case and

23   because of some medical issues he had to -- he had to

24   transfer the case to Judge Bunning.  And now Judge Bunning

25   has some scheduling issues.  He has a number of cases that

1  are set for trial, and transferred the case to me for

2  trial, and it's set for trial on the 12th.  And it's a

3  fairly straightforward case.  I guess no case is really

4  straightforward.  But in terms of it being one count, the

5  elements are fairly straightforward, but they don't

6  involve any of the things that you really talked about

7  here this morning.

8         And when the case goes to trial, you're not

9  going to be able to raise those issues.  You can't raise

10  those with the jury because of relevancy.  Rules of

11  evidence would prevent you from raising those issues, the

12  political issues that you've talked about.  So it's going

13  to be straightforward, and that may be frustrating to you

14  as well.

15         But you do have competent counsel, and you have

16  had an attorney that's handled many, many cases and is

17  familiar with the rules of evidence, the rules of criminal

18  procedure, the orders that I enter in cases.  She's

19  familiar with sentencing guidelines, case law that relates

20  to sentencing issues.  She really is -- has covered the

21  waterfront on many occasions in a lot of cases.  And so

22  you do have very competent counsel in the matter.

23         But a person has a right to make a decision as

24  to whether they want to be represented by counsel or

25  whether they want to represent themselves because you can

1   certainly make that decision.  But in making that decision

2   it doesn't untether you from all of the rules that have to

3   be followed in court.  In other words, the evidence that

4   you present still has to be relevant to the charge in the

5   case.  Cross-examination has certain limitations in place.

6   In other words, you are limited in terms of the questions

7   that can be asked and the way that you can ask those

8   questions if the case does proceed to trial, and if for

9   some reason you decide to represent yourself.

10          And there's a reason that, you know, attorneys

11  have to go to school to learn the rules of evidence, the

12  rules of civil procedure and criminal procedure.  Because

13  while it looks like it's a straightforward case, sometimes

14  the evidence can be difficult to get through.  And

15  attorneys really have -- they have two duties.  They have,

16  of course, a duty of zealous advocacy to their clients.

17  They also have a duty of candor to the Court.  In other

18  words, they can't present witnesses that they know would

19  make a false statement to the Court.  They have a duty

20  of -- to be honest to the Court when they're asked a

21  direct question.

22          And there's -- and I don't know about some of

23  the things that you were mentioning earlier about

24  Ms. Yavelak, but attorneys, while they do have to withhold

25  confidences of their clients, under the rules of ethics

1    that are followed they have -- there is what's called a

2    crime fraud exception.  And any time an attorney believes

3    that there may be a crime that's about to happen, or a

4    fraud that's about to take place, then the attorney has an

5    obligation to make a report of that to prevent that type

6    of activity from taking place.

7              Now, many times attorneys will check with the

8    Bar Association to determine if, number one, that's

9    required; and, number two, if it is required, whether they

10   then would have to withdraw from the case.  And so that

11   may be where we are here.  But in terms of those issues

12   and terms of -- or with respect to Ms. Yavelak, none of

13   that's relevant to this particular proceeding.

14             Let me just cover one other thing.

15             DEFENDANT SULIK:  Yes, sir.

16             THE COURT:  And that is you mentioned John.  I

17   don't know who John is, number one, but I'm assuming it's

18   someone that you were incarcerated with.  Is it Woodford

19   County?

20             DEFENDANT SULIK:  Yes, sir.

21             THE COURT:  And I don't know about the dispute.

22   I don't know about the jail's rules or regulations or the

23   other regulations of -- that would have resulted in you

24   being placed in solitary for a while.  So I'm not

25   familiar with any of that, but I can tell you that none

1    of that would be admissible or related in this

2    proceeding.

3              Now, sometimes, parties that represent

4    themselves can make things relevant that otherwise would

5    be harmful by bringing those things out either during

6    their statements to the jury or in open court through

7    cross-examination or direct examination of witnesses,

8    things that would not necessarily be evidence per se.

