UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON, KENTUCKY

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Lexington Criminal |
| | ) Action No. 18-20 |
| Plaintiff, | ) |
| | ) At Lexington, Kentucky |
| -vs- | ) |
| | ) February 12, 2019 |
| SCOTT W. SULIK, | ) 8:35 a.m. |
| | ) |
| Defendant. | ) **DAY 1 OF 2** |


TRANSCRIPT OF JURY TRIAL PROCEEDINGS
(TESTIMONY OF WITNESSES)
BEFORE THE HONORABLE DANNY C. REEVES
UNITED STATES DISTRICT JUDGE


Appearances of Counsel:

On behalf of Plaintiff:          ANDREW T. BOONE, ESQ.
                                 Assistant U.S. Attorney
                                 260 West Vine Street
                                 Suite 300
                                 Lexington, Kentucky  40507

On behalf of Defendant:          PAM LEDGEWOOD, ESQ.
                                 271 West Short Street
                                 Suite 403
                                 Lexington, Kentucky  40507

Court Reporter:                  PEGGY W. WEBER, RPR
                                 Official Court Reporter
                                 U.S. District Court
                                 P.O. Box 362
                                 Lexington, Kentucky  40588
                                 (859) 421-0814


Proceedings recorded by mechanical stenography,
transcript produced by computer.

1          (Whereupon, Day 1 of the Jury Trial proceedings

2     commenced on February 12, 2019, at 8:35 a.m., on the

3     record in open court, during which the testimony of

4     witnesses began at 11:20 a.m., on the record in open

5     court, with the juror members present, as follows.)

6               THE COURT:  We will then proceed with

7     presentation of proof.

8               Mr. Boone, if you're ready, you may call your

9     first witness at this time.

10              MR. BOONE:  Yes, Your Honor.  The United States

11    calls Special Agent Hugh Thatcher.

12              THE COURT:  Thank you.

13              THE CLERK:  Please raise your right hand.

14              Do you swear, or affirm, that the testimony

15    you are about to give in this matter shall be the truth,

16    the whole truth, and nothing but the truth, as you shall

17    swear unto God, or affirm, subject to the penalty of

18    perjury?

19              THE WITNESS:  I do.

20              THE COURT:  All right.  Thank you.

21              Mr. Boone, you may proceed when you are

22    ready.

23              MR. BOONE:  Thank you, Your Honor.

24

25

1                          HUGH THATCHER,

2    having been first duly placed under oath, was examined

3    and testified as follows:

4                       DIRECT EXAMINATION

5    BY MR. BOONE:

6    Q.   Good morning.

7    A.   Good morning.

8    Q.   Could you please state and spell your name for the

9    record?

10   A.   Hugh Thatcher; H-U-G-H T-H-A-T-C-H-E-R.

11   Q.   What do you do for a living?

12   A.   I'm a special agent with the United States Capitol

13   Police.

14   Q.   Where is the Capitol Police based?

15   A.   Based out of Washington, D.C.

16   Q.   And what are your responsibilities?

17   A.   I'm an investigator with the investigations division

18   focusing on electronic crimes.

19   Q.   What are electronic crimes, just a general overview?

20   A.   Anything dealing with computers, the Internet.  It

21   also includes forensics on computers, cell phones,

22   tablets.

23   Q.   And do your -- do your personal responsibilities

24   include forensics on computers and tablets and phones?

25   A.   They do.

HUGH THATCHER - DIRECT BY MR. BOONE                                4

1  Q.    Can you describe for the jury what you mean by

2  forensics?

3  A.    Doing an examination of a computer, cellphone,

4  tablet, pulling the information out, and then analyzing it

5  and looking for evidence of a crime, to include items that

6  were deleted, renamed, hidden files, anything like that.

7  Q.    And how do you typically conduct a forensic

8  examination?

9  A.    It would start by receiving the device at my lab

10  where I conduct the exam, photograph the device.  If it's

11  a computer, going to try and take the hard drive out, so

12  that I can connect that to my forensic tower that I use to

13  conduct the exam.  I'll make an exact duplicate image of

14  the hard drive from the suspect device using forensic

15  tools, to include write blocker that prevents any changes

16  being made from the subject hard drive.  And then once I

17  create that, I'll use other tools to examine the device.

18  Q.    And you mentioned a couple of terms in there that I'd

19  like to ask you to elaborate on for the benefit of

20  everyone here.

21  A.    Okay.

22  Q.    But before we do that, I just want to ask you are

23  these procedures that you received training to do?

24  A.    Yes, they are.

25  Q.    And could you elaborate on the training that you

1  received?

2  A.    Received training from several different venues.

3  I've gone through the Department of Defense, Cyber

4  Investigative Training Academy.  It was a six-week

5  program, broken up into three sections dealing with

6  computer hardware, basics, and the way computers operate,

7  acquiring evidence, the -- making the forensic images, and

8  then conducting the exams.

9      I've also been through six-week basic computer

10  evidence recovery training that was put on through the

11  Treasury Department for Secret Service, HSI, Homeland

12  Security Investigations, and the IRS.  It's very similar

13  to the DOD training.  It's a six-week training taking you

14  from how computers operate to how to conduct the exams.

15      Further, I have through that same program about every

16  three or four years received in-service training, advanced

17  computer evidence recovery that brings up new topics as

18  computers change, to include the vendor specific training

19  for the different programs that I use.

20  Q.    Do you receive certifications as a result of any of

21  these training programs?

22  A.    Yes, sir.

23  Q.    For example, are you a certified BlackLight examiner?

24  A.    I am.

25  Q.    What is BlackLight?

HUGH THATCHER - DIRECT BY MR. BOONE                               6

1   A.   BlackLight is a forensic tool created by BlackBag

2   Technologies.   It's a computer forensic company.   They

3   have a Black -- BlackLight is a program you can use for

4   computers, both Windows and Max, cell phones, tablets.

5   Q.   How long have you been doing this, Agent Thatcher?

6   A.   Been doing the computer forensics for 10 years.

7   Q.   Now, I want to get back to a couple of terms that you

8   used.   You referenced a couple of times an image.   When

9   you say image, is that essentially another word for copy?

10  A.   Yes, a copy of the hard drive.

11  Q.   Is there -- when you take in a hard drive and you

12  make a forensic image of it, is there a functional

13  difference between the content of the original hard drive

14  and the content of the forensic image?

15  A.   No.   They're exact duplicates of one another.

16  Q.   Okay.   And you mentioned a write blocker.   What is a

17  write blocker?

18  A.   Write blocker is a -- it's a piece of hardware that

19  sits between the hard drive and the computer that only

20  allows information to go from the hard drive to the

21  computer.   It blocks any information from going backwards

22  so that it doesn't make any changes to the hard drive.

23  Q.   Does it -- is it a way that you use to keep the

24  original hard drive intact and unchanged during your

25  forensic examinations?

1   A.   Yes, that is.

2   Q.   You mentioned a forensic tower.  What is a forensic

3   tower?

4   A.   It's the computer that I conduct my exams on.  It has

5   all the forensic tools on it.

6   Q.   Okay.  Agent Thatcher, were you called upon to assist

7   with the execution of a search warrant here in Kentucky?

8   A.   I was.

9   Q.   And when about was that?

10  A.   It was January 2018.

11  Q.   Where in Kentucky?

12  A.   Versailles.

13  Q.   Do you recall that the exact date was January 10th,

14  2018?

15  A.   Yes, sir.

16  Q.   Who -- was it at a residence?

17  A.   It was.

18  Q.   And did you determine who lived at that residence?

19  A.   Mr. Sulik and Ms. DeVries.

20  Q.   Do you see Mr. Sulik in the courtroom here today?

21  A.   I do.

22  Q.   Where is he seated?

23  A.   Seated right to my right.

24  Q.   And what is he wearing?

25  A.   Wearing a tan shirt and tie.

1           MR. BOONE:  Your Honor, may the record reflect

2    that Agent Thatcher has identified the defendant?

3           THE COURT:  The record will so reflect.

4    BY MR. BOONE:

5    Q.   And you mentioned a Ms. DeVries.  Who is that?

6    A.   Mr. Sulik's wife.

7    Q.   Is that something you learned during the

8    investigation?

9    A.   I did.

10   Q.   What were you looking for?

11   A.   I was specifically looking for electronics.

12   Q.   Did you find any?

13   A.   I did.

14   Q.   What did you find?

15   A.   Two laptops, three cell phones, and an external hard

16   drive.

17   Q.   Did you examine each of them?

18   A.   I did.

19   Q.   And after you examined them, did you prepare a report

20   summarizing your findings?

21   A.   I did.

22   Q.   Okay.  Do you recall -- what was the phone number of

23   the first cell phone that you examined?

24   A.   The -- I'm not aware of the cell number for the first

25   cell phone that I examined.

1  Q.    Would it refresh your recollection if you had an

2  opportunity to review the report that you prepared?

3  A.    It would, yes.

4          MR. BOONE:  Your Honor, with the assistance of

5  the court security officer, may I hand Agent Thatcher a

6  copy of his report?

7          THE COURT:  Yes, sir, you may.

8          THE WITNESS:  Thank you.

9  BY MR. BOONE:

10 Q.    Have you reviewed the document sufficiently?

11 A.    Yes.

12 Q.    Has it refreshed your memory?

13 A.    It has.

14 Q.    What was the phone number of the first phone that you

15 examined?

16 A.    The first phone that I examined, the phone number was

17 (480)267-8847.

18 Q.    And during your examination, did you give this

19 particular phone a moniker, a name?

20 A.    I labeled it device one.

21 Q.    Okay.  The second cell phone that you examined what

22 was the phone number of that phone?

23 A.    It was (480)468-6215.

24 Q.    And during your examination, did you give that device

25 a label?

HUGH THATCHER - DIRECT BY MR. BOONE                          10

1   A.   I did, device two.

2   Q.   Okay.  During the course of the search, were

3   photographs taken of the inside of the residence?

4   A.   They were.

5   Q.   Okay.  You have a binder in front of you of potential

6   trial exhibits.  I would like you to open that up and look

7   at Exhibits 9A through 9I, and then let me know if you've

8   had an opportunity to do that.

9   A.   Yes.

10  Q.   Do you recognize Exhibits 9A through 9I?

11  A.   I do.

12  Q.   What are they?

13  A.   These are photographs of the inside of Mr. Sulik's

14  residence.

15        MR. BOONE:  Your Honor, at this time I would

16  move for the introduction of Exhibits 9A through 9I.

17        THE COURT:  All right.  Any objection to their

18  admission?

19        MS. LEDGEWOOD:  No, Your Honor.

20        MR. BOONE:  May we publish them?

21        THE COURT:  Yes.  United States Exhibits 9A

22  through I will be admitted, and they may be shown to the

23  jury at this time.

24        MR. BOONE:  Thank you.

25      (Whereupon, Government's Exhibit Numbers 9A through

HUGH THATCHER - DIRECT BY MR. BOONE                    11

 1  9I were admitted into the record.)

 2         MR. BOONE:  Could we have Exhibit 9A, please?

 3  BY MR. BOONE:

 4  Q.   Agent Thatcher, what are we looking at with

 5  Exhibit 9A here?

 6  A.   When you -- looking at the -- I will call it a family

 7  room when you come into the front door of the residence,

 8  to the left, this room is off of the kitchen.  It's a TV

 9  area with a work station all the way in the back by the

10  back window that you see.

11  Q.   Okay.  We'll get back to that work station.  Right

12  now I'd like to look at Exhibit 9C, please.

13      Agent Thatcher, looking at Exhibit 9C what does this

14  photo reflect?

15  A.   This shows the master bedroom of the residence.

16  Q.   And did you find any of the devices that we've

17  discussed so far in this room?

18  A.   Yes.  The device one and two were found in the master

19  bedroom.

20  Q.   Okay.  Can you point to a specific spot on this

21  photograph and tell us where these two devices were found?

22  A.   Device number two, if you look at the wall between

23  the bathroom and the closet, you can see the electrical

24  outlet.  There's a plug plugged into the bottom outlet.

25  That is where device two was located.  And you can't

1    really see on this very well, but the bedside table had

2    device number one on it.

3               MR. BOONE:  Pull up Exhibit 9G, please.

4    BY MR. BOONE:

5    Q.    Special Agent Thatcher, which device does Exhibit 9G

6    reflect?

7    A.    Device number one.

8    Q.    And where was it found?

9    A.    On the bedside table.

10               MR. BOONE:  Okay.  And can we have 9I, please?

11    BY MR. BOONE:

12    Q.    Agent Thatcher, what are we looking at with

13    Exhibit 9I?

14    A.    Device two.

15    Q.    Okay.  So is this underneath where we saw the plug

16    coming out of the --

17    A.    Yes.

18    Q.    -- wall on Exhibit 9C?

19    A.    Yes, sir.

20    Q.    What is device two sitting on top of in this

21    photograph?

22    A.    It's sitting on top of a pair of what I'll call

23    sandals and slippers.

24    Q.    That's how you found it?

25    A.    Yes.

HUGH THATCHER - DIRECT BY MR. BOONE                          13

1   Q.    Are they men's shoes or women's shoes?

2   A.    They appear to be men's shoes.

3   Q.    Now at the site of the search, were you able to

4   attribute either of these devices to either Mr. Sulik or

5   Ms. DeVries?

6   A.    Yes, sir.

7   Q.    And how did you reach that determination?

8   A.    Ms. DeVries asked for a phone number that was stored

9   in her cell phone that she wanted to have, and we asked

10  her which phone was hers, and she directed us to the phone

11  that was on the bedside table, which was device number

12  one, and she was able to direct me to where the phone

13  number was that she was looking for.  And that's how we

14  attribute device one to her.

15  Q.    Did you conduct a forensic examination of device one?

16  A.    Not -- not on-site but eventually, yes.

17  Q.    Okay.  We'll get to all the forensic examinations

18  later, but right now I generally want to ask you, did your

19  forensic examination of device one reveal any information

20  that you found relevant to the identification of the

21  ownership and use of device two?

22  A.    Yes, it did.

23  Q.    Can you describe that for us, please?

24  A.    Device one had a contact card for Mr. Sulik's

25  telephone with the phone number for device two, and which

1  led me --

2  Q.   And, again, that phone number would be (480)468-6215?

3  A.   Yes.

4  Q.   What sort of area code is that?

5  A.   480 is area code for Arizona.

6  Q.   As you searched the residence, did you encounter any

7  other mobile telephones?

8  A.   Found one additional mobile phone.

9  Q.   Where did you find that?

10  A.   That was in the -- kind of in the garage off of the

11  family room in a box.

12  Q.   Did it appear to be in active use?

13  A.   It did not.

14  Q.   Was it charging?

15  A.   It was not.  It was just in a box with other items.

16  Q.   So did -- during your search did you only find two

17  mobile phones that appeared to be active use to you?

18  A.   Yes sir.

19         MR. BOONE:  Can we go to Exhibit 9B, please?

20  BY MR. BOONE:

21  Q.   What does Exhibit 9B reflect, Agent Thatcher?

22  A.   This is showing the family room and the computer work

23  station from the opposite view looking back towards the

24  kitchen.

25         MR. BOONE:  Could we have 9B, please?

 1  BY MR. BOONE:

 2  Q.    So this would be back to the room that we originally

 3  looked at with Exhibit 9A; correct?

 4  A.    Correct.

 5  Q.    Okay.  What does 9B show?

 6  A.    This is a close up of the computer work station.

 7          MR. BOONE:  Let's have 9E, please.

 8  BY MR. BOONE:

 9  Q.    What does Exhibit 9E reflect?

10  A.    This is a closer up photo of the Lenovo laptop.

11  Q.    From the photograph it appears that it's plugged into

12  something; is that right?

13  A.    Yes, sir, it's plugged into the -- two of the

14  monitors that you see on the desk.

15  Q.    Okay.  And was it in some type of a dock or a hub, or

16  how did you find it?

17  A.    It -- found it just like this.  It's sitting

18  connected to the Internet and the monitors.

19  Q.    Did it appear that it was being actively used?

20  A.    Yes.

21          MR. BOONE:  Could we have 9F, please?

22  BY MR. BOONE:

23  Q.    What does Exhibit 9F reflect?

24  A.    It shows the Lenovo laptop turned over, showing the

25  back side with the information and serial number.

1  Q.   What was the serial number?

2  A.   If I can refer to it.

3  Q.   Do you recall what the serial number was?

4  A.   I do not.

5  Q.   Would it refresh your recollection to review the

6  report?

7  A.   It would.

8  Q.   Please do so.

9  A.   The serial number for the Lenovo was R9-8GYCY 10/11.

10 Q.   Did you -- as you were examining this device, this

11 Lenovo laptop, did you give it a name for the purpose of

12 your examination?

13 A.   I titled it device three.

14 Q.   Okay.  Now, I kind of assume this, but did you seize

15 devices one, two, and three from the residence?

16 A.   I did.

17 Q.   And what did you do with them?

18 A.   After we took them, packaged them up, and shipped

19 them back to Washington, D.C.

20 Q.   Is that where your office is?

21 A.   It is.

22 Q.   Okay.  And once they arrived at your office, what did

23 you do next?

24 A.   After they arrived at our offices, they were checked

25 in to our crime scene unit, cataloged, and then they were

1  checked out to my lab, and I began my examination.

2  Q.   Okay.  How did you begin your examination?  I'll take

3  them one at a time.  I want to focus on device two first.

4  How did you begin your examination of device two?

5  A.   I would have photographed the exterior of the device,

6  and then after determining the -- which tool I wanted to

7  use, I connected that device two to my forensic tower, and

8  I used the program BlackLight to extract the data and

9  conduct the exam.

10  Q.   And did you obtain an extraction of the data

11  contained on device two?

12  A.   I did.

13  Q.   Did you perform a search of that data?

14  A.   I did.

15  Q.   And what did that search find?

16  A.   Among other -- among other items I found I found

17  three photographs of child exploitation.

18  Q.   Okay.  We'll come back to that.  Did you commence a

19  forensic examination of device three, the laptop?

20  A.   I did.

21  Q.   And how did you commence that examination?

22  A.   Again, photographed the exterior, removed the hard

23  drive from the laptop, connected that to my forensic tower

24  using the write blocker, created a forensic image, a

25  duplicate image.

HUGH THATCHER - DIRECT BY MR. BOONE                    18

1      Once the image was created, I then imported that into

2 the BlackLight program that I use for the device two.

3 Q.   So focusing on device three, did you -- was a focus

4 of your examination to determine who was using the device?

5 A.   Yes, that was part of the purpose.

6 Q.   And, again, let's focus on device -- let's start with

7 device three.  Did your examination yield evidence of who

8 was using the device?