9              For example, if you're asking a witness a

10   question -- if you decide to represent yourself, and

11   you're asking a witness a question, your statements to the

12   witness would not be evidence.  But if somehow there's

13   some representation that would have to be corrected, the

14   government may be required to put a witness on the stand

15   to counter the statement that you would have made.  And so

16   that's why it's important that you understand the rules of

17   evidence.  So you don't, in other words, open the door for

18   something coming in that might be -- might be harmful to

19   you.  And so that's another reason why it's sometimes very

20   helpful to have counsel as opposed to representing

21   yourself.

22             But ultimately there are three things that can

23   happen.  You can hire an attorney.  If you can't afford

24   one, of course, an attorney is provided to you.  And we

25   don't have a federal public defender in this district.  We

1  have what's called CJA attorneys.  They're appointed under

2  the statute, the Criminal Justice Act, similar to a public

3  defender system, either in the state level or the federal

4  level, but we have attorneys that practice privately but

5  also accept appointments from the Court for

6  representation.

7          So we have attorneys that can be -- that can

8  represent you in two ways, either by being hired or by

9  being appointed, or there's the opportunity for

10 self-representation, and I've gone through some of the

11 perils of self-representation in the case.

12          Again, Mr. Sulik, I know that you're frustrated

13 in this matter, and I know that you've got some questions

14 or concerns about the previous case.  But really what I

15 can tell you now is the previous case is just that.  That

16 case is not going to be held against you in this

17 proceeding.  I'm not going to allow that to be held

18 against you in this proceeding.  People aren't going to be

19 able to talk about it in this proceeding, but you can't

20 either.  That's the issue.  You know, the prior conviction

21 that you have is not something that would be relevant.

22          DEFENDANT SULIK:  Well, let me ask you this

23 then.

24          THE COURT:  Yes, sir.

25          DEFENDANT SULIK:  If Rachel told me on two

1  different occasions and the redacted discovery of what

2  I wrote to Gutierrez about, then maybe the FBI, the

3  Girl Scouts at the FBI will vindicate you for them, that's

4  a bias right there.  The whole country knows the whole

5  head of the FBI is corrupted.  It's not -- it's not a

6  secret.  So who's to say that everything beneath it have

7  pockets of corruption, and I've been caught in a bias of

8  the FBI.

9          The other thing is, and it took 10 months,

10  10 months, only through Pam that I was able to access a

11  file that's not in my discovery of a two-year track record

12  of intellectual property that wasn't in the computer of

13  technology for tracking future markets in oils, bonds,

14  currencies, equities, which I've worked on for 17 years.

15  And the two-year track record performed over 1,000 percent

16  a year, and it was all documented.  And I kept asking as

17  part of the forfeiture thing on the plea deal is, well,

18  wait a minute.  Why can't I have -- I needed that to

19  present when and if I ever get out of the prison system to

20  hedge funds, which I've worked for before, to use that

21  record to get access to funds to trade.

22          Now, the FBI has those.  It would be hundreds of

23  pages because I took screen shots at the end of every

24  trading day.  It was only the first hour-and-a-half that

25  that system produced those results, never trading anything

1  but the capital, never trading the profit throughout the

2  year to make those kinds of results.  And it totally shows

3  what Wall Street is, is a big Ponzi scheme.  And so --

4          THE COURT:  Right.  But, again, what you're

5  saying is something that would not be relevant to the

6  underlying charge in the case.

7          DEFENDANT SULIK:  But there's all kinds of

8  underlying things that show a bias because there's no

9  admittance from the FBI that those existed.  And thanks to

10  this woman here, she says there is a file on it.  She was

11  not able to see it.  So there obviously -- what I want to

12  know is if I made my decision to take that plea deal based

13  on Rachel telling me that Rand Paul's case was a state

14  case, I thought, well, there's no sense, I have to take a

15  deal, there's no comparison in what happened to the way he

16  was charged.  But that wasn't -- the facts are it was a

17  federal case, and it would have made a total difference.