9 A.   It did.

10 Q.   What in that regard did you find?

11 A.   Found several items.  There was a photograph of a

12 credit card with Mr. Sulik's name on it.  On the device

13 found an email address with emails to and from that email

14 that through investigation I knew was associated with

15 Mr. Sulik.  And also found some medical x-rays that were

16 associated to Mr. Sulik.

17 Q.   All right.  Did you find evidence that Mr. Sulik was

18 using the laptop in and before October 2017?

19 A.   Yes, sir.

20 Q.   And did you find evidence that Mr. Sulik was using a

21 laptop after let's say November 1st, 2017?

22 A.   Yes, sir.

23 Q.   You mentioned an email address.  What was that email

24 address?

25           MS. LEDGEWOOD:  Excuse me.  Your Honor, may we

HUGH THATCHER - DIRECT BY MR. BOONE                           19

1  approach the bench for a moment?

2           THE COURT:  Yes, you may.  Come on up.

3       (Whereupon, a bench conference was had with the Court

4  and counsel out of the hearing of the open court and juror

5  members, as follows.)

6           THE COURT:  Yes, ma'am.

7           MS. LEDGEWOOD:  I have no objection if the

8  witness would like to refer to that report more.  I think

9  it's -- given the length of time, it's unfair to ask him

10 to just say it off the top of his head.  So it's fine with

11 me if he wants to continue referring to the report.

12          MR. BOONE:  Appreciate that.

13          MS. LEDGEWOOD:  If that will assist the --

14          THE COURT:  That's fine.

15          MR. BOONE:  While we're up here, I intend to

16 move to qualify Agent Thatcher as an expert in forensic

17 examinations, specifically examination related to child

18 exploitation, related cases.  I have a little bit more to

19 cover with his opinions in that regard, but if it's

20 something you wanted to handle at the bench.

21          THE COURT:  We can.  He's been sufficiently

22 qualified at this point to allow opinions to be solicited

23 from him.  Is there an objection?

24          MS. LEDGEWOOD:  No objection.

25          THE COURT:  All right.  You can certainly cover

 1  matters on cross-examination if you feel like it's

 2  appropriate.

 3              MS. LEDGEWOOD:  Thank you.

 4              MR. BOONE:  Thank you.

 5              THE COURT:  All right.  Thank you.

 6         (Whereupon, the bench conference concluded.)

 7              THE COURT:  All right.  Thank you.  Thank you,

 8  counsel.

 9         And if you need to refer to your report to

10  respond to the last question about the email address, you

11  can do that.

12              THE WITNESS:  Thank you, sir.

13              THE COURT:  Yes, sir.

14  BY MR. BOONE:

15  Q.   All right.  Agent Thatcher, I believe the last

16  question was what was the email address that you were

17  referencing earlier when you said that you found evidence

18  of the use of an email account on the laptop.

19  A.   Yes, sir.  It's stealthvadertrader@gmail.com.

20  Q.   And is that spelled just like it sounds?

21  A.   Yes.

22  Q.   Okay.  And can you go into a little bit more detail

23  about what you found?  Without getting into the content of

24  the email messages, can you go into a little bit more

25  detail about what you found on the laptop that

HUGH THATCHER - DIRECT BY MR. BOONE                          21

1  signified -- that you found significant to the defendant's

2  potential use of the laptop?

3  A.   Yes, sir.  In reference to the email, I found emails

4  from that address to a known email address in reference to

5  the investigation, and also found screenshots that were

6  taken and saved on the computer of like day trading

7  software that was relevant based on the title of the email

8  addressed the trader portion.

9  Q.   Can you look at Exhibit 23 in your binder?

10 A.   Yes, sir.

11 Q.   What is Exhibit 23?

12 A.   An email from the stealthvadertrader@gmail.com.

13 Q.   Is this something that you found on device number

14 three?

15 A.   It is.

16      MR. BOONE:  Your Honor, I'd move for the

17 admission of Exhibit 23.

18      THE COURT:  All right.  Any objection?

19      MS. LEDGEWOOD:  No.

20      THE COURT:  Exhibit 23 will be admitted.

21   (Whereupon, Government's Exhibit Number 23 was

22 admitted into the record.)

23 BY MR. BOONE:

24 Q.   Would you look at Exhibit 24, please?

25      Do you recognize it?

1   A.   Yes.

2   Q.   And what is it?

3   A.   Again, it's an email from stealthvadertrader dated

4   October 2017.

5   Q.   And is this something you found on device three?

6   A.   It is.

7           MR. BOONE:  All right.  And move for the

8   admission of Exhibit 24.

9           THE COURT:  Any objection?

10           MS. LEDGEWOOD:  No.

11           THE COURT:  It will also be admitted.

12       (Whereupon, Government's Exhibit Number 24 was

13   admitted into the record.)

14   BY MR. BOONE:

15   Q.   And, lastly, Agent Thatcher, I'd ask you to take a

16   look at Exhibit 25 in your binder.

17   A.   Yes, sir.

18   Q.   Do you recognize it?

19   A.   Yes.

20   Q.   What is it?

21   A.   It's the screenshot with the day trader type

22   programs.

23   Q.   Is it a screenshot that you found on device three?

24   A.   Yes, it is.

25           MR. BOONE:  Your Honor, I'd move for the

HUGH THATCHER - DIRECT BY MR. BOONE                    23

1  admission of Exhibit 25.

2           THE COURT:  Any objection?

3           MS. LEDGEWOOD:  No.

4           THE COURT:  Exhibit 25 is admitted.

5      (Whereupon, Government's Exhibit Number 25 was

6  admitted into the record.)

7           MR. BOONE:  May we publish Exhibit 25 to the

8  jury?

9           THE COURT:  Yes, sir, you may.

10 BY MR. BOONE:

11 Q.   Agent Thatcher, this is not the easiest thing to see

12 on the screen, but can you describe for us what we're

13 looking at here with respect to Exhibit 25?

14 A.   As I stated, it appears to be the day trader type

15 program, which then tracks stocks and may, you know, see

16 the -- see what the different stocks are doing that you're

17 going to follow and make the trades based on that

18 information.

19 Q.   And how is that saved -- or how was that found on

20 device number three?

21 A.   It was found as a screenshot, I believe, as like a

22 J-peg type, so like a photo file.

23 Q.   What is a screenshot?

24 A.   When you do it -- several numbers away when you're

25 just capturing what you're seeing on the screen, and you

HUGH THATCHER - DIRECT BY MR. BOONE                          24

 1  can use different tools that come with Windows 7.

 2  Windows 10 have the snipping tool that you can activate

 3  the program, and you draw a box around what you want to

 4  capture, and it captures it and saves it, and you save it

 5  if you like what you captured.

 6  Q.   In your investigation did you learn of information

 7  that you could look to to determine who was in the

 8  household was engaged in trading activity?

 9  A.   Yes.  I believe that that was -- that information was

10  provided by the case agent.

11  Q.   Okay.  We'll -- I'll take that up with him later

12  then.

13              MR. BOONE:  Can we show Exhibit 24, please?

14  BY MR. BOONE:

15  Q.   All right.  We've discussed this email to some

16  extent.  Can you for the record just tell us what the date

17  of the email is here with Exhibit 24?

18  A.   Wednesday, October 11th, 2017.

19  Q.   And is it from an email address?

20  A.   Yes.

21  Q.   And then to an email address that you have in your

22  investigation associated with the defendant?

23  A.   Yes.

24              MR. BOONE:  Lastly, let's just display

25  Exhibit 23, please.

HUGH THATCHER - DIRECT BY MR. BOONE                    25

1  BY MR. BOONE:

2  Q.   We've discussed this already.  Can you just for the

3  record state what the date of this email is?

4  A.   Thursday, September 28th, 2017.

5  Q.   And is it from an email address that in your

6  investigation you would associate with the defendant?

7  A.   Yes.

8  Q.   Thank you.

9       Based on the evidence that you found on device three

10 and then what we've looked at so far, were you able to

11 reach any conclusions with respect to who was using device

12 three?

13 A.   That Mr. Sulik was using device three.

14 Q.   Let's talk again about device two, the cell phone.

15      During your examination of the cell phone of

16 device two, did you encounter information that was germane

17 to your inquiry about who was using that phone?

18 A.   Yes.

19 Q.   What -- and specifically you referenced a photo of a

20 credit card earlier.  Is that -- did you find that on the

21 phone or the computer?

22 A.   I -- yes.  I found -- the credit card was on the

23 phone.

24 Q.   Okay.  Can you look to Exhibit 19 in your binder

25 there in front of you?

1   A.    Yes, sir.

2   Q.    What is Exhibit 19?

3   A.    Exhibit 19 is a photograph of the front and back of a

4   Wells Fargo Visa debit card with the name Scott Sulik.

5   Q.    That's something you found in your examination?

6   A.    It is.

7   Q.    Where did you find it?

8   A.    It was -- it was found on device two.

9          MR. BOONE:  Okay.  Your Honor, at this time I

10  would move for the admission of Exhibit 19.

11         THE COURT:  All right.  Any objection?

12         MS. LEDGEWOOD:  No.

13         THE COURT:  Exhibit 19 will be admitted.  It may

14  be shown if you wish to do so.

15         MR. BOONE:  Thank you.  If you could briefly

16  display it.

17      (Whereupon, Government's Exhibit Number 19 was

18  admitted into the record.)

19  BY MR. BOONE:

20  Q.    Agent Thatcher, we're looking at Exhibit 19 now.

21  What is the name on the credit card?

22  A.    Scott W. Sulik.

23  Q.    Okay.  Based on the presence of this picture on the

24  device two and the other -- some of the other information

25  that you've discussed with us, did you reach any

1  determinations about who possessed and used device two?

2  A.    I did.

3  Q.    And what was your determination?

4  A.    Device two was used and possessed by Scott Sulik.

5  Q.    All right.  You mentioned a -- earlier in your

6  testimony you mentioned encountering some photographs on

7  the respective devices.  Before we get into the content of

8  the photographs, I just want to ask you how you

9  encountered them.

10 A.    Right.  So the part of my -- part of doing the exam,

11 the BlackLight breakout, you know, it will pull all the

12 pictures that are on the device and put them in one

13 location so you can look at -- from them the views of all

14 the pictures on the device.  And based on the search

15 warrant that I had, I previewed the devices looking for

16 ownership and anything else related to the investigation.

17 Q.    Did that -- that initial review of the content of the

18 devices include an examination of what sorts of programs

19 were installed on the devices?

20 A.    It did.

21 Q.    Did you find during that initial review any programs

22 that were relevant to -- to the matter that you were

23 investigating?

24 A.    On device two?

25 Q.    Starting with device two.

HUGH THATCHER - DIRECT BY MR. BOONE                     28

1  A.    Nothing that jumped out in the initial review of

2  device two.

3  Q.    What about device three?

4  A.    Device three did find several programs that could be

5  used to remove data or from your devices such as one

6  program CCleaner and another, Avast, Avast, however you

7  pronounce that.

8  Q.    How does CCleaner work?

9  A.    CCleaner is a program that you can -- you can either

10  have it clean up certain data off of your computer such as

11  different Internet histories or cookies that are installed

12  on your computer, or you can point it at a specific

13  program or file on your computer that you want to delete,

14  and it deletes it by overriding that section of the

15  computer so that the data is no longer there.

16  Q.    Why would you -- or why would a computer user delete

17  something by overriding it?  Is there a reason?

18  A.    You just -- you don't want whatever you're deleting

19  on the computer, security conscious, or any number of

20  reasons that you could do that.

21  Q.    If you -- if a computer user tries to delete a file

22  simply by moving it to the recycled bin, is that file

23  deleted from the system?

24  A.    It is not.

25  Q.    Why not?

HUGH THATCHER - DIRECT BY MR. BOONE                              29

1   A.   When you delete a file or move it to recycle bin, all

2   you're doing is you're breaking the link from the file to

3   the computer's directory.  So it doesn't look like it's

4   there anymore, but it's still there until that space on

5   the hard drive is used again and something new goes over

6   the top of it.

7   Q.   And is the program that you mentioned, CCleaner,

8   something that changes the -- that normal way things work

9   that you just described?

10  A.   So the CCleaner one of the ways that it removes the

11  programs is it goes in and overwrites that section of the

12  hard drive where the file that you want removed is

13  located.  So it will put ones or zeroes, physically put

14  something on that section of the hard drive so the old

15  data is no longer accessible.

16  Q.   All right.  Let's get back to your initial search of

17  the images.  After that initial review, found images,

18  sexually explicit images of children, what did you then do

19  next, if anything?

20  A.   At that time I documented what I found and provided

21  the information to the case agent so that he could seek an

22  additional search warrant to allow me to look further.

23  Q.   And did you later learn that an additional warrant

24  had been issued?

25  A.   Yes, sir.

1              THE COURT:  Mr. Boone, would this be a good

2    place to break?  I'll let you go a little further if you

3    need to, but we're getting close to the noon hour.

4              MR. BOONE:  I think this would be a fine place

5    to break.

6              THE COURT:  Would it be?  Okay.

7              All right.  Ladies and gentlemen, we will take

8    our lunch break at this time until 1:10 this afternoon.

9              Please keep in mind the admonitions that you

10   were given previously.

11             Please don't discuss the case among yourselves

12   while we are in recess, and please follow all of the other

13   admonitions that you were given earlier.

14             You can leave your notebooks in your chair if

15   you want to do that.  If you have any materials you want

16   to leave back in the deliberation room, back here to my

17   left, you can drop those off as well.  But, otherwise,

18   when you come back from lunch, the court security officer

19   will bring you back into the deliberation room, and then

20   we'll begin hopefully between 1:10, 1:15 this afternoon.

21             So at this time the jury will be excused.

22             Also, if you want to have -- if you brought your

23   lunch or if you want to stay in, you can come back to the

24   deliberation room if you prefer to do that as well.

25             All right.  The jury will otherwise be excused

 1  until 1:10 this afternoon.

 2          You-all can come around -- if you want to, you

 3  can come around this way if it's easier for you.

 4      (Whereupon, the juror members leave the courtroom.)

 5          THE COURT:  Let's see if we have any issues to

 6  take up outside the presence of the jury.

 7          MR. BOONE:  No, Your Honor.

 8          MS. LEDGEWOOD:  No, Your Honor.

 9          THE COURT:  All right.  We'll be in recess until

10  1:10 this afternoon.

11          Thank you.

12      (Whereupon, a recess was taken at 12:00 p.m., and

13  Day 1 of the Jury Trial proceedings continued at

14  1:10 p.m., without the juror members present, as follows.)

15          THE COURT:  All right.  Thank you.

16          Before we bring the jury in, I want to make sure

17  that you -- that the attorneys received the revised

18  verdict form that I had drafted and provided over the

19  lunch hour.  I'll give you a chance to look over that.  I

20  think that's according to what you referenced earlier.

21          MR. BOONE:  Yes, Your Honor.  Thank you.  This

22  seems to resolve the issue.

23          THE COURT:  All right.  It's not -- of course,

24  you can look at that further, but I wanted to make sure

25  you had a chance to review that and make sure it was in

1   compliance with what you were seeking in terms of the

2   verdict form.

3          All right.  Do we have any other issues we need

4   to take up before the jury is brought in?

5          MR. BOONE:  Not from our perspective.

6          THE COURT:  Ms. Ledgewood.

7          MS. LEDGEWOOD:  No, sir.  And with regard to the

8   jury form thank you very much for doing that.  That's

9   absolutely fine.  It was written with the defendant's

10  perspective.

11         THE COURT:  All right.  Then we'll bring the

12  jury in.

13      (Whereupon, the juror members enter the courtroom.)

14         THE COURT:  All right.  Thank you, and please be

15  seated.

16         The record will reflect that all members of the

17  jury are present.

18         Defendant and counsel are also present in the

19  courtroom.

20         Let's see.  Mr. Thatcher has returned back to

21  the witness stand.

22         Special Agent Thatcher, I will remind you that

23  you're still under oath, of course.

24         THE WITNESS:  Yes, sir.

25         THE COURT:  Mr. Boone, you may continue.

1              MR. BOONE:  Thank you.

2   BY MR. BOONE:

3   Q.   Good afternoon, Agent Thatcher.

4   A.   Good afternoon.

5   Q.   All right.  Where we had left off you had conducted a

6   preliminary examination of the devices, and you indicated

7   that you located some sexually explicit images; correct?

8   A.   Correct.

9   Q.   Now, had this -- is this something that's come up in

10  your investigations before?

11  A.   It has.

12  Q.   Approximately how many child exploitation cases have

13  you worked?

14  A.   Approximately 20 to 25.

15  Q.   And have you conducted forensic examinations of

16  electronic devices in those investigations?

17  A.   Yes, I have.

18  Q.   What do you typically look for?

19  A.   Looking for explicit images and videos through both

20  manual review and using the tools that we have to search

21  for those items.

22  Q.   Does an issue ever come up in these cases as to

23  whether the images that you're looking at or looking for

24  are fabricated or images of real children?

25  A.   Yes.  We want to find the images of real children

HUGH THATCHER - DIRECT BY MR. BOONE                    34

1  that have not been altered.

2  Q.   And in what sorts of things are you typically looking

3  for to confirm that an image is one of a real child?

4  A.   Looking for extortion of the images, pixelation, or

5  where like images have been overlaid over the top of one

6  another so they don't line up or fit correctly.

7  Q.   Do you have experience with identifying digitally

8  altered or digitally enhanced images?

9  A.   Yes, sir.

10 Q.   Where we left off you had received -- you testified

11 before the afternoon break that you had received

12 notification that a second search warrant had been issued;

13 correct?

14 A.   Correct.

15 Q.   What did you do next after you received that

16 notification?

17 A.   After receiving the notification of the additional

18 search warrant being issued, I continued with my exam,

19 both manually reviewing the rest of the data, the photos,

20 on device two, and the other devices, specifically looking

21 for any child exploitation photos or videos, and then also

22 used the electronic tools to assist in that search.

23 Q.   To refresh everyone's memory, device two would be the

24 LG smartphone that you located on top of the pile of

25 shoes; is that correct?

HUGH THATCHER - DIRECT BY MR. BOONE                    35

1  A.    Correct.

2  Q.    And the phone number of that would be (480)468-6215;

3  is that right?

4  A.    Yes, sir.

5  Q.    Okay.  During your overall examination, on what

6  devices, device or devices, did you locate sexually

7  explicit images of children?

8  A.    On device two, the LG cell phone and device three,

9  the Lenovo laptop.

10 Q.    All right.  I'd like to refer you to the binder of

11 exhibits and specifically Exhibit 5.