18  I would have went to trial on those charges.  So it does

19  have an affect on --

20          THE COURT:  Well, see, here is what you're

21  attempting to do.  You're attempting now to argue what

22  would be called a 2255 issue, a habeas issue, in an

23  unrelated case.  Because the way the matter proceeds is

24  that earlier case, the one I referred to as 18-19, that's

25  on appeal now, and that's an issue that would be related

1    to that appeal in that case but not necessarily in this

2    case.

3           And so what will -- what's likely to happen in

4    this particular matter is the case will go to trial on the

5    12th, the date that we have it scheduled.  And the

6    government presents its case, and it has to show proof to

7    meet all of the elements in the case for possession of

8    child pornography.

9           DEFENDANT SULIK:  Yeah, there was one picture of

10   a breast enhancement.  My wife --

11          MS. LEDGEWOOD:  No, don't --

12          DEFENDANT SULIK:  I don't -- I don't care at

13   this point.  And so now I've been charged with child

14   pornography.  The women that was in the file was on my

15   computer.  I admit to anything on the phone, was a prepaid

16   phone, I had nothing to do with it.  But --

17          THE COURT:  Well, those are matters that you

18   might raise as defenses to the case.

19          DEFENDANT SULIK:  The law system has become so

20   abstract.  It's like a 72,000-page tax code that nobody

21   knows what it is.  If you don't have a Ph.D. in law, then

22   you're screwed as far as getting your Constitutional

23   rights.

24          You know -- you know, it was funny I was reading

25   my Daily Bread today, and it talked about the Pharisees

1   questioning Christ, why their disciples didn't wash their

2   hands before eating, breaking the tradition of the

3   Pharisees.  And he questioned them.  He said, well, why do

4   you write enhancements to break the commandments of God

5   where you don't have to take care of your parents when

6   they become elderly, breaking the Fifth Commandment.

7           The enhancement -- not all of them, but the

8   enhancements are a way to take away people's

9   Constitutional rights to a fair trial under the

10  Constitution.

11          I respect your -- like I said, we have lawyers

12  in my family, and my grandmother's brother is a Supreme

13  Court Judge in Minnesota, Lawrence Yetka.

14          I know what your job is, sir, and I know -- I

15  took an oath to the Constitution like you did, okay.

16  And how you see it and how I perceive it and how I told

17  those FBI agents who came in there in an intimidation --

18  in an intimidating fact way to sit right in front of me

19  this close, knee to knee, and basically try to intimidate

20  me.

21          And I said, well, you guys took an oath to the

22  Constitution too.  And the young guy goes, well, we're

23  down here, and they're up here, meaning this judicial

24  system to have America is a slave to it.  And I said, but

25  you're getting a paycheck; right?  So your paycheck

1  overrides your oath to God.  And what it says, "I do

2  solemnly swear to defend this country and the Constitution

3  against all enemies, foreign and domestic."

4          Domestic enemies are from within, sir.  That

5  isn't written in there anticipating that there isn't

6  corruption or corruption will come from our forefathers

7  that put that in there.

8          So I respectfully acknowledge everything you

9  told me today.  I'm going to proceed with Rachel.  And if

10 my people aren't ready, then they'll have a --

11          THE COURT:  Ms. Ledgewood.  I think you

12 misspoke.  Ms. Ledgewood.

13          DEFENDANT SULIK:  I meant Ms. Ledgewood.

14          THE COURT:  Yes, sir.

15          DEFENDANT SULIK:  Yes.  And I respectfully

16 acknowledge everything you're telling me.

17          THE COURT:  All right.

18          DEFENDANT SULIK:  And we come from different

19 walks of life, and I respect yours, and I hope you respect

20 mine as well.

21          THE COURT:  Yes, sir, I do.

22          DEFENDANT SULIK:  And I would think that

23 somebody would tell Gutierrez he owes General Kelly's

24 family an apology on TV.

25          THE COURT:  All right.  Ms. Ledgewood.

1          MS. LEDGEWOOD:  Would the Court indulge me

2  briefly, Your Honor?