12 A.    Yes, sir.

13 Q.    Do you recognize Exhibit 5?

14 A.    I do.

15 Q.    What is it?

16 A.    It's -- Exhibit 5 is listing some data about the four

17 images that I located on devices two and three.

18 Q.    An exhibit summary of metadata?

19 A.    Yes, sir.

20 Q.    What is metadata?

21 A.    Metadata is simply it's data about data.  So all

22 files on a computer have metadata that pertain to that

23 file, such as when it was created, where it sits on the

24 computer, information like that.

25 Q.    Is the same true for data stored on the smartphone?

1   A.   Correct.

2   Q.   All right.  At this time -- and two more questions.

3        Is the -- is metadata something that's created by an

4   individual using an electronic device, or is it created by

5   the system?

6   A.   It's created by the system.

7   Q.   And is that data voluminous?

8   A.   It is.

9   Q.   All right.  And is Exhibit 5 a summary of the data

10  you found pertinent during your examination?

11  A.   It is.

12          MR. BOONE:  Your Honor, at this time I would

13  move for the introduction of Exhibit 5.

14          THE COURT:  All right.  Any objection?

15          MS. LEDGEWOOD:  No.

16          THE COURT:  Exhibit 5 will be admitted.

17          MR. BOONE:  And may we publish it, please?

18          THE COURT:  Yes, sir.

19          MR. BOONE:  Thank you.

20      (Whereupon, Government's Exhibit Number 5 was

21  admitted into the record.)

22  BY MR. BOONE:

23  Q.   Agent Thatcher, can you tell us what we're looking at

24  with Exhibit 5?

25  A.   In this exhibit we're looking at the -- as I said

HUGH THATCHER - DIRECT BY MR. BOONE                              37

 1  before, the metadata on the four images separated by which
 2  device the images were found on.  So on device two, the
 3  LG phone, you got images one, two, and three.  The file
 4  path is showing where the image sat on the phone, where it
 5  was stored, and then the date/time modified shows when it
 6  was placed on the phone.
 7  Q.   All right.  So let's use Exhibit 1 as an example.
 8  Can you describe for us the information that's relayed
 9  under the file path called?
10  A.   Yes, sir.  The file path for Exhibit 1 that is
11  showing it -- working left to right it's showing that it
12  was found on the SD card, which is the memory card placed
13  in the phone in a folder labeled downloads, and it came
14  from using the Google Chrome Explorer.
15       And then you have the A-I-F-L-O-X.  That would be
16  what -- the name of the file, or the designation.  And
17  then the day/time modified November 13th, 2017.
18  Q.   What is Google Chrome?
19  A.   Google Chrome is Internet browser that you can use on
20  your phone or smartphones.
21  Q.   Does this file path reflected with reference to
22  Exhibit 1 give you as the forensic examiner any
23  information about where the file came from?
24  A.   That it came from the Internet via the Chrome
25  browser.

HUGH THATCHER - DIRECT BY MR. BOONE                38

1  Q.   Was it downloaded to the phone?

2  A.   It appears that it was.  It went into the downloaded

3  folder.  It's not in Internet cache area where the system

4  automatically stores data.

5  Q.   Can you elaborate on the difference between a

6  download folder and the Internet cache?

7  A.   So when you -- when you go on the Internet and you go

8  to a certain page if there are items that say that there

9  are pictures on the page, your device will cache that

10  information so that if you -- say you go to another page

11  and then you browse back, it'll -- that image on the page

12  will open up much quicker because it's temporarily holding

13  on to it.  This happens automatically as opposed to if you

14  download something that you're taking the affirmative step

15  to make it store on your device.

16  Q.   If an item is found in the Internet cache, would its

17  presence in that location suggest any kind of affirmative

18  step on the part of the smartphone user?

19  A.   No, sir.

20  Q.   And what about an item found in the download folder?

21  A.   It would.

22  Q.   What would the user of an LG-K371 smartphone have to

23  do to download a file to the download folder?

24  A.   You would need to select the download icon off of a

25  menu and select to download it or save it.  And it would

1   save to the download folder as the default.

2   Q.   Okay.  Again, let's talk about the data referenced

3   with respect to Exhibit 1.  Does the metadata that you

4   located during your examination give you any confirmation

5   about the date or time that this particular file was

6   downloaded to the smartphone?

7   A.   Yes, sir.

8   Q.   And what date does that data indicate to you?

9   A.   November 13th, 2017.

10  Q.   Is there a particular time?

11  A.   4:16 UTC.

12  Q.   What is UTC?

13  A.   Universal Time Code, the Greenwich Mean Time, where

14  times starts for us.

15  Q.   During -- in your experience do electronic systems

16  typically mark time based on UTC?

17  A.   They do.

18  Q.   Now, there are two tables here in Exhibit 5; correct?

19  A.   Yes, sir.

20  Q.   What's the significance of the two individual tables?

21  A.   Representing the device two and device three.

22  Q.   Okay.  Can you tell us -- because the fields are a

23  little bit different, can you explain to us what we're

24  looking at with respect to the metadata summarized on

25  device three?

HUGH THATCHER - DIRECT BY MR. BOONE                    40

1  A.   Yes.  Device three, the laptop, its metadata is a

2  little bit different.  It's -- still the file path shows

3  where the image file was located.

4       And, again, working from the left to right it was

5  found in the user's folder for Desiree DeVries, pictures,

6  folder, and then there were two subfolders, Kawasaki and

7  Accessories.  And then in the accessories folder is where

8  that image file was located.

9  Q.   What is the significance of user folder that's at the

10 very beginning of that file path?

11 A.   The user folder is a system-generated folder.  When

12 you get a new computer or you become a new user on the

13 computer and you set up your user account, it will

14 automatically establish a folder and then subfolders

15 within that, such as pictures.

16 Q.   And with respect to this laptop, did -- was there a

17 specific user name that your examination determined was

18 used by the user of this computer?

19 A.   Yes, sir.

20 Q.   And what was that user name?

21 A.   Desiree DeVries.

22 Q.   All right.  Did you find evidence that Mr. Sulik used

23 the computer under that name?

24 A.   Yes, sir.

25 Q.   Is that -- is that simply the name that the user of

HUGH THATCHER - DIRECT BY MR. BOONE                        41

1   the computer would type in to log into the computer?

2   A.    Correct.

3   Q.    Okay.   Now, we go further down the file path, and we

4   get to the word picture.   Describe the nature of that

5   information for us.

6   A.    So the folder pictures is, again, that's a

7   system-generated folder that's created when the user

8   account is made.

9   Q.    And we go further down and we see the word Kawasaki.

10  What does that mean?

11  A.    Kawasaki, that is a non-system generated folder so a

12  user of that computer would have to create that folder

13  within the pictures folder.

14  Q.    And we keep going and we see the word accessories.

15  What does that mean?

16  A.    Again, that's another user-generated folder.   The

17  system did not create it.

18  Q.    And at the end of the file path for that last slash

19  we see accessories, the number 10 in parentheses .jpg.

20  What is that?

21  A.    That's the name of the image file and its extension.

22  Q.    What is .jpg?

23  A.    That tells that it is an image file, a j-peg.   It's

24  the extension for the file.

25  Q.    The type of file?

HUGH THATCHER - DIRECT BY MR. BOONE                              42

1   A.   Yes, sir, and then photo file.

2   Q.   In your experience is Kawasaki a motorcycle

3   manufacturer?

4   A.   It is.

5   Q.   Okay.  Let's focus on the last column there,

6   dates/times.  There were several dates listed there with

7   respect to Exhibit 4.  Can you just describe for us the

8   significance of each date?

9   A.   Yes, sir.  Starting at the top the date created, that

10  would be the date and time when the image was brought onto

11  the computer.

12       The date access, then modified, which are the same,

13  that would be the last time that the file was accessed or

14  viewed opened.

15       And the date changed, that date reflects the date

16  that the master file table, which is kind of like the

17  computer's table of contents for its internal workings so

18  it knows where all the files are at, or something changed

19  in that that caused the date change.  And that could be

20  anything from running a virus scan to moving files, or any

21  number of items could cause that to -- that date to

22  change.

23  Q.   Okay.  Thank you, Agent Thatcher.

24            MR. BOONE:  We can take that one down.

25            Your Honor, if we might have just have a minute

HUGH THATCHER - DIRECT BY MR. BOONE                    43

1   here.  We have to actually stop the computer to show the

2   next set of exhibits.

3            THE COURT:  Yes, sir, that's fine.

4   BY MR. BOONE:

5   Q.   Agent Thatcher, I would like to show you the next

6   series of exhibits.

7            MR. BOONE:  And if we could maybe put these up

8   on the witness's screen and not publish them yet.

9   BY MR. BOONE:

10  Q.   Let me show you Exhibit 1.  Do you see it?

11  A.   Yes, sir.

12  Q.   Okay.  What is it?

13  A.   It's a photo of an explicit image of a child.

14  Q.   Is this something that you found during your

15  examination?

16  A.   It is.

17  Q.   Okay.  Where did you find it?

18  A.   Found this on device number two.

19           MR. BOONE:  Okay.  Could we have Exhibit 2,

20  please?

21  BY MR. BOONE:

22  Q.   Do you recognize Exhibit 2?

23  A.   I do.

24  Q.   What is it?

25  A.   It's an image that I found on device two.

1               MR. BOONE:  Okay.  Can we have Exhibit 3,

2  please?

3  BY MR. BOONE:

4  Q.    Before -- actually before that, is Exhibit 2 an image

5  of a child also?

6  A.    It is.

7  Q.    Okay.  And is it a sexually suggestive image?

8  A.    It is.

9  Q.    Okay.  Is Exhibit 3 before you now?

10  A.    Yes, sir.

11  Q.    Do you recognize Exhibit 3?

12  A.    I do.  It's an --

13  Q.    What is it?

14  A.    -- explicit image of a child that I located on device

15  number two.

16               MR. BOONE:  And, lastly, could we have

17  Exhibit 4, please?

18  BY MR. BOONE:

19  Q.    Do you recognize Exhibit 4?

20  A.    I do.

21  Q.    What is it?

22  A.    Another explicit image of a child that was located on

23  device number three.

24  Q.    And was it located during your examination?

25  A.    It was.

1          MR. BOONE:  Okay.  Your Honor, I at this time
2   move for the admission of Exhibits 1 through 4.
3          THE COURT:  All right.  Do we need to address
4   Exhibit 2?
5          MR. BOONE:  Yes, sir.
6          THE COURT:  All right.  Would you-all like to
7   come up to sidebar, please?
8          MR. BOONE:  Sure.
9      (Whereupon, a bench conference was had with the
10  Court and counsel out of the hearing of the open court
11  and juror members, as follows.)
12         THE COURT:  As I understand, based on our
13  discussions during the pretrial conference, Exhibits 1, 3,
14  and 4 would be offered as substantive proof of a violation
15  that's been charged in the case.
16         Exhibit 2 would be essentially other acts
17  evidence under Rule 404.  Is that accurate?
18         MR. BOONE:  Yes, Your Honor.
19         THE COURT:  At this time unless there are other
20  objections, I would admit the four documents.  The time
21  stamp, the date information that you just reviewed in
22  Exhibit 5 would support the statement that was made
23  earlier, that you're seeking to introduce these to show
24  knowledge and absence of mistake on behalf of the
25  defendant.

1            However, if requested, I would provide a

2    limiting instruction on these, I guess, Exhibit Number 2

3    at this time.

4            MS. LEDGEWOOD:  And I think I would so request

5    it, I guess, just for absolute clarification if necessary

6    down the road.  I guess I need to -- perhaps renew my

7    objection that I made at the pretrial.

8            THE COURT:  Yes.  One second.

9            MS. LEDGEWOOD:  Yes, sir.

10           THE COURT:  I'll just refer to my notes.  I

11   will -- I have considered the case authority that was

12   provided by the parties, and it would appear that

13   Exhibit 2 would be admissible.

14           I've reviewed the Hentzen case, as well as Guy

15   and Caldwell.

16           The child erotica on film that's reflected as

17   Exhibit 2 will be admitted under 404(b) because of the

18   probative admissions of it and the defendant's character.

19   It indicates a sexual interest in children, which makes it

20   less likely that he did not intend to possess the other

21   images or that he possessed them by mistake.  Here there's

22   so few images that it's more probative, and then case

23   documents.  As the United States explained earlier, the

24   images were downloaded on different devices, and that's

25   been borne out through the proof that's been offered to

HUGH THATCHER - DIRECT BY MR. BOONE                    47

1   this point, on different devices at different times

2   indicating that the possession, if the jury finds that it

3   occurred, is not by virtue of an accident or a mistake.

4   So that would be the Court's ruling on that.

5           The limiting instruction that I would give would

6   be similar to that that was provided earlier in the

7   filings, draft instructions, instruction number 14, which

8   would essentially be that the jury has heard testimony

9   that the defendant possessed the depiction which has been

10  identified as photo number two.

11          And I will state that it does not depict a minor

12  engaging in sexually explicit conduct, but it may be

13  probative of a sexual interest in children.

14          If the jury finds the defendant possessed the

15  photo, they can consider it only as it relates to the

16  claim that the defendant knew he possessed or intended to

17  possess sexually explicit visual depictions of minors,

18  that he did not possess it by mistake and should not

19  consider it for any other purpose, that he's only on trial

20  for the possession of visual depictions of minors engaged

21  in sexually explicit conduct, and they should not return a

22  guilty verdict unless the government proves the crime

23  charged beyond a reasonable doubt.

24          So that will be the cautionary instruction I

25  would give before admitting and allowing the jury to view

HUGH THATCHER - DIRECT BY MR. BOONE                    48

1   those photographs.

2           MR. BOONE:  No objection.

3           MS. LEDGEWOOD:  No objection.

4           THE COURT:  All right.  So at this point there

5   is a motion to admit Exhibits 1 through 4.

6           MR. BOONE:  Yes, sir.

7           THE COURT:  Then I'll give this instruction on

8   number two before we show it to the jury.

9           MR. BOONE:  Okay.

10          MS. LEDGEWOOD:  And I wonder if I may while

11  we're up here.  I don't know if the Court has noticed but

12  throughout the proceeding Mr. Sulik has been occasionally

13  mumbling under his breath and trying to give me

14  information.  I asked him to take notes of that.  So I do

15  think that I am going to have to confer with him just a

16  bit before cross-examination.

17          THE COURT:  Certainly, yes.  All right.

18          MR. BOONE:  Just to let you know, we have maybe

19  10 more minutes.

20          MS. LEDGEWOOD:  Okay.  Thank you, Your Honor.

21          THE COURT:  All right.

22      (Whereupon, the bench conference concluded.)

23          THE COURT:  All right.  Thank you.

24          Ladies and gentlemen, I'm going to admit

25  United States Exhibits 1 through 4 at this time, but I do

HUGH THATCHER - DIRECT BY MR. BOONE                    49

1   want to give you a specific instruction with regard to one

2   of the photographs, which will be identified as photo

3   number two, or Exhibit Number 2.

4           You have heard testimony that the defendant

5   possessed a visual depiction that's been referenced as

6   Exhibit 2, or photo number two, which does not depict a

7   minor engaged in sexually explicit conduct, but it may be

8   probative of a sexual interest in children.

9           If you find that the defendant possessed photo

10  number two, which has been referred to as Exhibit

11  Number 2, you can consider it only as it relates to the

12  government's claim that the defendant knew that he

13  possessed or intended to possess sexually explicit visual

14  depictions of minors, or that he did not possess such

15  images by mistake.  You may not consider photo number two

16  for any other purpose.

17          Remember, the defendant is on trial here only

18  for possessing visual depiction of a minor engaged in

19  sexually explicit conduct.  Do not return a guilty verdict

20  unless the government proves the crime charged in the

21  indictment beyond a reasonable doubt.

22          With that limiting instruction, the Exhibits 1

23  through 4 have been introduced, and you may show those to

24  the jury.

25          MR. BOONE:  Thank you, Your Honor.

HUGH THATCHER - DIRECT BY MR. BOONE                        50

1              We will start with Exhibit 1.  If you could

2   display it.

3         (Whereupon, Government's Exhibit Numbers 1 through 4

4   were admitted into the record.)

5   BY MR. BOONE:

6   Q.   Agent Thatcher, can you describe for the record what

7   Exhibit 1 depicts?

8   A.   Yes, sir.  Exhibit 1 depicts a female approximately

9   three to five years of age, dark complexioned.  She's

10  holding an erect penis with both hands positioned in front

11  of her mouth.

12  Q.   And the three to five years of age is that an

13  estimate that you reached based on your training and years

14  of experience with these cases?

15  A.   It is, sir.

16  Q.   All right.  Looking at this photograph do you observe

17  any characteristics that would be consistent with any

18  digital alterations of the photo?

19  A.   I do not.

20  Q.   Do you have any -- looking at this photograph and

21  drawing on your training and experience and background do

22  you have any reason to conclude that this is anything

23  other than a photograph of a real minor?

24  A.   I do not.

25  Q.   And based on your training and experience and

 1  background, do you have any reason to believe that this
 2  could have been produced without the minor having engaged
 3  in sexually explicit conduct?
 4  A.   I do not.
 5  Q.   Let me -- and, specifically, I mean, the conduct
 6  specifically depicted in the picture that you described
 7  for us.
 8  A.    Correct.
 9          MR. BOONE:  We can take that off the screens.
10  BY MR. BOONE:
11  Q.   Did your examination determine when this item,
12  Exhibit 1, was downloaded to the device?
13  A.   November 13, 2017.
14  Q.   What time?
15  A.   4:16 in the afternoon.
16  Q.   And which device?
17  A.   Device number two.
18  Q.   All right.  Agent Thatcher, show you Exhibit 2.  Can
19  you please describe for purposes of the record what
20  Exhibit 2 depicts?
21  A.   Depicts a -- depicts a female approximately six to
22  eight years of age wearing a white sports bra type top and
23  a black thong type underwear, with her -- standing facing
24  away from the camera looking over her shoulder with her
25  hands beneath her buttocks.

1  Q.   Is your statement about her age an estimation that

2  you reached based on your training and years of experience

3  with these type of cases?

4  A.   Yes, it is.

5  Q.   Looking at the photograph and what you know about the

6  device have you observed any characteristics that would be

7  consistent with alteration of this photograph?

8  A.   I have not.

9           MR. BOONE:   We can take that one down.

10 BY MR. BOONE:

11 Q.   In your examination did you determine when Exhibit 2

12 was downloaded to the phone?

13 A.   December 24th, 2017.

14 Q.   What time?

15 A.   12:46.

16 Q.   So that's approximately six weeks after the first

17 one?