3          THE COURT:  Yes, ma'am.

4          MS. LEDGEWOOD:  Thank you.

5          I think he alluded to this.  I have shared with

6  him privately, particularly in our last lengthy meeting a

7  couple of weeks ago, that I do have some significant

8  mental health concerns about Mr. Sulik.  And when I say

9  that to a client and when I say this in open court, and I

10 think we're all in agreement here.  We are -- throughout

11 history we have learned more and more about mental health

12 issues, and none of us --

13          DEFENDANT SULIK:  Families, Benghazi's families,

14 have health issues too, and Agent Terry's family.

15          This is my lawyer.  That's -- and so now you

16 wonder why I question being told that Rand Paul's case was

17 a state case twice when I was making my decision on

18 federal charges against myself --

19          THE COURT:  All right.

20          DEFENDANT SULIK:  -- in comparison.

21          THE COURT:  Well, let me let Ms. Ledgewood

22 finish up, and then if you -- if you need to -- Mr. Sulik,

23 if you need to add something, I'll give you the chance to

24 do that.

25          DEFENDANT SULIK:  Yes, sir, I'm fine.

1              MS. LEDGEWOOD:  And I have shared with him that
2    I do have some concerns because I'm sure that it comes as
3    no surprise to Your Honor, to the United States, that the
4    thoughts that he has offered here today he shared with me
5    privately.
6              I have considered -- I have been very -- I
7    looked sort of deep into my own soul and my own mind about
8    this.  I have considered do I believe that he has mental
9    health issues because his comments that he makes are so
10   different than what I'm used to experiencing in my both
11   personal and professional life when I have conversations
12   with other people.
13             So, in other words, bluntly put, am I letting
14   the fact that I may have a different view of the world
15   cause me to think, well, you just have mental health
16   issues?  And so I --
17             DEFENDANT SULIK:  You may have mental health
18   issues.  Have you ever thought of that?
19             MS. LEDGEWOOD:  I'm sharing with everybody
20   because I feel --
21             THE COURT:  I appreciate that.
22             MS. LEDGEWOOD:  -- the Court with a duty of
23   candor.
24             THE COURT:  Yes, ma'am.
25             MS. LEDGEWOOD:  So I'm having you try to

 1   understand my thought process, if I may, Your Honor.

 2              THE COURT:  Yes, ma'am.

 3              MS. LEDGEWOOD:  And have him to understand it

 4   too.  So I really -- the particular last month or so, I

 5   have asked myself privately repeatedly, number one, has

 6   he raised questions of his competency?  He clearly

 7   understands the nature of the charges, and I believe he

 8   is able -- this is how I've looked at it up until now.

 9   He is able, I believe, to assist me in preparing a

10   defense.

11              And I've also factored in the fact that I know

12   very well the professionalism of Mr. Boone, Ms. Yavelak,

13   and Your Honor, and I know, bluntly put, what thorough

14   guilty pleas that Your Honor takes.  I mean, it's by the

15   book, it's in depth, and defendants are repeatedly given

16   opportunities to stop the plea and proceed to trial, stop

17   the plea and confer with counsel, or at the conclusion of

18   the plea Your Honor makes it very clear any questions that

19   the defendant wants to ask Your Honor are there.

20              DEFENDANT SULIK:  My decisions were based on her

21   giving me wrong information though.

22              THE COURT:  Okay.  Let me, if I could, let me

23   just add a little bit of input here.

24              MS. LEDGEWOOD:  Yes, sir.

25              THE COURT:  And I appreciate your comments, and

1    I certainly do understand Mr. Sulik's frustration.  And

2    throughout the course of what is now two proceedings --

3            MS. LEDGEWOOD:  Yes.

4            THE COURT:  -- I've attempted to listen closely,

5    as I do in every case, because --

6            MS. LEDGEWOOD:  Yes.

7            THE COURT:  -- my obligation when a person

8    enters a guilty plea or proceeds to trial is to make sure

9    that they're competent and able to make those decisions

10   for themselves.