18 A.   Yes, sir.

19 Q.   Agent Thatcher, I'm going to show you Exhibit 3 now.

20 Can you please describe for the record what Exhibit 3

21 depicts?

22 A.   Exhibit 3 shows approximately three to five year old

23 female, light complexioned, laying on her back with a

24 denim skirt that's pulled up above her waist, and she's

25 exposing her genitalia with her fingers.

HUGH THATCHER - DIRECT BY MR. BOONE                    53

1   Q.   Is your statement about her age an estimate that you

2   reached based on your training and experience and

3   background with these cases?

4   A.   Yes, sir.

5   Q.   And looking at this photograph and the information

6   you know its -- the device which it was found, did you

7   observe any characteristics that would be consistent with

8   digital alteration or any type of alteration of this

9   photo?

10  A.   I have not.

11  Q.   Based on background, your training, and experience do

12  you have any reason to believe that this is anything other

13  than a photo of an actual minor?

14  A.   No, I do not.

15  Q.   Okay.  And based on all of your training and

16  experience, would it -- is it your understanding that this

17  photograph could have been created without the minor

18  engaging in the conduct depicted?

19  A.   It could not have been.

20          MR. BOONE:  You can take that one down.

21  BY MR. BOONE:

22  Q.   In your examination of the devices, did you determine

23  when this particular file, Exhibit 3, was loaded on to one

24  of the devices?

25  A.   Yes, sir, November 13th, 2017, on device two.

HUGH THATCHER - DIRECT BY MR. BOONE                    54

1  Q.   What time?

2  A.   16:00 or 4:00 p.m.

3  Q.   You said device two?

4  A.   Device two.

5  Q.   How did it get there?

6  A.   From Google Chrome downloaded into the downloads

7  photo on the SD card.

8  Q.   From the Internet?

9  A.   From the Internet.

10 Q.   Lastly, Agent Thatcher, I just want to show you

11 Exhibit 4.  Can you please describe for purposes of the

12 record what Exhibit 4 depicts?

13 A.   Exhibit 4 depicts approximately an 11 to 13-year-old

14 female, light complexioned.  She's wearing a garter belt

15 that's attached to knee high white socks and then white

16 high heel shoes.  She's leaning back on a sofa with her

17 left leg up on the sofa in such a manner that it exposes

18 her genitalia, and her breasts are also exposed.

19 Q.   Is your statement about her age an estimate that you

20 reached based on your training and experience with these

21 types of cases?

22 A.   It is.

23 Q.   Based on your examination, your observation of the

24 photo, and everything else you know about the device on

25 which it was found, have you observed any characteristics

1  that would be consistent with alteration or enhancement of

2  this photograph?

3  A.    I have not.

4  Q.    And based again on your training and experience and

5  background, are you aware, or do you know, if this

6  photograph could have been produced without the individual

7  engaged in the conduct depicted?

8  A.    It could not have.

9          MR. BOONE:  You can take that one down.

10  BY MR. BOONE:

11  Q.    Did your examination determine when this photograph,

12  Exhibit 4, was loaded onto the device in question?

13  A.    Yes, sir.

14  Q.    What did you determine?

15  A.    August 29th, 2017.

16  Q.    Was there any other information about -- that you

17  found on the system about when this photograph was

18  accessed?

19  A.    Last accessed September 11th, 2017.

20  Q.    About two weeks after the download?

21  A.    Yes, sir.

22  Q.    What other information can you tell us based on your

23  examination about Exhibit Number 4 and the data that was

24  on the system about it?  Did the file have a name?

25  A.    The file did have a name.  It was named Accessories,

 1  parentheses, 10, parentheses.

 2  Q.   Is this a file that was found in the Kawasaki folder

 3  on the computer?

 4  A.   In a folder called accessories that was inside of the

 5  Kawasaki folder.

 6  Q.   Which device did you determine this was found on?

 7  A.   Device three.

 8           MR. BOONE:  Your Honor, may I have one moment?

 9           THE COURT:  Yes, sir.

10           MR. BOONE:  Thank you.

11           Mr. Thatcher, I have no further questions.

12           THE WITNESS:  Thank you, sir.

13           THE COURT:  We'll take just a moment.  We're

14  going to take just a brief break before we proceed with

15  cross-examination.

16           How much -- how much time would counsel like for

17  the break?

18           MS. LEDGEWOOD:  10 minutes.

19           THE COURT:  15 minutes?

20           MS. LEDGEWOOD:  I said 10, whatever, Your Honor.

21           THE COURT:  All right.  We'll take a break of

22  approximately 15 minutes.

23           Please keep in mind the admonitions that you

24  have been given previously.

25           Please don't make up your mind about this case

1  until it is finally submitted to you, and we'll call you

2  back approximately 2:00 p.m. to resume.

3          (Whereupon, the juror members leave the courtroom.)

4              THE COURT:  All right.  Thank you.

5              We will be in recess until approximately

6  2:00 p.m. this afternoon.

7              (Whereupon, a recess was taken at 1:45 p.m., and

8  Day 1 of the Jury Trial proceedings continued at

9  1:55 p.m., with the juror members present, as follows.)

10             THE COURT:  All right.  Thank you.

11             The record will again reflect that all members

12 of the jury are present.

13             Defendant and counsel are present in the

14 courtroom.

15             Let's see, we were about to begin

16 cross-examination.

17             The witness is reminded he's still under oath.

18             Ms. Ledgewood.

19             MS. LEDGEWOOD:  Thank you, Your Honor.

20                      CROSS-EXAMINATION

21 BY MS. LEDGEWOOD:

22 Q.   Thank you, Agent Thatcher, just a few questions.

23      I believe you said that you have in your career done

24 about 20 to 25 child exploitation investigations.  Did I

25 hear you correctly on that?

1   A.   Yes, ma'am.

2   Q.   Dating back how long?

3   A.   2009.

4   Q.   Would it be fair to say that in many of your

5   investigations persons have actually been in possession of

6   hundreds, if not thousands, of images?

7   A.   In some cases, yes, ma'am.

8   Q.   And in some cases many, many videos of actual

9   children involved in sexually exploitative situations

10  captured on video?

11  A.   In some cases, yes, ma'am.

12  Q.   And some cases involved the actual distribution of

13  exploitative images; correct?

14  A.   Yes, ma'am.

15  Q.   This is not a distribution case?

16  A.   No, ma'am.

17  Q.   So there is no evidence here that Mr. Sulik was

18  sharing contraband pornography on the Internet?

19  A.   Correct.

20  Q.   And in the same vein this is not a case involving

21  peer-to-peer file sharing; correct?

22  A.   Correct.

23  Q.   Would you explain to the jury what I mean by that,

24  peer-to-peer file sharing?

25  A.   Peer-to-peer file sharing is where you can use

1  different services to share different types of files.

2  Towards the -- I mean, you can -- if you're looking for a

3  video, you can get it from another person through, you

4  know, they share the file with you and vice versa, and

5  it's also used in child exploitation.

6  Q.   In fact, quite commonly; correct?

7  A.   Correct, it's common.

8  Q.   Now, you are a long-time federal investigator;

9  correct?

10  A.   Yes, ma'am.

11  Q.   But you were not investigating Mr. Sulik on a child

12  exploitation matter when you got involved in this case;

13  correct?

14  A.   Correct.

15  Q.   There's been testimony in response to Mr. Boone's

16  question about Avast, the Avast product, the Avast

17  cleaner.  Consumers are encouraged, are they not, to

18  protect their Internet privacy?

19  A.   The companies that do encourage.

20  Q.   All right.  I mean, and there have many companies;

21  correct --

22  A.   Correct.

23  Q.   -- that sell these products?

24  A.   Correct.

25  Q.   Sometimes they actually come with a computer or a

1    cell phone; correct?

2    A.    Correct.

3    Q.    And there are numerous companies that offer these

4    products to consumers?

5    A.    Yes.

6    Q.    So my point simply is this.  There is nothing

7    sinister in and of itself about Mr. Sulik having purchased

8    this product, the Avast product?

9    A.    Correct.

10   Q.    I believe that you referenced, and we saw an exhibit,

11   involving Mr. Sulik's trading activities.  I think that

12   was one of the exhibits that we saw here; correct?

13   A.    Yes, ma'am.

14   Q.    Small point of clarification, but he trades in

15   futures, doesn't he?

16   A.    I'm not aware of the distinction.

17   Q.    You just know that -- that he was very active in

18   trading in some form or fashion?

19   A.    Correct.

20   Q.    And I don't know how many, but there were -- when you

21   analyzed these devices, there was an awful lot of material

22   connected to this trading activity, was there not?

23   A.    There were quite a few of the screenshots similar to

24   the one that we looked at, yes.

25   Q.    And let me modify again for his understanding, his

 1   future activity.  I don't mean to mislead.

 2       It is possible, is it not, that an individual can

 3   inadvertently download material from the Internet?

 4   A.   It would take a step to complete the download, just

 5   like going to a page, you wouldn't download an item.

 6   Q.   But it can happen?

 7   A.   If you went to a page and click the right button, it

 8   could happen.

 9   Q.   We don't -- we don't know -- we've used the

10   expression these images were downloaded from the Internet;

11   right?  That's the wording that you've used in your

12   testimony?

13   A.   Yes, ma'am.

14   Q.   But we don't have a website -- or, excuse me,

15   investigators do not have a website that they can point to

16   and say it came from here --

17   A.   Correct.

18   Q.   -- correct?  And we're also not saying, just for

19   point of clarification, the government is not maintaining

20   that these cleaners were used to scrub thousands of

21   images.  We're not going that far, are we?

22   A.   No, ma'am.  I was stating what the cleaners can do.

23   Q.   You can only testify the presence of the cleaners;

24   correct, and the capability of the cleaners?

25   A.   Correct.

1  Q.   When this was -- in your professional opinion could

2  the two images on the cell phone particularly have an

3  attachment to an email?

4  A.   I mean, obviously they could be an attachment, but

5  the way that the path showing where they came from, that

6  would lead me to say no.

7  Q.   I understand.  I understand.

8       Your investigation has not led you to the source of

9  the LG phone, has it?  By that I mean you don't know when

10 that cell phone was purchased?

11 A.   I do not.

12 Q.   And you do not know if it was purchased from Best Buy

13 or a grocery store or something like that?  You don't

14 know?

15 A.   I do not.

16 Q.   And, in fact, you don't even know -- this could have

17 been a prepaid phone; correct?

18 A.   I'm not aware.

19 Q.   But you don't know?

20 A.   I do not know.

21         MS. LEDGEWOOD:  Your Honor, that's all I have at

22 this point.  If I may step back and confer with him for

23 just a moment.

24         THE COURT:  Yes, ma'am, that's fine.

25         MS. LEDGEWOOD:  And if I could have the white

1   noise.

2        (Whereupon, an off-the-record discussion was had

3   between Ms. Ledgewood and Defendant Sulik.)

4            MS. LEDGEWOOD:  Thank you, Your Honor.  That's

5   all I have at this point.

6            THE COURT:  Redirect?

7            MR. BOONE:  Very briefly, Your Honor.

8            THE COURT:  Yes, sir.

9                      REDIRECT EXAMINATION

10  BY MR. BOONE:

11  Q.   Agent Thatcher, Ms. Ledgewood asked you some

12  questions about whether it was possible that the files on

13  the phone were inadvertently downloaded.  I just want to

14  direct your attention to the metadata again.  When was --

15  based on your examination, when was Exhibit 1 downloaded?

16  Actually start with Exhibit 3, please.  When was that

17  downloaded?

18  A.   Number three?

19  Q.   Yes.

20  A.   November 13, 2017, 16:00 UTC or 4:00 p.m. UTC.

21  Q.   And based on your examination when was Exhibit 1

22  downloaded?

23  A.   Again, November 13th, 2017, at 16:16 UTC or 4:16 p.m.

24  Q.   16 minutes later; right?

25  A.   Yes, sir.

1  Q.   And in your experience would that be a fact that

2  would be consistent with inadvertent downloads from either

3  file?

4  A.   No, sir.

5  Q.   When was Exhibit 2 downloaded to the device?

6  A.   December 24th, 2017, 12:46 UTC.

7  Q.   Approximately six weeks later; correct?

8  A.   Correct.

9  Q.   And, again, based on your experience would that

10 timing be consistent with inadvertent download of any of

11 these three files?

12 A.   No, sir.

13 Q.   Why not?

14 A.   If it was an inadvertent where you went to a page and

15 you accidentally clicked on a link that -- it would have

16 happened for Exhibits 1 and 3 almost at the same time, not

17 16 minutes apart.  That seems like you're doing something.

18 You're not inadvertently going to a page and it's

19 happening.

20 Q.   In your experience with these investigations if

21 somebody did download a file accidentally, would they go

22 back 16 minutes later and download another?

23 A.   Not if it was an accidental situation.

24 Q.   Ms. Ledgewood asked you some questions about the

25 cleaners, and I think there was a specific hypothetical

HUGH THATCHER - REDIRECT BY MR. BOONE                      65

1  question about if a cleaner had been used to scrub

2  thousands of files off of the computer.  Just to be clear,

3  we're not claiming that there were -- the government is

4  not claiming that there were thousands of files on the

5  computer; correct?

6  A.    No, sir.

7  Q.    All right.  If a cleaner had been employed to remove

8  a file, would there be a trail of that left on the system?

9  A.    The way the CCleaner works there wouldn't be anything

10 left of the original file because it was overwritten.

11 Q.    When you conduct a forensic examination of a device

12 that has a program like CCleaner on it, would that

13 forensic examination reveal to you whether the cleaner had

14 actually been used or not?

15 A.    Yes, it could show that.

16 Q.    Okay.  And Ms. Ledgewood asked you some questions

17 about the purchase of the LG phone, device two.  I think

18 you had -- you testified to this earlier.  The area code

19 of the phone was what?

20 A.    The 480.

21 Q.    What area code is that?

22 A.    Arizona area code.

23 Q.    Based on your experience with examinations of

24 electronic devices, specifically phones, does the area

25 code hold any significance for you regarding where the

1   phone might have been purchased?

2   A.    When most people purchase a mobile phone, they -- if

3   they don't already have a phone number, they get it for

4   the area where they're living.

5   Q.    So would that suggest to you that the phone was

6   purchased in Arizona?

7   A.    Yes, sir.

8               MR. BOONE:  Thank you.  No further questions.

9               THE COURT:  Let's see if we have any recross on

10  matters brought up on direct.

11              MS. LEDGEWOOD:  No, Your Honor.

12              THE COURT:  All right.  Thank you,

13  Special Agent.  You may step down.

14              THE WITNESS:  Thank you, Your Honor.

15              THE COURT:  Do you have any -- do you have those

16  documents?  You can leave those there.

17              Thank you.

18              You can return the -- your report.

19              MR. BOONE:  Thank you.

20              THE COURT:  Mr. Boone, you may call your next

21  witness when you're ready to do so.

22              MR. BOONE:  Thank you, Your Honor.

23  United States calls Special Agent Anyaso.

24              THE COURT:  Thank you.

25              THE CLERK:  Do you swear, or affirm, that the

1  testimony you're about to give in this matter shall be the

2  truth, the whole truth, and nothing but the truth, as you

3  shall swear unto God, or affirm, subject to the penalty of

4  perjury?

5          THE WITNESS:  I do.

6          Good afternoon.

7          MR. BOONE:  Your Honor, if I may have a moment.

8  I lost my exhibit runner.

9          THE COURT:  Yes, sir.

10         MR. BOONE:  I will need to do this myself.

11         THE COURT:  Yes, sir.

12         MR. BOONE:  We are off to a great start.

13                  LAWRENCE ANYASO,

14  having been first duly placed under oath, was examined

15  and testified as follows:

16                  DIRECT EXAMINATION

17  BY MR. BOONE:

18  Q.   Good afternoon.

19  A.   Good afternoon.

20  Q.   Would you please state and spell your name for the

21  record?

22  A.   It's Special Agent Lawrence Anyaso, L-A-W-R-E-N-C-E.

23  Last name is A-N-Y-A-S-O.

24  Q.   What do you do for a living?

25  A.   I'm a special agent with the United States

1  Capitol Police.

2  Q.    What are your responsibilities?

3  A.    We investigate any federal crimes that's not

4  specifically statutory to any particular agency, which

5  there are only a couple that might be specific to one

6  particular agency, but other than that any federal crime

7  that would have a nexus or connection to members of

8  Congress.

9  Q.    And what specifically do you do for the Capitol

10 Police?

11 A.    I -- I work in the threat assessment section for

12 Capitol Police, but that involves investigative areas of

13 different crimes.

14 Q.    How long have you been there?

15 A.    About almost five years.

16 Q.    And what did you do before that?

17 A.    Total I've been with Capitol Police for 17 years, and

18 I've been a crime scene investigator, I'm a hostage

19 negotiator, just various different things that I do.

20 Q.    Now, as part of your responsibilities were you called

21 upon to investigate Mr. Sulik at some point?

22 A.    Yes.

23 Q.    When did that investigation start?

24 A.    Approximately in November of 2017.

25 Q.    And in the course of your investigation did you do

 1  any Internet research to find out what you could about the

 2  defendant?

 3  A.   Yes, I did.

 4  Q.   Did you look at Facebook?

 5  A.   I did.

 6  Q.   Do you have that binder of exhibits in front of you?

 7  A.   I do not.

 8          MR. BOONE:  Thank you.

 9  BY MR. BOONE:

10  Q.   Could you turn to Exhibit 22, please?

11       Do you recognize Exhibit 22?

12  A.   I do.

13  Q.   What is it?

14  A.   It's a picture of a screenshot that I captured from

15  the Facebook of Desiree DeVries, Scott Sulik's wife.

16          MR. BOONE:  Your Honor, I'd move for the

17  admission of Exhibit 22.

18          THE COURT:  Any objection?

19          MS. LEDGEWOOD:  No, sir.

20          THE COURT:  Exhibit 22 will be admitted.  It may

21  be displayed.

22          MR. BOONE:  Thank you.

23       (Whereupon, Government's Exhibit Number 22 was

24  admitted into the record.)

25

LAWRENCE ANYASO - DIRECT BY MR. BOONE                    70

 1  BY MR. BOONE:

 2  Q.    Can you describe for the record what we're looking

 3  at, this photograph?

 4  A.    Basically it's a screenshot, and it shows Mr. Sulik

 5  standing in a motorcycle jacket beside a motorcycle, and

 6  the caption under the date says "PCH California," which

 7  based on my experience means Pacific Coast Highway.

 8  Q.    Does that appear to be a Kawasaki motorcycle to you?

 9  A.    Actually, I'm certified as a rider, but I'm not

10  100 percent on this motorcycle, but it is a possibility,

11  but I'm not 100 percent based on the picture.