11           MS. LEDGEWOOD:  Yes, sir.

12           THE COURT:  Now, they may not like the outcome

13   of the proceeding at the end of it, but they need to

14   understand, and they need to make decisions knowingly and

15   intelligently, in other words, know what the consequences

16   are, not only know what they're doing but know what the

17   consequences may be.

18           And Mr. Sulik has expressed some concerns that a

19   lot of people have.

20           MS. LEDGEWOOD:  Yes.

21           THE COURT:  A lot of people in the country have

22   the same concerns that Mr. Sulik has.

23           MS. LEDGEWOOD:  Absolutely.

24           THE COURT:  And he's been frustrated for some

25   period of time, and that's understandable, his --

1               MS. LEDGEWOOD:  Yes, sir.

2               THE COURT:  -- frustration.  He's not an

3    attorney, and sometimes it is difficult for those that are

4    not trained in the law to really understand the

5    limitations that we all face.

6               MS. LEDGEWOOD:  Yes, sir.

7               THE COURT:  Because many times I may want to say

8    something to a jury, but I just can't do that because of

9    the limitations on me, and the same thing with the

10   attorneys that practice here.

11              And -- but I do understand the frustration.

12              MS. LEDGEWOOD:  Yes, sir.

13              THE COURT:  I certainly do understand the

14   government can be frustrated.  They can have witnesses

15   that are frustrated by my rulings, and certainly

16   defendants do as well, and attorneys do.

17              I don't get angry or upset with anybody with the

18   ruling that I make.  I just don't because it's just too

19   emotional to be in the courtroom and have your life, you

20   know, your liberties at stake.

21              MS. LEDGEWOOD:  Yes, sir.

22              THE COURT:  And so I certainly do understand and

23   appreciate that.

24              Now, I have to act sometimes differently based

25   upon the person and how they respond in order to maintain

 1   control in the courtroom.  But in every case I'm always

 2   thinking -- every case, not just Mr. Sulik, but in every

 3   single case, I'm always thinking of the statutory

 4   provisions, 3142.

 5            MS. LEDGEWOOD:  Yes, sir.

 6            THE COURT:  And I haven't heard anything that

 7   Mr. Sulik has said, either now or in the earlier

 8   proceeding that I had, case 18-19, that would cause me to

 9   send him for a competency evaluation to determine if he's

10   competent and if he's able to assist counsel.

11            That's a different question than whether he's

12   willing to assist counsel.  You can be able to assist

13   counsel and decide for yourself that you don't like the

14   system, you don't want to participate in it, and you

15   choose not to, and then there are consequences for that.

16   That doesn't mean that you're not competent.

17            MS. LEDGEWOOD:  Yes.

18            THE COURT:  That just means that you've made an

19   informed decision if you are aware of what may happen.

20            So with regards to competency issues, I wouldn't

21   consider at this point sending Mr. Sulik for an evaluation

22   because I think he would not meet the standard for

23   incompetency.  He's -- he understands the nature of the

24   charges against him.  He understands, I believe, the

25   elements as far as we've discussed it today.  And he's

1   able to assist in the representation if he chooses to do

2   that.

3              MS. LEDGEWOOD:  Yes, sir.  I'm so glad that you

4   did, because that is -- I'm not presuming to put my

5   analysis on the level of any Court's.

6              THE COURT:  Yes, ma'am.

7              MS. LEDGEWOOD:  But I will tell you that is

8   exactly how I have analyzed it myself, and that is why I

9   have not -- the Court will note, I have not filed a

10  motion --

11             THE COURT:  Yes, ma'am.

12             MS. LEDGEWOOD:  -- of that because I believe him

13  to be.  However, I am sharing with the Court that I have

14  told him privately that I do have some mental health

15  concerns.  That's different --

16             THE COURT:  Right.

17             MS. LEDGEWOOD:  -- than competency.

18             THE COURT:  And I understand.  Because sometimes

19  when we say to -- use the phrase "mental health concerns,"

20  I mean, that can be anxiety and depression.

21             MS. LEDGEWOOD:  Right.

22             THE COURT:  And I don't know what percentage of

23  the population suffers from anxiety or depression on a

24  particular day, but I imagine it's pretty high.