12  Q.    Okay.  When you began your investigation relating to

13  Mr. Sulik, did you make a determination about where he was

14  living at the time?

15  A.    Yes, I did.

16  Q.    What did you determine?

17  A.    I determined that during the beginning of my

18  investigation, at least when it came to my attention, he

19  was actually in Arizona, in Mesa, Arizona, area.  And then

20  as the investigation continued, I determined that he had

21  moved from Mesa, Arizona, to Versailles, Kentucky.

22  Q.    Did you obtain records during your investigation that

23  identified the dates during which time he was living in

24  Mesa, Arizona?

25  A.    I did.

1  Q.   Do you see Exhibit 7 in your binder there?

2  A.   I do.

3  Q.   Do you recognize it?

4  A.   Sorry?

5  Q.   Do you recognize Exhibit 7?

6  A.   I do.

7  Q.   What is it?

8  A.   It's business records that I obtained from the Apache

9  Wells RV Resort in Mesa, Arizona, regarding rental

10 agreements with Mr. Sulik and his wife.

11         MR. BOONE:  Your Honor, I move for the admission

12 of Exhibit 7.

13         THE COURT:  All right.  See if there is any

14 objection.

15         MS. LEDGEWOOD:  No, sir.

16         THE COURT:  Exhibit 7 will be admitted.

17         MR. BOONE:  Yes, sir.  Thank you.

18    (Whereupon, Government's Exhibit Number 7 was

19 admitted into the record.)

20 BY MR. BOONE:

21 Q.   All right.  We're looking at Exhibit 7.  Is the first

22 page just briefly a cover letter that was directed to

23 another U.S. Attorney enclosing some documents from the

24 resort that you mentioned?

25 A.   That's correct.

LAWRENCE ANYASO - DIRECT BY MR. BOONE                    72

1   Q.   Okay.  And can you generally characterize the rest of

2   the records that are part of Exhibit 7?

3   A.   So as it goes down, any time we obtain business

4   records we generally -- they will provide us with a

5   declaration, which basically shows that it's a certified

6   copy of information, and it's true to their company.

7        And after that there's confirmations, and it's

8   basically the rental agreements so there's confirmation.

9        There's going to be a reservation inquiry, trailer

10  registries, or registration inquiry, trailer registries.

11  Q.   I have seen in the first few pages reference to a

12  Desiree and a Scott DeVries?

13  A.   That's correct.

14  Q.   Did your investigation identify who that was?

15  A.   Desiree DeVries ultimately we learned that it is his

16  wife, and Scott DeVries we learned it was Scott Sulik, but

17  in these documents it does show DeVries.

18  Q.   Flip to page 5 of the document.

19        Do you see a box that reflects the names of the two

20  individuals we have been talking about?

21  A.   I do.

22  Q.   And do you see a reference on the second line of the

23  table Scott Sulik and then DeVries is in parentheses?

24  A.   I do.

25  Q.   So would that indicate to you that these records

LAWRENCE ANYASO - DIRECT BY MR. BOONE                    73

1  pertain to the defendant?

2  A.   It does.

3  Q.   I'm going to flip to page 18 of this document.

4       What are we looking at on page 18?

5  A.   So these are the rental payments for the -- for the

6  RV resort showing different times when they're making

7  payments for their rent.

8  Q.   When do these -- do these records reflect when they

9  arrived and departed from the resort?

10  A.   They have done it a couple times.  In this

11  particular -- this particular time the -- it shows May 16,

12  2017, departing November 3rd, 2017.

13  Q.   Flip to pages -- page 14 of the document.  What are

14  we looking at?

15  A.   These are checks for rent issued by a check that has

16  the defendant Scott Sulik's name on it.

17  Q.   Are the checks signed?

18  A.   They are signed by Scott Sulik.

19  Q.   What are the time periods that are identified in

20  these checks?

21  A.   They're -- I can't see -- September 2017,

22  August 31st, 2017.  I believe there was a -- I don't know

23  whether it was '18.  I mean, I'm sorry, the one above it.

24  July -- no, August 4th, 2017.

25  Q.   I'm just going to scroll down one page, page 15 of

1   Exhibit 7.  What are we looking at here?

2   A.   These are checks written by Desiree DeVries,

3   Mr. Sulik's wife, for the rent for -- or utilities and for

4   the resort for the rent.

5   Q.   And what is the last time period identified in these

6   checks?

7   A.   For the October site and utilities it was

8   November 3rd, 2017.

9   Q.   So based on this information, did your investigation

10  determine that Mr. Sulik and Ms. DeVries were living in

11  Mesa, Arizona, through the end of October 2017?

12  A.   I did.

13  Q.   What did you determine about -- if anything, about

14  where they went from there?

15  A.   As law enforcement we have various resources and ways

16  to check for information.  So subsequent what we call open

17  source search, so public records that's open to the

18  public, I was able to see that Ms. DeVries has a P.O. Box

19  associated with her that actually comes back to the

20  Lexington, Kentucky, area.  And so with connection to that

21  we determined that they had actually moved here, but just

22  based on the record itself we like to make sure we're

23  actually accurate in what we're seeing, so I -- the FBI in

24  Lexington actually assisted me with confirming that

25  Desiree DeVries and Mr. Sulik were seen actually in --

LAWRENCE ANYASO - DIRECT BY MR. BOONE                    75

 1  later in November and December in actual Lexington,

 2  Kentucky.

 3  Q.    At a later point in time did you obtain records that

 4  identified a particular address in which they lived?

 5  A.    Yes, I did.

 6  Q.    Do you see Exhibit 6 in your binder there?

 7  A.    I do.

 8  Q.    Do you recognize it?

 9  A.    I do.

10  Q.    What is it?

11  A.    It is the farm lease and purchase agreement between

12  Desiree DeVries, Mr. Sulik, and the owners of a property

13  in Versailles, Kentucky.

14            MR. BOONE:  Your Honor, I move for the admission

15  of Exhibit 6, please.

16            THE COURT:  Any objection?

17            MS. LEDGEWOOD:  No objection.

18            THE COURT:  Exhibit 6 will be admitted.

19      (Whereupon, Government's Exhibit Number 6 was

20  admitted into the record.)

21  BY MR. BOONE:

22  Q.    Now, did you -- upon reviewing this document in the

23  course of your investigation, did you determine that

24  Mr. Sulik and Ms. DeVries had leased a particular

25  property?

1  A.   I did.

2  Q.   What was the address of that property?

3  A.   It is 4854 McCowans Ferry Road in Versailles,

4  Kentucky.

5  Q.   Is that Woodford County, Kentucky?

6  A.   It is.

7  Q.   And I'm going to turn to Exhibit 2 of the exhibit --

8  or page 2 of the exhibit.

9       Upon reviewing the document, did you determine that

10  they leased the property beginning on a particular day?

11  A.   Yes.

12  Q.   What was that date?

13  A.   November 15th, 2017.

14  Q.   Did you obtain records pertaining to Internet service

15  at this property?

16  A.   I did.

17  Q.   Turn to Exhibit 8, please.

18       Do you recognize Exhibit 8?

19  A.   I do.

20  Q.   What is it?

21  A.   It is the business records that I obtained from

22  Windstream, the services, Internet provider and phone

23  service in here -- down here in Kentucky.

24            MR. BOONE:  Your Honor, I move for the admission

25  of Exhibit 8.

LAWRENCE ANYASO - DIRECT BY MR. BOONE                    77

1              THE COURT:  Any objection?

2              MS. LEDGEWOOD:  No.

3              THE COURT:  Exhibit 8 will be admitted.

4       (Whereupon, Government's Exhibit Number 8 was

5  admitted into the record.)

6  BY MR. BOONE:

7  Q.   I'm going to turn to page 2 of Exhibit 8, Agent

8  Anyaso.

9  A.   Yes.

10  Q.   What are we looking at on page 2?

11  A.   This is -- basically through the investigation

12  there's -- we have to do a lot of cross-referencing so in

13  able to get these records I have to provide certain

14  information connecting -- so that the company Windstream

15  could actually find information for us connecting them to

16  a particular person or residence.  So these are showing

17  the subscriber information regarding that.

18  Q.   What is -- what's the name identified in these

19  records?

20  A.   The subscriber name is Scott Sulik.

21  Q.   What is the service address given?

22  A.   5845 McCowans Ferry Road, Versailles, Kentucky.

23  Q.   Is there a start date given for service?

24  A.   Yes.  It's November 22nd, 2017.

25  Q.   And do you see a field where there is a phone number

1  specified and email address specified?

2  A.    Yes.

3  Q.    So it's two separate fields.  Based on your law

4  enforcement experience, did you understand that these

5  were -- this was a phone number and email address that was

6  assigned by Windstream?

7  A.    Yes.

8  Q.    And do you see a field that says alt phone?

9  A.    Yes.

10  Q.    Based on your experience what is that?

11  A.    Based on my experience generally there is the phone

12  number issued, which a lot of times is going to be the

13  home number that is issued by the company, and then

14  subscribers will give an alternate phone number.  A lot of

15  times it's going to be a cell phone, which is given so

16  that the company can contact them.

17  Q.    What is the alt phone number listed here in

18  Windstream's records?

19  A.    (480)468-6215.

20  Q.    Are you familiar with that area code?

21  A.    Based on investigation, yes.

22  Q.    What is it?

23  A.    It's Arizona area code.

24  Q.    Based on the investigation are you familiar with that

25  phone number being attributed to any particular device?

LAWRENCE ANYASO - DIRECT BY MR. BOONE                    79

1  A.    Yes.

2  Q.    What device?

3  A.    Device two.

4  Q.    And that would be the name given in Agent Thatcher's

5  examination?

6  A.    That is correct.

7  Q.    We heard some testimony about an email account.

8  A.    Yes.

9  Q.    Do you see Exhibit 17 in your binder?

10 A.    Yes.

11 Q.    What -- do you recognize it?

12 A.    I do.

13 Q.    What is it?

14 A.    This is an email -- this is a copy of an email that

15 was taken from -- well, basically there was a separate

16 search warrant done later that I did with Google, and

17 basically we requested information about the -- this

18 particular email address stealthvadertrader@gmail.com, and

19 we wanted the content of that account.  So this was one of

20 the emails provided by Google to us.

21         MR. BOONE:  Your Honor, I move for the admission

22 of Exhibit 17.

23         MS. LEDGEWOOD:  No objection.

24         THE COURT:  Any objection?  Exhibit 17 is

25 admitted.

LAWRENCE ANYASO - DIRECT BY MR. BOONE          80

 1      (Whereupon, Government's Exhibit Number 17 was

 2  admitted into the record.)

 3  BY MR. BOONE:

 4  Q.    Agent Anyaso, can you read for us the second --

 5  there's an email that is separate from the top of the

 6  page.

 7  A.    Yes.

 8  Q.    What does that say?

 9  A.    Stealth -- the email address?

10  Q.    Start with that.

11  A.    So the email is stealthvadertrader@gmail.com.

12  Q.    Okay.  What's the date?

13  A.    November 30th, 2017, at 12:17 p.m.

14  Q.    Okay.  And you're reading the header from the very

15  top of the page; right?

16  A.    Correct.

17  Q.    Now, do you see about two lines down there's a

18  sentence that begins with "this"?

19  A.    Yes.

20  Q.    Does that appear to be in a separate email?

21  A.    Yes.

22  Q.    What is the date and time of that email?

23  A.    Well, it's actually the November 30th, 2017, at

24  12:16 p.m.

25  Q.    Who is that email from?

1  A.   Based on the -- it's from the

2  stealthvadertrader@gmail.com, but in the content of the

3  email it states that this is Scott Sulik at

4  stealthvadertrader@gmail.com.

5  Q.   And there actually appears to be a misspelling;

6  correct, in --

7  A.   That is correct.

8  Q.   -- that gmail?

9  A.   Correct.

10 Q.   Would you understand that to be a correct email

11 address?

12 A.   In this particular case it would be a typo.  Anything

13 that's generally going to be in the header will be the

14 actual accurate information.  The statement is a

15 self-gen -- is a user-generated statement.

16 Q.   All right.  And like all email threads, email

17 strings, you can see the original, the reply, keep going

18 up the page see another reply to that; right?  Is there a

19 reply to the email you just read?

20 A.   Yes.

21 Q.   Who has replied to the 12:16 p.m. email from

22 stealthvadertrader@gmail.com?

23 A.   It's a new account at ampclearing.com, which is a

24 trading platform, or service.

25 Q.   Well, I'm asking --

1  A.   Oh, I'm sorry.

2  Q.   -- you about the very top email, the last one.

3  A.   Okay.

4  Q.   Who is that email from?

5  A.   Stealthvadertrader@gmail.com.

6  Q.   So this would be a reply from his own email; is that

7  right?

8  A.   No.  This would be a reply to the clearing house.

9  Q.   Okay.  Let's make sure we get on the same page.

10 There are multiple emails on this page; right?

11 A.   Right.

12 Q.   Okay.  The original email is from who?

13 A.   The original email is from the AMP Global.

14 Q.   Okay.  Now, is there a new -- a response to that

15 email at 12:16 p.m.?

16 A.   Yes.

17 Q.   Who is that email from?

18 A.   Oh, I see.  So it was -- it was the

19 stealthvadertrader@gmail.com.

20 Q.   Okay.  Now, is there another reply to that email?

21 A.   Yes.

22 Q.   And who was that reply from?

23 A.   That's from stealthvadertrader@gmail.com.

24 Q.   Okay.  So he replied to his own email; is that right?

25 A.   Well, based on the thread it appears that he is

1  actually, actually replying to the question from the

2  company.  That's based on my understanding of what's being

3  said here.

4  Q.    Okay.  Fair enough.

5        What is the -- the final word in the conversation,

6  the last email?

7  A.    It says, "No one else has access to

8  stealthvadertrader@gmail.com but myself."

9  Q.    Okay.  All right.  Agent Anyaso, did you participate

10  in the execution of a search warrant at the property that

11  we discussed?

12  A.    Yes, I did.

13  Q.    Would that be 5845 McCowans Ferry Road in Versailles?

14  A.    It is.

15  Q.    When was that search warrant executed?

16  A.    January 10, 2018.

17  Q.    Who else was present -- were any of the residents of

18  the property present when you executed the warrant?

19  A.    Yes.

20  Q.    Who?

21  A.    When -- Scott Sulik and Desiree DeVries.

22  Q.    Did you place either of them under arrest?

23  A.    Yes.

24  Q.    Did you interview either of them?

25  A.    Yes.

LAWRENCE ANYASO - DIRECT BY MR. BOONE                    84

1    Q.   Now, when you interview a suspect, how do you usually
2    begin the interview?
3    A.   If we're -- if we're placing somebody under arrest
4    and they're going to be transported somewhere, there's
5    general booking questions that we ask so that we can
6    identify the person, and so we would go through that to
7    identify them.
8    Q.   Did you record your interview?
9    A.   It was recorded.
10   Q.   Your interview of Mr. Sulik in particular?
11   A.   Yes.
12   Q.   All right.  Did you --
13          MR. BOONE:  Your Honor, at this time I'd move
14   for the admission of Exhibit 20.
15          THE COURT:  All right.
16          MR. BOONE:  Video of the interview.
17          THE COURT:  See if we have any objection.
18          MS. LEDGEWOOD:  No.
19          THE COURT:  Exhibit 20 will be admitted.
20          MR. BOONE:  Thank you.  Actually, excerpt of the
21   video.
22          THE COURT:  Yes, sir.
23       (Whereupon, Government's Exhibit Number 20 was
24   admitted into the record.)
25

1  BY MR. BOONE:

2  Q.   Can you just elaborate on what you mean by routine

3  booking questions?  What sorts of things do you ask?

4  A.   So we transport them to -- in this particular case he

5  was transported to the Versailles Police Department where

6  the recording took place.  But any facility we go to we

7  need to identify who the person is, and there's generally

8  questions like the name, their phone number, address,

9  birth date, Social Security number.  Those questions are

10 asked, and then they're later inputted into a booking

11 system.

12 Q.   Okay.  And in this case did you ask Mr. Sulik what

13 his phone number was?

14 A.   Yes.

15 Q.   Was the answer recorded?

16 A.   Yes.

17 Q.   All right.  I would like to play that.

18      (Whereupon, Government's Exhibit Number 20, the

19 video excerpt, was played in open court.)

20 BY MR. BOONE:

21 Q.   Agent Anyaso, it's kind of hard to hear.  What was

22 Mr. Sulik's reply to the questions?

23 A.   I asked him what his phone number.  He said he

24 doesn't have a phone but that his wife does, and he

25 provided his wife's cell phone number.

1           MR. BOONE:  All right.  If I may have a moment

2   to look at my notes here.

3           THE COURT:  Yes, sir.

4           MR. BOONE:  Thank you.  No further questions.

5           THE COURT:  Do you need a moment?

6           MS. LEDGEWOOD:  No.

7           THE COURT:  You ready to proceed, all right.

8   You may cross-examine the witness.

9           MS. LEDGEWOOD:  I have no questions for him.

10          THE COURT:  All right.  Thank you.  You may step

11  down.

12          Thank you.

13          Mr. Boone, at this time do you wish the Court to

14  read any stipulations to the jury that the parties have

15  agreed upon?  Would it be numbers one and two?

16          MR. BOONE:  Yes, Your Honor.

17          THE COURT:  All right.  At this time, ladies and

18  gentlemen of the jury, let me read to you certain

19  stipulations that the parties have agreed upon prior to

20  the commencement of trial.

21          They read as follows:  In order to expedite and

22  simplify the trial of this case, the parties hereby

23  stipulate and agree as follows.

24          Number one, the following United States'

25  exhibits are authentic and admitted under Federal Rules of

1   Evidence 803, subsection 6.  And they include the farm

2   lease and purchase agreement for 5845 McCowans Ferry Road,

3   Versailles, Kentucky, tentatively marked as Exhibit 6.

4          B, lease and payment records maintained by

5   Apache Well RV Resort, Mesa, Arizona, tentatively marked

6   as Exhibit 7.

7          Windstream records pertaining to file number

8   76490 tentatively marked as Exhibit 8.

9          Second stipulation reads that the following

10  United States exhibit is authentic and admissible as a

11  summary of voluminous records under Federal Rule of

12  Evidence 1006, and it would be a summary of metadata

13  from LG-K371 and Lenovo Thinkpad tentatively marked as

14  Exhibit 5.

15         When the parties stipulate, or agree, you may

16  accept their stipulation without any further proof being

17  offered on those points.

18         All right.  Mr. Boone, any additional witnesses?

19         MR. BOONE:  No, Your Honor.  I would just ask

20  the Court to take judicial notice that Woodford County is

21  in the Eastern District of Kentucky.