25             MS. LEDGEWOOD:  Well, I hope you wouldn't put me

 1  under oath and ask me, but I just wanted to make clear

 2  that is --

 3              THE COURT:  I understand.

 4              MS. LEDGEWOOD:  Okay.

 5              THE COURT:  And when we use those terms,

 6  sometimes a person that's not using those every day as we

 7  are, may get a different impression of what it means.

 8              MS. LEDGEWOOD:  Yes.  And that's why I wanted to

 9  put it on the record that I do believe him to be

10  competent, and part of my analysis was knowing that he had

11  so recently been held competent by the Court.

12              THE COURT:  All right.  All right.

13              Now, Mr. Sulik, I didn't want -- I didn't mean

14  to cut you off earlier, but if --

15              DEFENDANT SULIK:  And I apologize for

16  interrupting you, sir.

17              THE COURT:  No, that's fine.  That's fine.

18              DEFENDANT SULIK:  I just -- it would be the same

19  thing as if I said I have a brand new Tahoe.  It's never

20  been driven.  It's black, the color you wanted, and then

21  you go pick it up, and it's bright pink.

22              What Rachel told me totally affected everything

23  in my whole interpretation of getting a fair

24  representation from the government.

25              THE COURT:  Right.

```
 1          DEFENDANT SULIK:  You know, Vegas wasn't built
 2    on winners, sir.  It was built on losers.
 3          And the way that the -- the law is written so
 4    abstract that even top lawyers have to discern.  Discern
 5    is so needed because there are so many loopholes and
 6    enhancements written, it takes away.  We don't have prison
 7    reform because the system is working right.  And we don't
 8    have Meek Mill out there now with millions of dollars
 9    backing him to go further with the reforms.  These things
10    are happening because the system isn't fair, and it's
11    written -- you know, I had no idea how many young men are
12    in for drugs, but apparently a lot because everybody in
13    the jail I'm with is a drug case.
14          THE COURT:  Yes, sir.  It's an epidemic, yes,
15    sir.
16          DEFENDANT SULIK:  And when I see young guys that
17    go in there and the amount of years they're looking at for
18    the -- the biggest special interest groups in Washington
19    are insurance companies and drug companies.  The Senate
20    and Congress knew they were putting these millions and
21    millions of pills.  They knew it.  And now they're making
22    money on the misery of convicting these men off the prison
23    system.
24          And, you know, there's a thing called humanity
25    in the world, and we're the last deacon of it here in the
```

1  United States.  And once our freedom is gone from this

2  country -- and I have no -- this is the appearance of me

3  getting justice.  I get a lawyer, I come here, it's the

4  master of appearances.

5        And no disrespect to you and your degree and all

6  you've done.  But look what happened to Judge Kavanaugh,

7  what they tried to do to him and each time he had been

8  promoted.  He had been, you know, under scrutiny by the

9  FBI multiple times in the past, but it just takes one

10 thing to try to ruin somebody's life, and he's got a much

11 more profound legacy to protect than I do.  I'm just a

12 peon who served my country and wants equal justice under

13 the law for everybody and not a weaponized FBI or IRS

14 that picks and chooses what they hide information on

15 while people get away with murder and letting a, you

16 know, Chris Stevens get drug through the street while

17 he's alive, getting sodomized with a broomstick and

18 tortured.

19        These things maybe talking about it sounds like

20 I'm mentally deranged, but those are facts.  And there's

21 more facts that go on over there that are much more cruel.

22 All the things when Erik Prince had Blackwater, all the

23 cases against Blackwater for the types of things that went

24 on over there.