22         THE COURT:  All right.  I will take -- ladies

23  and gentlemen, I will also take judicial notice of the

24  fact that Woodford County is located within the

25  Eastern District of Kentucky.

1          When the Court takes judicial notice of a fact,

2   you may accept that fact as proven without any further

3   proof being offered, but you're not required to do so.

4          Thank you.

5          MR. BOONE:  United States rests, Your Honor.

6          THE COURT:  All right.  Thank you.

7          We'll take another brief recess, ladies and

8   gentlemen, before we continue this afternoon.  We'll call

9   you back just as soon as we can, but please keep in mind

10  the admonition that you were given previously.

11         Please don't discuss the case among yourselves

12  while we are in recess.

13         And, again, we'll call you back here just as

14  soon as we can.

15         Thank you.

16      (Whereupon, the juror members leave the courtroom.)

17         THE COURT:  All right.  Thank you, and please be

18  seated.

19         The United States having announced close of its

20  case-in-chief, I will take up any motions that the parties

21  wish to make at this time.

22         Ms. Ledgewood.

23         MS. LEDGEWOOD:  Thank you, Your Honor.

24         Your Honor, pursuant to Federal Rules of

25  Criminal Procedure, Rule 29(a), Mr. Sulik hereby moves for

1  a motion of acquittal, believing that the evidence is

2  insufficient to permit any reasonable juror to sustain a

3  conviction.

4           THE COURT:  All right.  All right.  Thank you.

5           When the Court considers a motion made under

6  Rule 29 of the Federal Rules of Criminal Procedure, it

7  considers the evidence in the light most favorable to the

8  party opposing the motion.

9           In the present case when we consider the

10  evidence that has been submitted, it would be sufficient

11  for a jury to return a guilty verdict.  There is

12  sufficient evidence to meet the elements that are outlined

13  and that I discussed in the preliminary jury instructions,

14  as well as those that are set forth in the draft

15  instructions that I had tendered to you earlier.

16           They include evidence of defendant knowingly

17  possessed one or more matters containing a visual

18  depiction.  The proof that has been offered would be

19  sufficient to the -- for the jury to draw that conclusion.

20           Second, that the production of the depiction

21  involved the use of a minor engaged in sexually explicit

22  conduct.  The testimony of Special Agent Thatcher would be

23  sufficient to meet that element as well.

24           As well as the third element, which is the

25  visual depiction was of a minor engaged in sexually

1    explicit conduct.

2            Fourth, that the defendant knew that the visual

3    depiction involved a minor engaged in sexually explicit

4    conduct.

5            The jury could draw that conclusion based upon

6    the information and the evidence that has been submitted,

7    including exhibits that indicate download times for the

8    various images that have been marked and introduced as

9    Exhibits 1, 3, and 4.

10            And while Exhibit Number 4 would be information

11    or depiction of child erotica and would not meet the

12    definition I described, it is admissible for the purposes

13    that the Court outlined earlier and is further evidence of

14    knowledge on behalf of the defendant.

15            Finally, that the visual depiction had been

16    transported using any means or facility of interstate

17    commerce or affecting commerce, or that the depiction was

18    produced using material that had been mailed, shipped, or

19    transported in interstate commerce by means of -- by any

20    means, including a computer.

21            The downloading images via the Internet on a

22    device such as Google Chrome would be sufficient to meet

23    this particular element.

24            And, therefore, the case will be presented to

25    the jury.

1              The motion made under Rule 29 will be -- will be

2    denied at this time.

3              And, Ms. Ledgewood, I don't know that you had

4    time to confer with Mr. Sulik about presentation of any

5    witnesses on his behalf.  Do you need a moment to do that

6    before we continue?

7              MS. LEDGEWOOD:  I don't think so, Your Honor, in

8    that he's indicated to me just a few moments ago that he

9    wishes to testify.

10             THE COURT:  All right.

11             MS. LEDGEWOOD:  He's been thinking about that

12   during the trial.  I would ask him to confirm that to

13   Your Honor and make sure that's still his intention.

14             THE COURT:  All right.  Is that correct,

15   Mr. Sulik?

16             DEFENDANT SULIK:  Yes.  Yes, Your Honor.

17             THE COURT:  All right.  Now, I do want to advise

18   you that, of course, if you do testify, then you may be

19   subject to cross-examination on matters such as prior

20   conviction in Lexington Criminal Action No. 18-19.  You're

21   aware of that?

22             DEFENDANT SULIK:  I understand.

23             THE COURT:  All right.  Thank you.

24             MS. LEDGEWOOD:  Before we bring the jury, may I

25   ask does anyone have an easy access to some Tums or

1    Rolaids?

2              THE COURT:  I can get those for you.

3              MS. LEDGEWOOD:  Could you?

4              THE COURT:  Yes, ma'am.

5              MS. LEDGEWOOD:  Thank you.  I'm sorry to ask the

6    Court that --

7              THE COURT:  No, ma'am.  That's fine.

8              MS. LEDGEWOOD:  I was hoping Mr. Boone would

9    have it.

10             THE COURT:  If you will give me just a couple

11   minutes, I will run across the hallway and get those.

12             MS. LEDGEWOOD:  That's fine.  Thank you.

13             THE COURT:  We'll take just a short recess.

14        (Whereupon, a recess was taken at 2:40 p.m., and

15   Day 1 of the Jury Trial proceedings continued at

16   2:50 p.m., on the record in open court, without the

17   juror members present, as follows.)

18             THE COURT:  All right.  Thank you.

19             Before we bring the jury in, I wanted to check,

20   Ms. Ledgewood, and see if you wanted to make an opening

21   statement.  You can waive, and you can proceed with

22   presentation of proof, but you do have that option.

23             MS. LEDGEWOOD:  Thank you, sir.  I'm going to go

24   ahead and waive opening and just proceed to Mr. Sulik's

25   testimony --

```
 1                    THE COURT:  All right.

 2                    MS. LEDGEWOOD:  -- if that's agreeable,

 3     Your Honor.

 4                    THE COURT:  Yes, ma'am, that will be fine.

 5                    We ready to go?

 6                    MR. BOONE:  Yes, Your Honor, just one question.

 7                    THE COURT:  Yes, sir.

 8                    MR. BOONE:  Agent Thatcher I would have to say

 9     is a potential rebuttal witness depending on the subjects

10     of Mr. Sulik's testimony.  He would like to sit in the

11     courtroom for that if possible.  I didn't know if as a

12     potential rebuttal witness he would continue to be

13     sequestered or not.

14                    THE COURT:  I have not invoked the rule on

15     exclusion of witnesses at this point.  If there is request

16     to do so, that he be excluded, then I would invoke the

17     rule, and he would have to remain outside.

18                    MS. LEDGEWOOD:  I wouldn't see there's a

19     problem, Your Honor, given the length of time that this

20     case has gone on, you know, since -- I have no problem.

21                    THE COURT:  All right.  Very well.  Rule 615

22     will not be invoked at this time.  He may remain in the

23     courtroom by agreement.

24                    MR. BOONE:  Thank you.

25                    THE COURT:  All right.  Any other issues we need
```

1    to take up?

2             MR. BOONE:  No, Your Honor.

3             THE COURT:  We'll bring the jury in.

4        (Whereupon, the juror members enter the courtroom.)

5             THE COURT:  Thank you, and please be seated.

6             The record will again reflect that all members

7    of the jury are present.

8             Defendant and counsel are also present in the

9    courtroom.

10            Ladies and gentlemen, the United States has

11   announced close of its case-in-chief, and we'll proceed

12   directly with presentation of proof on behalf of the

13   defendant.

14            Ms. Ledgewood, you may call your witnesses.

15            MS. LEDGEWOOD:  Thank you, Your Honor.

16            Your Honor, if I may, I would like to call

17   Scott W. Sulik to the stand.

18            THE COURT:  All right.  Thank you.

19            THE CLERK:  Please raise your right hand,

20   please.

21            Do you swear, or affirm, that the testimony

22   you're about to give in this case shall be the truth, the

23   whole truth, and nothing but the truth, as you shall swear

24   unto God, or affirm, subject to the penalty of perjury?

25            THE WITNESS:  Yes, I do.

1           THE COURT:  All right.  Thank you.

2           Ms. Ledgewood, you may proceed.

3           MS. LEDGEWOOD:  Thank you, Your Honor.

4                   SCOTT WARREN SULIK,

5  having been first duly placed under oath, was examined

6  and testified as follows:

7                   DIRECT EXAMINATION

8  BY MS. LEDGEWOOD:

9  Q.   Mr. Sulik, would you state your name, please?

10 A.   Scott Warren Sulik.

11 Q.   And would you spell those names for us, please?

12 A.   S-C-O-T-T, middle name Warren, W-A-R-R-E-N, last name

13 Sulik, S-U-L-I-K.

14 Q.   How old are you, Mr. Sulik?

15 A.   I'm 55 years of age.

16 Q.   Where were you born?

17 A.   Just right near O'Hare Airport, Park Ridge, Illinois,

18 Chicago.

19 Q.   How much education do you have?

20 A.   High school education and military encryption in the

21 military.

22 Q.   And what branch of the military did you serve in,

23 Mr. Sulik?

24 A.   Six years in the Marine Corp, honorably discharged,

25 with secret clearances.

1  Q.   And you're going to need to speak up a little bit.

2  It seems to me that your --

3  A.   My throat has been hoarse since it's dry.

4  Q.   I'm sorry.  I'm sure there's some water if you need

5  it.

6  A.   Is that better?  Oh, there.  That's better.

7  Q.   And are you married?

8  A.   Yes, I am.

9  Q.   And what is your wife's name?

10  A.   My wife -- my beautiful wife's name is

11  Desiree DeVries, and she was in the horse business her

12  whole life, and her mom was a horse trainer.  We have

13  saddlebreds.  And for anybody in the industry knows her by

14  DeVries.  That's why she kept her name, because when I

15  married her in Chicago, we don't have saddlebreds.

16  Q.   Mr. Sulik, in your post-military life, what types of

17  employment have you done, just generally?

18  A.   Private contracting.  As you know, if you Google my

19  name, I'm not on the Internet.  I've never been on

20  Facebook, never been on Twitter.  I didn't want anything

21  conflicting with any contract work I did after the

22  military.

23  Q.   And --

24  A.   That was sporadic, but I...

25  Q.   And you -- your current address is in -- well, let me

SCOTT W. SULIK - DIRECT BY MS. LEDGEWOOD          97

1   rephrase that.

2        In the year 2017, did you live in more than one

3   state?

4   A.    We -- in -- since the last housing market when the

5   derivative market tanked from the bad loans, we moved

6   because the horse -- or we were trying to keep afloat with

7   all the horses.  The horse industry got slaughtered.  We

8   moved nine times at least.  We lived in Kentucky twice,

9   Arizona three separate times, California, Nevada for a

10  year, Utah, and Colorado.  We've been all over just to

11  make it through to while things got better because we lost

12  a lot of customers.  That's the first thing with show

13  horses.

14  Q.    And you mentioned the stock market.  Just a little

15  bit, not a lot, but tell the jury, if you will, what --

16  what involvement you have with the stock market.

17  A.    Research and development of futures markets and

18  derivatives, which most people don't know, but people who

19  do -- are stockbrokers their whole life don't trade

20  futures.  Futures are the apex of Wall Street.

21        And a friend of mine who has the same background as I

22  have in the military encryption learned to write code.

23  And over the past 12 years we developed a trading system,

24  a math -- our own math that calculates constants.  We

25  identify constants in the market.

1       Like today the future's market overnight opened up at

2   2754.  Even though I haven't been able to trade for over a

3   year, because this is the first time I've worn civilian

4   clothes over a year.  But we calculated that constant in

5   November -- or October of 2017, and it was a high that the

6   S&P 500, which are the top 500 companies in the world, had

7   never seen before.  So you don't have historical data to

8   go on.  It's highly advanced now.  It only works for this.

9       And today is the first day since all this has

10  transpired from the original investigation on me for

11  defending a gold star family that was insulted by a

12  Congressman who happened to be a marine that I served with

13  who was a highly decorated general who lost their son in

14  Afghanistan.  That's why this has all transpired because

15  I'm more loyal to my Marine brothers than I am to

16  politicians.

17      But getting back to the trading, I had a two-year

18  track record with a $25,000 account, which in all my

19  discovery it's the only thing that hasn't been in my

20  discovery, and it's two years', trading the first

21  hour-and-a-half of the open in the futures market doing at

22  least 5 to 10 percent a day in the first hour-and-a-half,

23  averaging over 1,000 percent a year on profit, and that's

24  what that record shows.

25      Now, when the feds came in, they came in on a

1  six-year-old fugitive, class D warrant.  We repoed some

2  horses that were in the horse farm up in Wisconsin we

3  donated to.  And it was on the front cover of the

4  Wisconsin State Journal, and we had found out about it.

5  There was about 50 horses that were starving and dogs in

6  cages.  And the people -- since we donated them, they

7  never transferred the horses out of our name on a

8  Saddlebred registry.

9      So we went with a pair of our customers, Glen Barry

10  who owns Star Trucking, and Michelle Clasen, who owns

11  Clasen Bakery.  They're divorced now, but they were

12  married at the time.  We used to train their kids.  And

13  one of their daughter's was a triple crown rider in

14  Equitation.  That was my wife's student.  They never

15  received -- they have horses.  They donated too.  They

16  came with us.  We got the horses off this property.  They

17  weren't locked up.  We didn't break and enter.  I was

18  actually on the road with the horse trailer with the

19  horses.

20      Long story short, we ended up moving to Arizona again

21  from Wisconsin.  I lived in Wisconsin too.  I think I

22  forgot Wisconsin.

23      And because the Werrys were millionaires -- they

24  never were cited with anything, but the poor horse

25  trainers were given -- we were served with at least a

SCOTT W. SULIK - DIRECT BY MS. LEDGEWOOD          100

1  year-and-a-half later, an older gentleman in plainclothes

2  came out in a regular car --

3  Q.    Mr. Sulik --

4  A.    -- and gave us a warrant.  So that's the warrant the

5  feds came in on.  I asked three times for the warrant when

6  they came to my house.

7  Q.    Mr. Sulik, I know that this is important to you, but

8  obviously we have to keep a little bit on track here.

9  A.    All right.

10 Q.    And I, again, I'm not --

11 A.    Well, it shows bias but --

12 Q.    I understand.

13 A.    Okay.

14 Q.    I'm just trying --

15 A.    I apologize.

16 Q.    I'm just trying to help get us back on track a little

17 bit here.

18      This -- the cell phone that has been discussed, the

19 LG phone that you heard testimony about, where did -- how

20 did you acquire that phone?

21 A.    When I helped my wife out with chores, a lot of

22 times, being in a pasture or cleaning the water, the phone

23 will fall out in the water, or a horse will step on it

24 cleaning the stall.  We even forget, and the horse will

25 pick it up and start playing with it.  And when you have

SCOTT W. SULIK - DIRECT BY MS. LEDGEWOOD          101

 1  an expensive contracted phone, insurance only works so

 2  many times.  So we had prepaid phones, plus you don't have

 3  to get in arguments about high bills.  And that phone was

 4  a prepaid phone.

 5  Q.   And where -- do you remember where you purchased it,

 6  what state?

 7  A.   It would have been -- it would have been, I think,

 8  Arizona.  I think the gentleman would be corrupt in that

 9  time.  Not -- I think so.

10  Q.   Now, the images on the phone, I'm just going to

11  take you -- and I'm just going to ask some real basic

12  questions about that.  The first image that you saw --

13  A.   Uh-huh.

14  Q.   -- of the young child, where did -- have you -- were

15  you aware -- let me rephrase that.

16       Were you in knowing possession of that image?

17  A.   I certainly would not have that in my phone.

18  Q.   With the second image, the so-called child erotica,

19  were you in knowing possession of that image?

20  A.   No, I was not.

21  Q.   The third image, were you in knowing possession of

22  that image?

23  A.   I was not in knowing possession of any of those

24  images.

25  Q.   And the fourth image, the image on the Thinkpad, were

1  you in knowing possession of that image?

2  A.   I was in -- I wasn't in knowing possession of any

3  pornographic images stored in my -- we had guests.  We had

4  just moved into the horse farm.  We got there out of

5  McCowans Ferry we were leasing, and I knew many people had

6  access to the computer.  I mean -- yeah.

7       And on the phone, I knew the pictures I had there

8  were just cats and horses.  I never saw any pictures like

9  that on there.  If they were in there, they were somewhere

10 hidden in the phone.  I had no idea they were there.

11 Q.   All right.

12 A.   And that's the truth.

13          MS. LEDGEWOOD:  All right.  With that,

14 Mr. Sulik -- Your Honor, I'm going to pass the witness now

15 to the United States for cross.

16          THE COURT:  All right.  Thank you.

17          Mr. Boone.

18          MR. BOONE:  May we approach, Your Honor?

19          THE COURT:  Yes, sir, you may.  Come on up,

20 counsel.

21     (Whereupon, a bench conference was had with the

22 Court and counsel out of the hearing of the open court

23 and juror members, as follows.)

24          THE COURT:  Yes, sir, Mr. Boone.

25          MR. BOONE:  Two matters, Your Honor.  One, I

1   intend to impeach Mr. Sulik with the evidence of his prior

2   conviction for cyberstalking, and I just wanted to raise

3   that and give Ms. Ledgewood an opportunity to raise any

4   objections.  I think it would only be admissible if the

5   probative value outweighed it under 609.

6           THE COURT:  Under 403?  I'm sorry, 609,

7   character?

8           MS. LEDGEWOOD:  Well, unfortunately he raised it

9   himself --

10           THE COURT:  Yes, ma'am.

11           MS. LEDGEWOOD:  -- with regard to being

12   incarcerated for --

13           COURT REPORTER:  I'm sorry, I'm having a hard

14   time hearing you.

15           MS. LEDGEWOOD:  I'm sorry.  I'm sorry,

16   Your Honor.

17           By implication he raised it, and he talked --

18   began to talk about the facts.  I tried to get him away

19   from that consistent with Your Honor's ruling --

20           THE COURT:  Yes.

21           MS. LEDGEWOOD:  -- as much as I could.

22           THE COURT:  He did open the door, and really the

23   only relevance would be the conviction as it goes to his

24   credibility.  And I'll give the cautionary instruction

25   that I think I've included in the draft of the final jury

 1    instructions.

 2              If you ask him that question, then I will advise

 3    the jury of it's use of the prior conviction, and then the

 4    details are not relevant to the proceeding.