25        So, I mean, you don't see it over here when --

1   when this last time when the -- you don't see anything

2   what happened to ISIS, how they got rid of ISIS.  They

3   just know that ISIS isn't around anymore.  But the media

4   wasn't allowed to show what they were doing to get rid of

5   ISIS.  But they are cold dark realities that our freedoms

6   as Christians, as a Christian nation, are under attack,

7   and once it's gone that's it.

8            And I'm seeing here -- these are just -- this is

9   just the appearance of me having my Constitutional rights,

10   and it's pretty saddening to feel this way that we can put

11   a number on it, and case this and case that, and I don't

12   get emotional about this, that, or the other.

13            You know, I had an agent ask me one time, he

14   goes, why are you so angry, and I'm like because you're

15   not.  How can you not -- how can you not want justice for

16   those families in Benghazi?

17            You know, Dinesh D'Souza went to prison for

18   nothing, for exercising his Constitutional right.  The

19   guy -- the video that had nothing to do with Benghazi,

20   that guy went to prison.  He didn't do anything but

21   exercise his Constitutional right.

22            So as far as the abstract 72,000 pages of IRS or

23   what they write to protect themselves in D.C., the laws

24   they're hiding behind, there is -- there is truth.  It's

25   God's truth.  And everybody is going to be held to it one

1  day when we all pass away.

2          And, you know, it's a shame because this is a

3  great country, you know.  And people say to me, oh, it's a

4  great country.  It's a great country but not compared to

5  what it used to be.

6          THE COURT:  Mr. Sulik, I'm sorry, but I'm going

7  to have to cut you off because I'm about 15 minutes late

8  for my 11 o'clock hearing.

9          DEFENDANT SULIK:  And I'd really like my files

10 with the two years of tradings that I busted 10 years of

11 my life to get 1,000 percent profit on those markets.

12         THE COURT:  Well, what I'm going to ask the

13 attorneys to do.  If you feel like it would be beneficial

14 to have a pretrial conference --

15         DEFENDANT SULIK:  I asked Rachel multiple times,

16 and she never brought it up.

17         THE COURT:  All right.  If you feel like it

18 would be beneficial to have a pretrial conference to

19 address any issues, we can do that.  You let me know, and

20 I'll schedule it.  I believe that Mr. Sulik is still in

21 Woodford County so we don't have the transportation

22 problem with Grayson County.

23         The trial will remain on the docket for the

24 12th of February.

25         And if there are any other motions that the

1  parties believe would be appropriate, if you could try to

2  get those filed as quickly as possible.

3          I have set the deadline for the defendant to

4  disclose any experts, and so, please, Mr. Sulik, if you'll

5  talk to Ms. Ledgewood about that.

6          DEFENDANT SULIK:  Yes, sir.

7          THE COURT:  Because there is the -- the clock

8  would be ticking on that -- on that particular issue.

9          DEFENDANT SULIK:  Yes, sir.

10          THE COURT:  I've attempted to address all the

11  matters that were covered in the motion.

12          Ms. Ledgewood, are there any other issues

13  that --

14          MS. LEDGEWOOD:  No, sir.  Thank you for hearing

15  us out.

16          THE COURT:  No, that's fine.

17          MS. LEDGEWOOD:  Again, I apologize, but I felt

18  it was necessary to have this hearing.

19          THE COURT:  That's not a problem at all.  And if

20  we do need to have further conference, we can certainly do

21  that.

22          Mr. Boone, are you aware of anything else?

23          MR. BOONE:  I have nothing further, Your Honor.

24          THE COURT:  All right.  The 11 o'clock matter,

25  let me take about a five-minute recess.  I need to pick up

1    my other file, and we'll call that up in just a moment.

2          We will be in recess.

3        (Whereupon, the Motions Hearing proceedings

4    concluded at 11:15 a.m.)

5                      C E R T I F I C A T E

6        I, Peggy W. Weber, certify that the foregoing is a

7    correct transcript from the record of proceedings in the

8    above-entitled matter.

9
     February 5, 2019                    s/Peggy W. Weber
10       DATE                            PEGGY W. WEBER, RPR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25