 5              MS. LEDGEWOOD:  Okay.

 6              THE COURT:  All right.

 7              MR. BOONE:  The second matter, but in his

 8    testimony he did put a very positive gloss on his conduct

 9    underlying that conviction, and I think that he opened the

10    door to some questions about the specific threats that he

11    made to the Congressman.

12              THE COURT:  He did open the door, and it is

13    relevant for purposes of impeachment, but very limited

14    impeachment on that particular issue.  We're not going to

15    relitigate the matter, but to the extent that he raised

16    the matter, then you may get into it briefly with him.

17              MR. BOONE:  Thank you, Your Honor.2.

18              THE COURT:  All right.

19              MS. LEDGEWOOD:  Thank you, Your Honor.

20              THE COURT:  Thank you.

21         (Whereupon, the bench conference concluded.)

22              THE COURT:  All right.  Thank you.

23              MS. LEDGEWOOD:  Mr. Boone, you may proceed.

24              MR. BOONE:  Thank you, Your Honor.

25                        CROSS-EXAMINATION

 1  BY MR. BOONE:

 2  Q.    Good afternoon, Mr. Sulik.

 3  A.    How you doing, Mr. Boone?

 4  Q.    I'm well.  How are you?

 5  A.    I've been better.

 6  Q.    I just wanted to go over some of the information that

 7  you provided.

 8        Let's talk about the cell phone first.  We talked

 9  about it as device number two in this proceeding, and you

10  testified that you had bought it as a prepaid phone;

11  correct?

12  A.    Yes.

13  Q.    And you bought it in Arizona; correct?

14  A.    Pretty sure.

15  Q.    Okay.  So you would have bought it before

16  November 2017; correct?

17  A.    Yeah.  I think so, yes.

18  Q.    You certainly were in possession of the phone by

19  December 2017; correct?

20  A.    Yes.

21  Q.    Where did you buy it?

22  A.    It would have been either Best Buy or a Walmart

23  maybe.

24  Q.    Okay.  And was it new when you bought it?

25  A.    A lot of times when you get the prepaids if they're

SCOTT W. SULIK - CROSS BY MR. BOONE                    106

1   cheaper, like $50, they're -- sometimes they have a

2   refurb.  They'll come in new package but like a

3   refurbished where they get quality control and then

4   reissued.

5   Q.    I'm sorry?

6   A.    They get -- they'll have a quality control thing on

7   them, the cheap ones for 50.  That was like a $50 phone I

8   think, or 60 bucks.

9   Q.    And it's your understanding when Best Buy or Walmart

10  or another big company like that sells you, the consumer,

11  a refurbished phone, they've already done something to --

12  A.    Correct.

13  Q.    -- wipe the memory on it; correct?

14  A.    Uh-huh.

15  Q.    They're giving --

16  A.    They're supposed to, yes.

17  Q.    They're giving you a phone that's new for your

18  purposes; correct?

19  A.    Yeah.  It just doesn't have all the bells and

20  whistles of, you know, a 700 or $600 smartphone.  Because

21  we damage a lot of phones at the barn.

22  Q.    Sure.  That's understandable.

23        Let's talk about the laptop, what we talked about as

24  device number three in this case.

25        You used that laptop; correct?

SCOTT W. SULIK - CROSS BY MR. BOONE                    107

1  A.    Yes, I've used it to do a lot of -- a lot of trading,

2  and it's got a lot of hours on it.

3  Q.    And you logged onto that laptop under -- when you

4  logon to a laptop or Windows computer, you log under a

5  user name; correct?

6  A.    Yeah.  And that one there might have been a couple

7  user names on there, but, yeah, I used a specific one.

8  But because I was trading, a lot of times it would just

9  stay on because the market it -- the system that I was

10 running, builds off of data, and when you shut it off and

11 reboot it, it takes a long time sometimes to catch up if

12 you want to get into a trade.  So I just -- unless I have

13 a large amount of money on there, which I hadn't.  You

14 know, if I leave the house, I definitely would shut it off

15 if I was trading a bigger account.

16 Q.    When you logged onto the laptop, you logged on under

17 the user name of your wife; correct, Desiree DeVries?

18 That would be --

19 A.    There was a password, but it -- I guess if that's

20 what was under the password, then that would be it, yeah.

21 Because I think she initially bought the computer, so it

22 was in her name.  I mean, when you purchase it, it's

23 generally how it works.  And that was a specific laptop

24 for trading.  So when you do look at the programs, it

25 doesn't -- even the Office was never used on that,

SCOTT W. SULIK - CROSS BY MR. BOONE                108

1    Windows Office, because Windows 7 works the best with

2    PC programs for trading to the Mercantile Exchange.  All

3    of them are PC.  They're not Apple.

4    Q.    Okay.  When did -- or how long have you had that

5    laptop?

6    A.    Pretty long time.  I was -- like I was mentioning to

7    Ms. Ledgewood, I think I changed the hard drive on it

8    once.  It doesn't have a solid state hard drive.  So --

9    but at least, I'm thinking, five years at least, six

10   years.

11   Q.    Certainly you had that laptop on August 29, 2017;

12   correct?

13   A.    Yes.

14   Q.    You would have been using it?

15   A.    Yes, sir.

16   Q.    And certainly you had that laptop in September, on

17   September 11th, 2017; correct?

18   A.    September 11th, yeah.  I do remember September 11th,

19   Benghazi.  I lost some of my friends in Benghazi, and

20   Hillary got away with murder literally and lied to the

21   families.  I definitely remember that.

22   Q.    I'm sorry to hear about your friend.

23   A.    Yeah.

24   Q.    I am.

25   A.    And then 9/11, of course, the 9/11.

SCOTT W. SULIK - CROSS BY MR. BOONE                109

1  Q.   And you certainly had that laptop in January of 2018

2  when U.S. Capitol Police agents searched your house;

3  correct?

4  A.   Yeah.  And I just wanted to clarify that those are

5  the same Capitol Police that investigated Wasserman

6  Schultz of the DNC, and the two employees she had that

7  were technicians for her who had vast security clearances

8  into our detailed military and were getting paid higher

9  than Congress gets paid and were caught sending money to

10 their families in Pakistan and India, which had ties to --

11 to Muslim extremists over there.

12      So I just wondered if that's the same Capitol Police,

13 or is this like a different Capitol Police that's

14 investigating me for this after I stood up for

15 General Kelly and stood up for the families in Benghazi.

16 I'm just wondering how it works when you serve your

17 country.

18 Q.   You had that laptop when you lived in Arizona;

19 correct?

20 A.   Yes, I did.

21 Q.   And you brought it with you to Kentucky when you

22 moved in November 2017; is that right?

23 A.   Well, it didn't walk here, yes.

24 Q.   So you brought it here?  Yes?

25 A.   It came in something packed, whether it got shipped,

SCOTT W. SULIK - CROSS BY MR. BOONE                110

1  or however.  We have been living in an RV for

2  six-and-a-half years trying to get a horse place to

3  recover after the last recession.  So that's how you know

4  you love a women.  You can live with her in an RV for

5  six-and-a-half years and three cats.

6  Q.   Mr. Sulik, you've denied knowing that any of the four

7  images, children, that we looked at today were -- that you

8  knew that they were on the phone or the laptop.  That's

9  your position; right?  You denied that?

10  A.   Yeah, I deny that because I wouldn't be able to sleep

11  at night.

12  Q.   Mr. Sulik, you have a felony conviction for

13  cyberstalking, do you not?

14  A.   Yeah.  Congressman Gutierrez, he's the one who

15  insulted General Kelly on national TV saying he was a

16  disgrace to the uniform.  I served with General Kelly

17  before he became a general, and he lost his son in

18  Afghanistan as a young Marine.  And when a politician

19  uses his political platform to insult somebody of

20  General Kelly's integrity, whether you like him or not, he

21  was there to stop the leaks at the White House after he

22  was moved from Homeland Security.  He's a great man, and

23  he -- and Marines are loyal to their -- just like I said

24  in the email, "Marines are loyal to their generals, not to

25  parasite politicians like you."  And I stand by that.

SCOTT W. SULIK - CROSS BY MR. BOONE                111

1        And -- but you can tackle the standing Senator and

2    get 30 days and break his ribs.  Mine wasn't even a

3    terroristic threat.

4    Q.    You sent Congressman Gutierrez a number of emails

5    from stealthvadertrader@gmail.com; right?

6    A.    Some of those are unsubstantiated that I sent because

7    they're not the verbiage I would use.  So I think they

8    were redacted or added to, but some of them were, and I

9    admitted the main one, so I'm saying it here.

10   Q.    You sent Congressman Gutierrez emails threatening him

11   physical harm, did you not?

12   A.    No, I did not.

13   Q.    You're denying that now?

14   A.    Physical harm in -- "at Parris Island, blood makes

15   the grass grow."  That's what every Marine chants when

16   they're running across the field with their bugle sticks

17   in boot camp.  Every single Marine that I ever know knows

18   blood makes the grass grow.  It doesn't mean that I was

19   intending on physical harm.  It could have been -- any

20   physical harm that was indicated or redacted to seem that

21   way could have been politically to his career.

22        I had to move my mom to Arizona from Chicago because

23   of the violence and the murders there.  Chicago is -- if

24   you're on Michigan Avenue, it's a great city.  But Chicago

25   is not what it was, and it's because of politicians that

SCOTT W. SULIK - CROSS BY MR. BOONE                112

1   let it slip into a drug-infested cesspool.

2   Q.   You sent Congressman Gutierrez an email specifically

3   stating "I am threatening you;" correct?

4   A.   No.   I sent him -- you know what, I don't -- I can't

5   confirm or deny off the top of my head, but I do know that

6   I did state because of the bias in the FBI, I said, "Maybe

7   you'll have Hillary's FBI Girl Scouts come and arrest me,"

8   which they were there that morning, and the 20 agents

9   storming into my house like I was public enemy number one,

10  and my wife.

11       Thankfully my father-in-law, my dad, my

12  brother-in-law are all Marines.   My father-in-law was in

13  CIA.   I was able to get my wife's extremely high bond down

14  to -- from 100,000 to 5,000 and get her out of jail.

15       So -- and just since we're on that, when I

16  countered you through my first federally appointed lawyer,

17  who I -- it's my first experience dealing with anything.

18  I didn't really have a record prior to General Kelly's

19  being disgraced on national TV.   When I countered you

20  through her, it was totally respectful.

21       Just so you know, they took me to the hole for a

22  month.   The first eight days I couldn't call anybody.   I

23  couldn't let my wife know what happened to me, nothing.

24       And the next morning she calls me, Rachel calls me,

25  and tells me she quits when I countered you, which is my

SCOTT W. SULIK - CROSS BY MR. BOONE                    113

1   constitutional right as an American, as it is all these

2   people here.  It's their constitutional right too to

3   counter you.  And I was reprimanded for it.

4       And the FBI came in, got this close to me in that

5   little room 31, started reading me my rights like I did

6   something wrong by exercising my constitutional right to

7   counter you.  Because I had it on outside authority

8   through one of my father-in-laws contacts that my

9   constitutional rights had been violated.

10      I'm not indicating it's this Court.  You're going off

11  of information you've been given.  And how that

12  information, however covert it is, is here to smear me

13  and ruin me the rest of my life.  Because I specifically

14  asked Rachel twice when Rand Paul's case was going on and

15  Dr. Beshay's case was going on, I would like to wait and

16  see what happens with that case so when he gets sentenced.

17  And she goes on two different occasions, he's under state

18  guidelines, and it's not federal.  He was prosecuted

19  federally.

20      And I was -- I -- in that time frame, I already took

21  the deal when you guys were trying to hold all the guns

22  I've ever had, which you couldn't -- there was nothing

23  ever on any gun I've ever bought or sold.  It was all on

24  the FBI form, and I was coerced into taking that four-year

25  deal with this, and I got a six-point enhancement for

SCOTT W. SULIK - CROSS BY MR. BOONE                          114

 1   being political.  There's nowhere on the Internet

 2   there's anything about me political.  In fact,

 3   Congressman Gutierrez used his political platform to be

 4   political against a gold star family who paid the ultimate

 5   sacrifice using their son so we could be afforded that

 6   First Amendment right that I got put in the hole for for a

 7   month.

 8        So I don't know how justice is when I took an oath

 9   and I solemnly swear to defend the Constitution of the

10   United States against all enemies foreign and domestic.

11   Domestic enemies doesn't mean they came from Afghanistan

12   or Canada or Mexico or Europe.  It means they're American

13   domestic enemies within our government who have a bias and

14   a division.  And everybody knows it.

15        The head of the FBI is corrupt.  I've worked on the

16   case with the FBI 15 years ago, a $500 million hedge fund.

17   I'm not going to go into details.  And when I needed their

18   help on something, it was like they slammed the door in my

19   face.  So it's all what you can do for me lately.

20        So as far as the government goes, I don't have a warm

21   fuzzy feeling about the government.  And what they've done

22   to try to destroy my life with these last charges, and

23   I've been -- but you guys, the Capitol Police, have been

24   woken up at 5:00 a.m. and drug in here waiting for the

25   next shooter drop for this day for months.

SCOTT W. SULIK - CROSS BY MR. BOONE                    115

1       I've been in jail 13 months.  I got sentenced in

2  September.

3  Q.   All right.  And, sir, I understand you feel very

4  strongly.

5  A.   Spend some time in jail.  You know my face last month

6  when you was it was from -- you get into fights.  They're

7  overcrowded, and --

8  Q.   Mr. Sulik -- Mr. Sulik --

9  A.   -- spend time in prison.

10          THE COURT:  Mr. Sulik, I'm going to ask you to

11  stop at this point --

12          THE WITNESS:  Yes, sir.

13          THE COURT:  -- and respond directly to the

14  questions that you're asked, please.

15          THE WITNESS:  I will respond.

16  BY MR. BOONE:

17  Q.   My question was simply about the email activity, the

18  threats that were made to Congressman Gutierrez.  And I

19  will just ask one more question because I'm not sure that

20  you ever answered the original one.

21      You stood in this court and you pled guilty --

22  A.   That's right.

23  Q.   -- to a felony conviction of cyberstalking as a

24  result of your emails to Congressman --

25  A.   Under wrong information from a federally-appointed

SCOTT W. SULIK - CROSS BY MR. BOONE                    116

1   lawyer that told me Rand Paul's case was state.  So I took

2   the deal because otherwise I would have thought, you know

3   what, let's just wait and see what he gets if it's federal

4   before I take this deal because I was wanting to go to

5   trial, and you know I wanted to go to trial.

6   Q.    Yes or no, you have a conviction, and you're --

7   A.    Yes, I do have a felony conviction.

8   Q.    -- serving 48 months in prison for cyberstalking

9   right now; correct?

10  A.    That's correct.

11  Q.    Okay.  Mr. Sulik, the images that you denied

12  knowingly possessing, we've looked at them, Exhibits 1

13  through 4 today.  You would agree that each of those

14  images depicts a child; correct?

15  A.    Yes.  When I was -- the first time I saw them last

16  week, I was in that -- or I call it the bird cage in there

17  with that heavy mesh.  It was very difficult to see.  I

18  think you remember you were trying to -- they were this

19  small.  And until just about an hour ago I pushed the

20  monitor down.  It was on an angle.  I saw it more.  I

21  didn't see them clearly until after, yes.  I saw those

22  images.

23  Q.    And you would agree they are children?

24  A.    Yes, I would.

25             MR. BOONE:  One moment, Your Honor.

```
 1              THE COURT:  Yes, sir.

 2              MR. BOONE:  Mr. Sulik, thank you for answering

 3   my questions.

 4              I have no further -- nothing further.

 5              THE WITNESS:  I didn't mean to be abrasive with

 6   you.  I know you're just doing your job and getting the

 7   information you were given.

 8              MR. BOONE:  And I appreciate that.

 9              THE WITNESS:  Thank you.

10              MR. BOONE:  Thank you.

11              THE COURT:  All right.  Thank you.

12              Ladies and gentlemen, let me advise you that

13   there's been cross-examination regarding a prior

14   conviction that the defendant has.  This conviction was

15   brought to your attention as a way of helping you decide

16   how believable his testimony was.  You can't use it for

17   any other purpose.  It's not evidence that he's guilty of

18   the crime for which he's on trial now.  You are so

19   instructed.

20              See if we have any redirect on matters brought

21   out on cross-examination.

22              MS. LEDGEWOOD:  No, I do not, Your Honor.

23   Thank you.

24              THE COURT:  All right.  Thank you.  Mr. Sulik,

25   you may step down.
```

1          Ms. Ledgewood, do you have additional witnesses
2    or testimony you would like to present?
3          MS. LEDGEWOOD:  No, I do not.  We will announce
4    close.
5          THE COURT:  All right.  Thank you.
6          Let's see if there's any rebuttal testimony or
7    evidence.
8          MR. BOONE:  No, Your Honor.
9          THE COURT:  All right.  Thank you.
10          Both sides have announced closed.
11          Ladies and gentlemen, I'm going to confer with
12    counsel.  I need to talk with them about jury instructions
13    and see where we stand on that.
14          I don't know if you want to try to finish up
15    this afternoon.  If you do, give me a big smile.  If you
16    don't, a frown.
17          Okay.  We have one person that's not decided it
18    looks like.
19          I'm going to excuse you right now to go back
20    into your deliberation room.  I will confer with counsel,
21    and we'll bring you back out here in just a moment.
22          If we proceed this afternoon, I'll need to
23    finish up the jury instructions, so it may take a little
24    bit longer.  And if so, then I'll send you a note to that
25    effect as well.

1              The jury will be excused at this time.

2              Please keep in mind the admonition that you were

3  given previously.

4        (Whereupon, the juror members leave the courtroom.

5              THE COURT:  Please be seated.

6              I was just informed that apparently the building

7  will have the water shut off at 5 o'clock this afternoon.

8  And so I would not be keeping the jury here without rest

9  rooms at 5 o'clock.  So that may help us make our decision

10  in terms of how we're going to proceed.

11              It's nearly 3:30 now.  We have about an

12  hour-and-a-half.  We can have our instructions conference,

13  or I can go ahead and send the jury home, and we can bring

14  them back tomorrow.  We can still have our instructions

15  conference, and then we can begin with the jury first

16  thing in the morning if that's your pleasure.

17              I hate to rush the jury, rush the instructions,

18  because we will need to finalize and make copies of these,

19  and it takes longer than anticipated to do that.

20              Parties in agreement with --

21              MR. BOONE:  We're fine with that.  For what it's

22  worth, I don't anticipate my closing to take very long.

23              THE COURT:  All right.  Ms. Ledgewood?

24              MS. LEDGEWOOD:  No, mine won't take very long

25  either.  That part about the rest rooms shutting down got

 1  my attention.

 2          THE COURT:  Well, it will get the jury's

 3  attention too.  I wished I had known.

 4          Well, think there's problems in the marshal's

 5  hold up as well, so it would affect, I think, quite a few

 6  folks here.

 7          I will bring the jury back in.  I'm going to

 8  bring them back at 9 o'clock tomorrow morning, and we'll

 9  proceed at that time.

10          I'll give the -- I'm going to give the

11  instructions first in this case, and then we'll have

12  closing arguments after that.

13          But we can discuss the instructions, and then we

14  can discuss how much time you would like for your closing,

15  and I will be able to get a copy of the instructions to

16  you tonight before 5 o'clock.

17          And we'll proceed in that manner.

18          MS. LEDGEWOOD:  I wonder if I should renew my

19  Rule 29 motion at this time, Your Honor --

20          THE COURT:  Yes, ma'am.

21          MS. LEDGEWOOD:  -- as previously stated.

22          THE COURT:  Yes.  And the Court's ruling would

23  be the same.  The Court does consider a revise -- or a

24  renewed motion under Rule 29 after the close of all the

25  proof in the case.

 1              The testimony of the defendant would not alter

 2      the fact that the United States has presented sufficient

 3      evidence to present the one count to the jury,

 4      notwithstanding his denial of knowing that these images

 5      were on a phone that he possessed, or that there is

 6      evidence that he possessed.  So the Court's ruling would

 7      be the same.

 8              And then the final matter I do want to mention

 9      to you would be forfeiture issue.  So we talked about that

10      briefly today, but we can discuss that in more detail

11      after I send the jury back -- or send the jury home.

12              All right.  Let's go ahead and bring the jury

13      back out.

14          (Whereupon, the juror members enter the courtroom.)

15              THE COURT:  Thank you, and please be seated.

16              The -- all members of the jury are present.

17              The defendant and counsel are also present in

18      the courtroom.

19              Just as you were leaving I was told that

20      apparently the building manager will be turning the water

21      off in the building at 5 o'clock this afternoon, and I

22      don't want to keep you here without water or rest rooms

23      available.

24              So what we will do is we will recess here in

25      just a moment for the evening, and I'll ask you to come

1  back tomorrow at 9 o'clock, and we will continue at that

2  time with the instructions.  I'll give you the final

3  instructions, and then we'll proceed with the closing

4  arguments, and then you'll be able to begin your

5  deliberations, hopefully with water.

6        I apologize to you but, again, I don't want to

7  keep you here with the chances that we'll be here after

8  5 o'clock, and you won't have rest rooms available for

9  you.  So I know we would all like to complete the case

10  if we can, but I want to give you plenty of time to do

11  that.

12        Now, when you leave tonight, you can leave your

13  notebooks in your chair.  We'll take those up, and we'll

14  put those back in the jury room for you.  So you can leave

15  those here.

16        If you have any coats or anything else that you

17  left back in the deliberation room, you can pick those up

18  before you leave as well.

19        I do want to again remind you of the admonition

20  that I have given you a couple of times in the case.

21        And as you know, of course, when we are in

22  recess, you should not talk with -- talk with anyone about

23  this case, and you shouldn't allow anyone to approach you

24  to discuss the matter.

25        If anyone should do that, you know that you're

1   to contact the Court through the security officer and

2   advise me of that.

3           So, again, don't speak with the parties, the

4   attorneys, or any witnesses in the case.

5           Don't read, watch, or listen to any accounts of

6   the case if there should be any.

7           Don't do any type of research or investigation

8   on your own.

9           Don't communicate through social media either

10  your position as a juror or anything about this case.

11  Just don't go to social media to discuss the case directly

12  or indirectly or to indicate that you're a juror in the

13  case.

14          And, of course, please don't make up your mind

15  about the case until it is finally submitted to you.

16          You have heard all of the proof that will be

17  submitted, but you have not heard the instructions, and I

18  do want to instruct on the law in this case, and the

19  attorneys will be making their closing arguments for you.

20  And so it's not time for you to begin your deliberations.

21          When you go home, I'm sure that you'll have

22  family members, a spouse perhaps, or maybe a child that

23  will ask you what you've been doing in federal court.  And

24  your response should be we can talk about the case when

25  it's over, but I can't talk about it until then because I

 1   don't want to be called in by the Judge and asked if I

 2   discussed the case, and I'll have to answer him

 3   truthfully, and that could affect the outcome of the case.

 4   So please don't do that.  So please don't discuss the

 5   case.  After it's over, I'll lift the admonition, and you

 6   can discuss the case if that's your choice.  But until

 7   then, of course, please don't do that.

 8            Again, you can leave your badges, and you can

 9   also leave your notebooks.  If you would, you may want to

10   write your juror number on the outside of your notebook so

11   you'll know which one -- which one you own when you come

12   back in tomorrow morning.

13            All right.  Again, I'm sorry that I'm having to

14   recess a little bit early, but we'll see you back tomorrow

15   at 9 o'clock.

16            And when you come back at 9:00, the security

17   officer will be able to bring you back into the

18   deliberation room, and hopefully we'll have some breakfast

19   items for you back there, and hopefully some water as

20   well.

21            All right.  The jury will be in recess at this

22   time.

23            Thank you.

24      (Whereupon, the juror members leave the courtroom.)

25            THE COURT:  All right.  Thank you, and please be

1   seated.

2           At this time we'll have our instructions

3   conference.

4           I had provided a copy of draft jury instructions

5   to the parties before the beginning of trial.  Actually,

6   yesterday.  I do want to go through the draft that I have,

7   and what I will do is I'll go through those highlighted

8   portions in the draft, and then I'll take up any other

9   issues that the parties would like to raise, and then

10  we'll also hopefully discuss the forfeiture claim in the

11  case.

12          On the first page I would take out the word

13  "draft" from the caption.  The page numbers may change on

14  the table of contents depending upon the changes that are

15  made to the body of the instructions.

16          And also it's my practice to remove the citation

17  to the pattern instruction numbers at the bottom, and so

18  the final draft that you will receive, hopefully this

19  evening, will have those citations removed.

20          The first highlighted portion appears at page 7

21  of your draft, and it would be paragraph 4.  And while I

22  anticipated that there would be objections, I don't

23  believe that there were any, and so I would take out

24  paragraph 4 if the parties are in agreement with that.

25  I'll give you a chance to look over it again.

```
 1                    MR. BOONE:  I agree.

 2                    MS. LEDGEWOOD:  As do I, Your Honor.

 3                    THE COURT:  All right.  I would take out

 4   instruction number 9.  This will change the instruction

 5   numbers, which is on page 14, dealing with lawyers'

 6   objections.

 7                    MR. BOONE:  Agreed.

 8                    MS. LEDGEWOOD:  Agreed, sir.

 9                    THE COURT:  All right.  On page 23, which is

10   instruction number 15, it will become 14.  I would use the

11   instruction that's at the bottom of the page inasmuch as

12   the defendant testified.

13                    And then instruction number 17, on page 25, is

14   the cautionary instruction that I just gave the jury with

15   regard to the use of -- I'm sorry.  This is the

16   instruction I had given with regard to photo number two,

17   the other acts evidence, 404(b) evidence.  And it --

18   again, it's essentially the cautionary instruction I had

19   given the jury during the trial.

20                    Let's see.  Instruction number 18, impeachment

21   by prior conviction, this is the cautionary instruction

22   that I had given the jury following the defendant's

23   testimony, and I would -- I would leave that in.  I would

24   obviously take out the highlighting but leave that in.

25                    Take out the highlighting on instruction
```

1  number 19, which is on judicial notice.

2          And then on the stipulations, unless the parties

3  want me to use the same language from the stipulation, I

4  would essentially say, "The government and the defendant

5  have agreed, or stipulated, to certain facts.  You may

6  accept those stipulated facts as proven without any

7  further proof being offered."

8          MR. BOONE:  It's not necessary to read the

9  stipulation again.

10          THE COURT:  In agreement?

11          MS. LEDGEWOOD:  I agree, Your Honor.

12          THE COURT:  All right.  "The government and the

13  defendant have agreed, or stipulated, to certain facts.

14  You must accept those facts stipulated as proven -- or

15  proved."

16          All right.  We have discussed the modified

17  verdict form earlier to include the special interrogatory

18  on age.

19          Now, let's see if the parties have any

20  additional instructions that they'd like the Court to

21  consider at this time.

22          Mr. Boone, are you aware of anything else?

23          MR. BOONE:  No, Your Honor.

24          THE COURT:  Ms. Ledgewood, anything else?

25          MS. LEDGEWOOD:  No, sir.

1            THE COURT:  All right.  I'll finalize this

2   draft and give these to you tonight.  It probably will

3   take 20 minutes to make those changes and then make the

4   copies for you.

5            And then I will also have copies -- we'll make

6   copies for the jurors tomorrow in case they want to use a

7   copy when they go back; inasmuch, as we do have some

8   definitions, and they may want to look at those

9   definitions.  So we'll have a copy for the jury.

10           I typically will only attach the jury form to

11  the instructions I read from.  Then I'll send that back to

12  the jury as well.  So there would only be one verdict

13  form, but they'll all have the instructions that will be

14  given.

15           And I will instruct first as I indicated, and

16  then the parties will have the time -- the time that they

17  would request for their closing.

18           Mr. Boone, how much time do you feel like you

19  need?

20           MR. BOONE:  No more than 15 for principal

21  closing.

22           THE COURT:  15 and five?

23           MR. BOONE:  Yes.

24           THE COURT:  All right.  Ms. Ledgewood, 20

25  sufficient?

1            MS. LEDGEWOOD:  20 minutes at most, but I'm

2 expecting no more than 15 myself, Your Honor.

3            THE COURT:  All right.  I typically will give

4 you the total amount of time I give the government since

5 they're allowed to reserve.  So I'll give you 20.  Of

6 course, you don't have to use it, but you'll each have a

7 total of 20.

8            And, Mr. Boone, I'll advise you when your time

9 is about up on your first 15 if you're not finished at

10 that point.  If you are finished, then you can reserve the

11 balance of your time.

12            MR. BOONE:  Thank you.

13            THE COURT:  All right.  Forfeiture, where do we

14 stand on that?

15            MR. BOONE:  Well, I -- our position is that if

16 the jury returns a verdict of guilty on the sole count,

17 then there should be a preliminary order of forfeiture

18 affecting Mr. Sulik's interest in the items listed in the

19 indictment, which would be the smartphone, the laptop, and

20 any peripherals and software contained on or associated

21 with them.  And, of course, that preliminary order would

22 not affect the third party's interest.

23            THE COURT:  Right.  They can make a claim for

24 those items, but it would affect the defendant's ability

25 to make a claim against those items.

1          Parties in agreement with that?

2          MS. LEDGEWOOD:  Yes.  I think that he -- you

3   would agree to the forfeiture; right?  You know if you're

4   convicted, unfortunately, you won't have a right to get

5   that back.

6          DEFENDANT SULIK:  I already did when they had

7   the other case.

8          MS. LEDGEWOOD:  Well, Mr. Boone thinks not, but

9   you don't expect to get the things back, do you?

10          DEFENDANT SULIK:  No.  My life will be over so,

11  yeah.

12          THE COURT:  All right.  I just wanted to make

13  sure we tied up any loose ends.

14          MS. LEDGEWOOD:  Yes, Your Honor.

15          THE COURT:  So it doesn't appear that there's a

16  dispute on that point.

17          And hopefully we'll be able to get realtime

18  running tomorrow.  I was -- there was like some

19  conversations I was trying to follow, and I had a hard

20  time doing that today.  Your realtime is not working.

21          MS. LEDGEWOOD:  Your Honor, one more thing.

22  Would this be agreeable with Your Honor if I left most of

23  my stuff here in the courtroom tonight?  I would prefer

24  not to have to drag it all back.

25          THE COURT:  Yes, ma'am.  We'll be locking the

1  courtroom here, and we'll be the first ones in tomorrow

2  morning.

3        MS. LEDGEWOOD:  All right.  Thank you, sir.

4        THE COURT:  So it will be safe if you want to

5  leave that.  But, again, I do want to give you these

6  instructions before you do leave so you will have those to

7  look at tonight.

8        Exhibits and then the indictment.  I'm not going

9  to send the indictment back to the jury in this particular

10 case.

11       Do we have hard copies of Exhibits 1 through 4

12 that will be sent back, or will the only way for the jury

13 to review those would be on a device?

14       MR. BOONE:  If it's the Court's preference, we

15 can print off hard copies tonight, but currently we only

16 have them on disk.

17       THE COURT:  All right.  The jury may want to --

18 because we're defining what some of these matters would

19 be, the jury may need to be able to look at those to see

20 if it meets the definition.

21       MR. BOONE:  I'll bring a sealed envelope with

22 hard copies, just one copy of each.

23       THE COURT:  If you will do that, and make sure

24 Ms. Ledgewood has a chance to look at those.  And if the

25 parties are in agreement, then we can allow that sealed

1   envelope to go back to the jury.  And if the jury then

2   wants to look at those images, we wouldn't need to bring

3   them back into the courtroom to do that.  So we'll be able

4   to send all of the exhibits back.  If there's a problem

5   with doing that, if you would prefer to do it some other

6   way, just alert me in the morning --

7          MR. BOONE:  Very well.

8          THE COURT:  -- before we proceed.  The jury is

9   coming in at 9 o'clock, so if you would be available.  If

10  you have any issues with the jury instructions, alert me

11  so we can take those up before we start at 9 o'clock.  Or

12  if you have any issues about the Exhibits 1 through 4, we

13  can take that up before we start.  But, otherwise, when

14  the jury comes in, we'll bring them back, and let them

15  come back into the jury deliberation room.  Then we'll

16  plan to start at 9 o'clock.

17         Have I forgotten anything?  Have we covered it

18  all?

19         MR. BOONE:  I think we hit it all, Your Honor.

20         THE COURT:  Ms. Ledgewood, anything else?

21         MS. LEDGEWOOD:  No.  I'm still obsessing about

22  no bathrooms.  Thank you, Your Honor, for letting us know

23  that.  That could have been bad.

24         THE COURT:  Now, don't blame me.  I'm not going

25  to tell you who to blame, but don't blame me for it.

1           MS. LEDGEWOOD:  Okay.

2           THE COURT:  The bearer of bad tidings.

3  Hopefully it will be remedied tonight, and there won't be

4  a problem tomorrow.  But I think it's not until -- we

5  still have about an hour and 15 minutes before that

6  happens.

7           MS. LEDGEWOOD:  Thank you, sir.

8           THE COURT:  Okay.  I'll send you these final

9  instructions here in just a few moments hopefully, but

10  we'll be in recess otherwise until 9:00 a.m. tomorrow

11  morning, unless you have something to bring up before.

12           MR. BOONE:  Thank you.

13           THE COURT:  Thank you.

14      (Whereupon, Day 1 of the Jury Trial proceedings

15  adjourned for the evening at 3:50 p.m.)

16               C E R T I F I C A T E

17      I, Peggy W. Weber, certify that the foregoing is a

18  correct transcript from the record of proceedings in the

19  above-entitled matter.

20

21
   May 15, 2019_____        s/Peggy W. Weber_____
22      DATE                         PEGGY W. WEBER, RPR

23

24

25

1                        **W I T N E S S E S**

2                                                                Pages

3    PROOF ON BEHALF OF THE GOVERNMENT:

4    Testimony of HUGH THATCHER
            Direct Examination by Mr. Boone                       3
5           Cross-Examination by Ms. Ledgewood                   57
            Redirect Examination by Mr. Boone                    63
6
     Testimony of LAWRENCE ANYASO
7           Direct Examination by Mr. Boone                      67

8
     PROOF ON BEHALF OF THE DEFENDANT:
9
     Testimony of DEFENDANT SCOTT W. SULIK
10          Direct Examination by Ms. Ledgewood                  95
            Cross-Examination by Mr. Boone                      104
11
     Certificate of Reporter                                    133
12   Index of Witnesses                                         134
     Index of Exhibits                                          135

13

14

15

16

17

18

19

20

21

22

23

24

25

|  | **E X H I B I T S** | |
|---|---|---|
| | | <u>Pages</u> |
| | | <u>Admitted</u> |

<u>GOVERNMENT'S EXHIBITS:</u>

| | | |
|---|---|---|
| No. 1 | Visual depiction of minor child from LG-K371 | 50 |
| No. 1A | Enlarged copy of visual depiction of minor child from LG-K371 | 50 |
| No. 1B | Enlarged copy of visual depiction of minor child from LG-K371 | 50 |
| No. 1C | Enlarged copy of visual depiction of minor child from LG-K371 | 50 |
| No. 1D | Enlarged copy of visual depiction of minor child from LG-K371 | 50 |
| No. 2 | Visual depiction of minor child from LG-K371 | 50 |
| No. 3 | Visual depiction of minor child from LG-K371 | 50 |
| No. 4 | Visual depiction of minor child from Lenovo Thinkpad | 50 |
| No. 5 | Metadata summary of LG-K371 phone and Lenovo Thinkpad | 36 |
| No. 6 | Farm lease and purchase agreement for 5845 McCowans Ferry Road | 75 |
| No. 7 | Apache Wells RV Resort Records | 71 |
| No. 8 | Records regarding Windstream, file number 76490 | 77 |
| No. 9A | Photo of entry of Sulik residence | 10 |
| No. 9B | Photo of computer work station at Sulik residence | 10 |
| No. 9C | Photo of master bedroom at Sulik residence | 10 |

1   **E X H I B I T S**

2                                                                                Pages

3                                                                                Admitted

4   GOVERNMENT'S EXHIBITS:

5   No. 9D   Photo of computer work station
             at Sulik residence                                                  10
6
    No. 9E   Photo of device three - laptop                                      10
7
    No. 9F   Photo of bottom of device three - laptop                           10
8
    No. 9G   Photo of device one - cell phone                                    10
9
    No. 9H   Photo of back of device one - cell phone                           10
10
    No. 9I   Photo of device two - cell phone                                    10
11
    No. 17   Email from stealthvadertrader@gmail.com
12           to new accounts dated 11/30/17                                      80

13  No. 19   Photo of Sulik's Wells Fargo Visa card                              26

14  No. 20   Video clip of Sulik's police interview                             84

15  No. 22   Screenshot of photo of Sulik
             found on his wife's phone                                          69
16
    No. 23   Email from stealthvadertrader@gmail.com
17           dated 09/28/17                                                      21

18  No. 24   Email from stealthvadertrader@gmail.com
             dated 10/11/17                                                      22
19
    No. 25   Screenshot from device three -
20           day trader program                                                  23

21

22

23

24

25